Appeal No. 2015-1436

# United States Court of Appeals

*for the*

# Federal Circuit

PROVERIS SCIENTIFIC CORPORATION,

*Appellant,*

– v. –

INNOVASYSTEMS, INC.,

*Appellee.*

APPEAL FROM THE UNITED STATES PATENT AND TRADEMARK OFFICE,
PATENT TRIAL AND APPEAL BOARD NO. 95/001,578

## BRIEF FOR APPELLANT

BARRY J. SCHINDLER, ESQ.
LENNIE A. BERSH, ESQ.
GREENBERG TRAURIG, LLP
200 Park Avenue
P.O. Box 677
Florham Park, New Jersey 07932
(973) 360-7900

– and –

SUSAN HANMER FARINA, ESQ.
PROVERIS SCIENTIFIC CORPORATION
290 Donald Lynch Boulevard, Suite 100
Marlborough, Massachusetts 01752
(508) 460-8822

ORIGINALLY FILED: MAY 11, 2105     *Attorneys for Appellant*
CORRECTED: MAY 15, 2015

**Form 9**

FORM 9.   Certificate of Interest

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Proveris Scientific Corporation ___ v. InnovaSystems, Inc. ___

No. 15-1436 ___

# CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party)

Proveris Scientific Corporation certifies the following (use "None" if applicable; use extra sheets if necessary):

1.      The full name of every party or amicus represented by me is:

Proveris Scientific Corporation

___

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

Proveris Scientific Corporation

___

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

None

___

4.   ☐   The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Barry Schindler, Lennie Bersh (Greenberg Traurig, LLP, 200 Park Ave, Florham Park, NJ 07932); Susan H. Farina (Proveris Scientific Corp., 290 Donald Lynch Blvd., Ste 100, Marlborough, MA 01752)

___

| 5/11/2015 | /s/Barry J. Schindler/ |
|-----------|------------------------|
| Date | Signature of counsel |
| | Barry J. Schindler |
| | Printed name of counsel |

Please Note: All questions must be answered
cc: David Kenealy, Esq. ___

124

# TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................................i

TABLE OF AUTHORITIES ........................................................................iv

STATEMENT OF RELATED CASES ...................................................... vii

JURISDICTIONAL STATEMENT ...........................................................1

STATEMENT OF THE ISSUES..................................................................2

STATEMENT OF THE CASE......................................................................2

    The Object of the Invention .................................................................2

    Embodiments of the Invention..............................................................6

    The Challenged Claims.......................................................................10

    Innova's Contempt Defense.................................................................13

    The Inter Partes Reexamination.........................................................14

    The Appeal to the Board .....................................................................21

    The Board's Decision .........................................................................27

        The Board's Claim Construction ...........................................27

        The Board's Anticipation and Obviousness Analysis ..........30

    The Request for Rehearing .................................................................31

SUMMARY OF THE ARGUMENT ......................................................33

ARGUMENT ...........................................................................................35

I.    STANDARD OF REVIEW .............................................................35

II.   THE COURT SHOULD REVERSE THE BOARD'S CONSTRUCTION OF THE '400 PATENT'S CLAIM 3..............................39

    A.    The Board Erred By Not Incorporating Limitations From The Preamble Into Its Claim Construction.................................40

B.    The Court Should Reverse the Board's Construction of the Limitation "an illuminator for providing an illumination of the spray plume along at least one geometric plane that intersects the spray plume." ................................................................................41

    1.    The Board's construction is inconsistent with the embodiment claimed in the preamble. ......................................41

    2.    The Board's construction of "an illuminator for providing an illumination" is inconsistent with the broadest reasonable interpretation in view of the specification................42

    3.    The Board's construction of "along at least one geometric plane" is inconsistent with the broadest reasonable interpretation in view of the specification...................................43

    4.    The Board's construction of "spray plume" is inconsistent with the broadest reasonable interpretation in view of the specification.................................................................................46

III.  THE COURT SHOULD REVERSE THE BOARD'S DECISIONS AFFIRMING THE EXAMINER'S REJECTIONS OF CLAIMS 3-13 AND NEW CLAIMS 14 AND 15 OF THE '400 PATENT AS ANTICIPATED AND/OR OBVIOUS. ........................................................48

    A.    Claims 3-4, 6-8, and 13-15 Are Not Anticipated By The Cited References. ...........................................................................48

    B.    Claims 5 and 9-15 Are Patentable Over The Cited Prior Art Combinations. ......................................................................52

        1.    Neither the Board nor the examiner made sufficient factual findings for a proper obviousness analysis. ...................54

        2.    Claims 5 and 13 are patentable over the combination of Deljouravesh and the '233 patent................................................55

        3.    Claim 9 is patentable over the cited combinations.....................55

        4.    Claims 10 and 11 are patentable over Dolovich, and Claim 12 is patentable over combinations of Settles and Dolovich. ....................................................................................56

5.    Claims 14 and 15 are patentable over the cited references. .......57

CONCLUSION ...................................................................................................59

ADDENDUM

U.S. Patent No. 6,785,400 B1 .............................................................. AD 001

Patent Trial & Appeal Board's April 27, 2012 Right of Appeal
Notice ................................................................................................. AD 009

US Patent & Trademark Office, Patent Trial and Appeal Board,
January 31, 2014 Decision on Appeal ................................................. AD 061

US Patent & Trademark Office, Patent Trial and Appeal Board,
November 26, 2014 Decision on Rehearing ....................................... AD 089

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME
LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE
STYLE REQUIREMENTS

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re: 55 Brake LLC*,
No. 2014-1554, 2015 WL 1610170 (Fed. Cir. Apr. 13, 2015) .........................44

*In re Abbott Diabetes Care Inc.*,
696 F.3d 1142 (Fed. Cir. 2012) ...................................................................35, 44

*ACTV, Inc. v. Walt Disney Co.*,
346 F.3d 1082 (Fed. Cir. 2003) .......................................................36, 39, 40, 41

*Baldwin. Graphic Sys., Inc. v. Siebert, Inc.*,
512 F.3d 1338 (Fed. Cir. 2008) .........................................................................43

*Bicon, Inc. v. Straumann Co.*,
441 F.3d 945 (Fed. Cir. 2006) ....................................................................36, 41

*C.W. Zumbiel Co. v. Kappos*,
702 F.3d 1371 (Fed. Cir. 2012) .........................................................................52

*Cadence Pharma. Inc. v. Exela PharmSci Inc.*,
780 F.3d 1364 (Fed. Cir. 2015) ...................................................................35, 45

*Finisar Corp. v. DirecTV Group, Inc.*,
523 F.3d 1323 (Fed. Cir. 2008) .........................................................................38

*Flo Healthcare Solutions LLC v. Kappos*,
697 F.3d 1367 (Fed. Cir. 2012) .........................................................................47

*Gechter v. Davidson*,
116 F.3d 1454 (Fed. Cir. 1997) ...................................................................48, 49

*Graham v. John Deere Co. of Kansas City*,
383 U.S. 1, 86 S. Ct. 684, 15 L.Ed.2d 545 (1966) ...........................................52

*In re Gurley*,
27 F.3d 551 (Fed. Cir. 1994) .............................................................................53

*Hockerson-Halberstadt, Inc. v. Converse Inc.*,
183 F.3d 1369 (Fed. Cir. 1999) ..................................................................*passim*

iv

*Howmedica Osteonics Corp. v. Wright Med. Tech., Inc.*,
   540 F.3d 1337 (Fed. Cir. 2008) ........................................................43

*In re Imes*,
   778 F.3d 1250 (Fed. Cir. 2015) ......................................35, 38, 39, 45

*In re Kahn*,
   441 F.3d 977 (Fed. Cir. 2006) .........................................................52

*KSR Int'l Co. v. Teleflex Inc.*,
   550 U.S. 398, 127 S. Ct. 1727, 167 L. Ed. 2d 705 (2007) ................52

*Markman v. Westview Instruments, Inc.*,
   52 F.3d 967 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370, 116
   S. Ct. 1384, 135 L. Ed. 2d 577 (1996).............................................38

*In re Morris*,
   127 F.3d 1048 (Fed. Cir. 1997) .......................................................36

*Pacing Technologies, LLC v. Garmin International, Inc.*,
   778 F.3d 1021 (Fed. Cir. 2015) ......................................36, 37, 38, 43

*In re Papst Licensing Digital Camera Patent Litigation*,
   778 F.3d 1255 (Fed. Cir. 2015) .......................................................35

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) ............................................35, 36, 38

*Proveris Scientific Corp. v. Innovasystems, Inc.*,
   536 F.3d 1256 (Fed. Cir. 2008) .......................................................13

*Proveris Scientific Corp. v. Innovasystems, Inc.*,
   739 F.3d 1367 (Fed. Cir. 2014) ................................................*passim*

*SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*,
   242 F.3d 137 (Fed. Cir. 2001) .........................................................37

*Scripps Clinic & Res. Found. v. Genentech, Inc.*,
   927 F.2d 1565 (Fed. Cir. 1991) .......................................................38

*Takeda Chem. Indus., Ltd. v. Alphapharm Pty., Ltd.*,
   492 F.3d 1350 (Fed. Cir. 2007) .......................................................52

v

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*,
    574 U.S. __, 135 S. Ct. 831 (2015) ...................................................................35

*In re Trans Texas Holdings Corp.*,
    498 F.3d 1290 (Fed. Cir. 2007) ...........................................................................36

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996) .............................................................36, 37, 38

*World Class Tech. Corp. v. Ormco Corp.*,
    769 F.3d 1120 (Fed. Cir. 2014) ...........................................................................37

**Statutes**

28 U.S.C. § 1295 ..............................................................................................................1

35 U.S.C. § 102 .......................................................................................................20, 47

35 U.S.C. § 103 .......................................................................................................20, 47

35 U.S.C. § 302 ..............................................................................................................1

35 U.S.C. § 307 ..............................................................................................................1

35 U.S.C. §§ 311-319 ...................................................................................................1

35 U.S.C. §§ 321-329 ...................................................................................................1

## STATEMENT OF RELATED CASES

Pursuant to Rule 47.5 of the FEDERAL CIRCUIT RULES, Proveris provides the following list of related cases:

(a)    The following opinions issued in appeals from decisions of the United States District Court for the District of Massachusetts ("district court"), Civil Action No. 05-CV-12424, before the Honorable William G. Young (transferred to on Feb. 11, 2014, and stayed by on April 17, 2014, the Honorable Richard G. Stearns):

*Proveris Scientific Corporation v. Innovasystems, Inc.*, No. 2007-1428, 536 F.3d 1256 (Aug. 5, 2008), before Circuit Judges Schall, Bryson, and Gajarsa (affirming permanent injunction against InnovaSystems, Inc. ("Innova") for admittedly infringing claims 3-10 and 13 of U.S. Patent No. 6,785,400 (the "'400 patent") and affirming Innova's failure to prove invalidity);

*Proveris Scientific Corporation v. Innovasystems, Inc.*, No. 2011-1043, 423 Fed.Appx. 982 (May 27, 2011) (unpublished), before Circuit Judges Gajarsa, Mayer, and Prost (granting Proveris Scientific Corporation's ("Proveris") motion to dismiss appeal of contempt ruling against Innova as premature because sanctions had not yet been determined); and

*Proveris Scientific Corporation v. Innovasystems, Inc.*, Nos. 2013-1166, 2013-1190, 739 F.3d 1367 (Jan. 13, 2014), before Circuit Judges Lourie, Schall, and Prost (determining that contempt proceeding was appropriate

because no colorable differences exist between admittedly infringing product and supposedly modified product found to be functionally identical to the original product; ruling the preamble to claim 3 to be limiting and, therefore, vacating the ruling of contempt and sanctions against Innova, and remanding to the district court for construction of the preamble and a re-assessment of infringement for contempt).

(b)    The following pending cases will be directly affected by the Court's decision in this appeal:

*Proveris Scientific Corporation v. InnovaSystems, Inc.*, Civil Action No. 05-CV-12424-RGS, before the Honorable Richard G. Stearns (remanded contempt action currently stayed and administratively closed pending the outcome of the reexamination at issue in this appeal); and

*In re InnovaSystems, Inc.*, No. 11-36228-ABA, United States Bankruptcy Court for the District of New Jersey (Camden) (Chapter 11), before the Honorable Andrew B. Altenburg, Jr. (the amount of contempt sanctions that may (again) be entered against Innova provide Proveris with a contingent, unliquidated claim in Innova's bankruptcy case.

# **JURISDICTIONAL STATEMENT**

Pursuant to 35 U.S.C. §§ 302-307 (as in effect on March 18, 2011)[1], the United States Patent and Trademark Office ("PTO") had jurisdiction over the underlying inter partes reexamination ("IPR") proceeding initiated by third-party requester / appellee Innova against patent owner / appellant Proveris's '400 patent.

This Court has exclusive jurisdiction over Proveris's appeal from the decision of the PTO's Patent Trial and Appeal Board ("Board") pursuant to 28 U.S.C. § 1295(a)(4)(A).

This appeal is from a final decision by the Patent Trial and Appeal Board of the Unites States Patent and Trademark Office.

The Notice of Appeal was filed timely on January 16, 2015.

---

[1]  With the America Invents Act, the inter partes reexamination process changed into two new processes implemented through 35 U.S.C. §§ 311-319 for inter partes review, and 35 U.S.C. §§ 321-329 for post-grant review.  While the process by which this appeal has reached the Court may no longer be available in the form available in March 2011 when Innova initiated it, the statutory modification has no impact on the Court's review of the issues presented.

1

## STATEMENT OF THE ISSUES

1.     Did the Board err by affirming a construction of the '400 patent's claim 3 that is inconsistent with the broadest reasonable interpretation of the claim in view of the specification?

2.     Did the Board err by affirming the examiner's rejection of issued claims 3-13 and new claims 14-15 of the '400 patent as anticipated and/or obvious?

## STATEMENT OF THE CASE

### The Object of the Invention

As explicitly evidenced by the '400 patent's specification, the object of the invention is to provide a system and apparatus for producing image data concerning the fluid dynamic characterization of the aerosol "spray plume" "emitted by metered nasal spray pumps and metered dose inhalers" – drug delivery devices ("DDDs"). (Addendum ("AD") 5, col. 1, ll. 27-45) The "duration of the spray plume created by a single pumping of the pump" of an inhaler-based DDD "is only on the order of one second." (AD6, col. 4, ll. 60-62) Nevertheless, the fluid dynamic characterization of inhaler-based DDD spray plumes "is an integral part of the regulatory submissions necessary for Food and Drug Administration ('FDA') approval of research and development, quality assurance and stability testing procedures for new and existing inhaler-based DDDs." (AD5, col. 1, ll. 41-

2

45) "In particular, measurement of the spray's divergence angle (plume geometry) as it exits the device; the spray's cross-sectional ellipticity, uniformity and particle/droplet distribution (spray pattern); and the time evolution of the developing spray have been found to be the most representative performance quantities in the characterization of an inhaler-based DDD." (AD5, col. 1, ll. 48-54)

While these density characteristic measurements have been found to be the most representative of inhaler-based DDD performance, at the time of the invention, "accurate, reliable and easy-to-use protocols and a system for inhaler-based DDD spray characterization [did] not exist." (*Id.*, col. 1, ll. 48-61.) At the time of the invention, the "inhaler spray testing standard" in use "at pharmaceutical companies involve[d] firing the spray pump at a solid, thin-layer chromatography ('TLC') plate having a coating that fluoresces in response to incident ultraviolet ('UV') radiation." Using "[m]arking instruments and mechanical calipers," a person then drew an outline around the fluoresced residue from the spray plume splashing against the TLC plate, and measured and recorded the spray pattern's "ellipticity in terms of major- and minor-diameters." (*Id.*, col. 1, ll. 66-67; col. 2, ll. 1-15)

The specification cites numerous disadvantages to the testing standard in use at the time of the invention, including: (a) inaccuracies of the test results arising

3

from "the presence of the TLC plate radically alter[ing] the natural fluid dynamics of the spray causing it to switch from a free aerosol jet to an impinging jet," (b) "a large amount of the spray particles bounc[ing] off the plate," (c) the sensitivity of the measurements "to the operator's judgment," which resulted in the measurements being "prone to low reliability," and (d) the fact that the then-current testing standard [could not] "be used to investigate any time-evolving or plume geometry properties of the spray" plume. (AD5, col. 2, ll. 16-34) An object of the invention is to "substantially overcome" the "disadvantages and drawbacks of the prior art." (*Id.*, col. 2, ll. 35-37)

The prior art considered by the PTO during prosecution included a number of references addressing how to view and/or analyze aerosol spray patterns and plumes. (AD1) Based on two of these prior art references, the examiner initially rejected claims 1-13 as obvious over U.S. Patent No. 5,561,527 (Krone-Schmidt) and U.S. Patent No. 6,193,936 (Gardner). (A233-A236) Krone-Schmidt discusses "an optical sensing apparatus for use with a CO2 jet spray nozzle that sprays a plume." (A255) "Gardner discusses a laser pyrolysis apparatus for thermal conversion of materials in an inert atmosphere." (*Id.*) Both discuss steady stream flows of material. (*Id.*) In response to the initial rejection, Proveris (then known as Image Therm Engineering, Inc.) submitted remarks addressing the examiner's concerns. Proveris explained that an embodiment of the invention:

4

shown in Figs. 1-3 comprises an arrangement for synchronized simultaneous vertical ejection of aerosol spray to form <u>a spray plume</u>, illuminating the plume with <u>a planar shaped laser</u> beam (28 or 38), and taking <u>an image of the cross-sectional slice or planar image formed by intersection of the plume and the laser</u> beam with the digital camera 12 for subsequent computer analysis. The acquired data provides useful information relating to <u>plane</u> characteristics, including divergence and uniformity.

(*Id.* (emphasis added))  With regard to Krone-Schmidt, Proveris explained that it "is not concerned with illuminating the plume 15 along <u>a geometric plane</u>," "does not discuss illuminating the plume along <u>at least one geometric plane</u>," and "has no relation to the image data representative of <u>an interaction</u> between the illuminator and the aerosol spray plume along <u>the</u> at least one geometric plane, as claimed in the present invention." (*Id.* (emphasis added))

With regard to Gardner, Proveris explained that it "adds no teaching or suggestions for the features lacking in Krone-Schmidt regarding illumination of the plume along at least one geometric plane." (A255-A256)  In other words, neither reference discusses illuminating an inhaler-based DDD spray plume, which lasts for approximately one second, along one geometric plane at a time to produce image data representative of a density characteristic of the spray plume. Proveris concluded that because the independent claims of the invention "each contain a limitation absent from Krone-Schmidt and Gardner, either explicitly or impliedly," the independent claims are not obvious over either reference. (A255)  The PTO granted the patent. (AD1; A258, A272-A273)

5

## Embodiments of the Invention

With an object of the invention to "substantially overcome" the "disadvantages and drawbacks of the prior art" related to the "fluid dynamic characterization" of inhaler-based DDD spray plumes, the specification describes a number of embodiments to achieve the object.  In one embodiment, the invention "is used to conduct spray pattern tests," which means:

> [T]he illumination device is positioned so that it illuminates in <u>a thin sheet</u> a predetermined, transverse axial cross section of the spray directly downstream of the spray pump tip as shown in FIG 2.  The centerline of the aerosol spray plume is shown as spray axis SA.  The imaging device is positioned so that it can view the spray pattern from above at a slight off-axis angle to prevent the spray particles from directly impinging on the imaging device 12 and lens 36.

(AD7, col. 6, ll. 26-35 (emphasis added))  Thus, to perform spray pattern tests, the illumination device must provide an illumination along "a thin sheet" – one geometric plane at a time – that is a "transverse axial cross section of the spray directly downstream of the spray pump tip as shown in FIG 2."  (*Id.*, col. 6, ll. 29-31; AD3)

In another embodiment, when the invention "is used to conduct spray [plume] geometry tests, the illumination device is positioned so that it illuminates <u>a plane</u> of particles parallel to the flow direction along the centerline of the spray or spray axis SA as shown in FIG. 3.  The imaging device 12 is positioned perpendicular to <u>the</u> illumination device <u>sheet plane 38.</u>"  (AD7, col. 6, ll. 52-57;

AD4 (emphasis added))    Thus, to perform spray plume geometry tests, the illumination device must provide an illumination along a thin sheet – one geometric plane at a time – that is different from the one plane used to perform spray pattern tests.  The illuminator must illuminate the plane that is "parallel to the flow direction along the centerline of the spray or spray axis SA as shown in FIG. 3."  (AD7, col. 6, ll. 55-56; AD4)

Accordingly, for an embodiment of the invention to allow an operator to perform either a spray pattern or a plume geometry test as disclosed in the specification, the illuminator must be able to provide illumination of the aerosol spray plume along at least one geometric plane at a time – either the thin sheet plane that illuminates a transverse axial cross section of the spray directly downstream of the spray pump tip (spray pattern), or the thin sheet plane that is parallel to the flow direction along the centerline of the spray or spray axis (plume geometry).  If the illuminator cannot illuminate along at least one geometric plane / thin sheet at a time, neither the spray pattern nor the plume geometry test disclosed in the specification can be performed.  Therefore, to perform at least one of these tests, the illuminator must be able to provide an illumination along at least one geometric plane / thin sheet at a time.  (AD2-4 (Figs. 1, 2, and 3); AD5 col. 2, ll. 41-52, 61-67; AD6 col. 3, ll. 1-12, 15-22, 35-40, 43-45, 61-66; col. 4, ll. 39-42, 45-46, 49-51; AD7 col. 5, ll. 51-56, 58-61; col. 6, ll. 22-31, 35-37, 52-60)

7

In other embodiments, to allow an operator to perform both spray pattern and plume geometry tests as disclosed in the specification, the illuminator must be able to provide both an illumination thin sheet plane that illuminates a transverse axial cross section of the spray directly downstream of the spray pump tip (spray pattern), and an illumination thin sheet plane that is parallel to the flow direction along the centerline of the spray or spray axis (plume geometry) – either simultaneously (one embodiment) or sequentially (another embodiment), depending on the type of illuminator used, with two substantially orthogonal planes of light illuminated either at the same time – simultaneously – or one after the other one – sequentially.  (AD6, col. 4, ll. 39-42; AD8, col. 8, ll. 41-43)  In the latter embodiment, sequential thin sheet illumination of the spray plume, "[a] first set of data is generated that is representative of a transverse cross-sectional slice of the spray plume," and "[a] second set of data is generated that is representative of a slice of the spray along the spray axis."  (AD6, col. 4, 45-46, 49-51 (emphasis added))  In all disclosed embodiments, the illumination device illuminates the spray plume with a very thin sheet of light (illumination along a geometric plane), approximately 1 mm in thickness.  (AD3-4; AD6, col. 3, ll. 61-66; AD6, col. 4, ll. 39-42, 45-46, 49-51; AD7, col. 5, ll. 47-54, 59-60; AD7, col. 6, ll. 22-31, 56-58)

In yet another embodiment, to produce image data representative of the time evolution density characteristic, the specification discloses an imaging device

providing a "framing rate in the neighborhood of 1000 frames/second (fps) at a resolution of 256x256 pixels and 8-bit intensity to accurately capture the time evolution of the spray for both the plume geometry and spray pattern testing." (AD7, col. 5, ll. 12-17)  "Such acquisition speed and spatial resolution values result in an 80 to 100 fold increase in the amount of pertinent information about the complete fluid dynamics of an aerosol spray plume compared to the TLC-plate method [then] being used." (*Id.*, col. 5, ll. 18-22)  Acquisition speed and spatial resolution values are important because the duration of the spray plumes created by inhaler-based DDDs is only approximately one second.  (AD6, col. 4, ll. 60-62) While the duration of the inhaler-based DDD spray plumes is only approximately one second, the duration may be controlled by means of the actuation force applied to a DDD during testing.  (AD5, col. 1, ll. 27-35, col. 2, ll. 58-61; AD6, col. 4, ll. 26-30, 55-64; AD7, col. 6, ll. 16-19)   The embodiments described in the specification are meant to be "illustrative and not restrictive" in that the "invention may be embodied in other specific forms without departing from the spirit of essential characteristics" of the invention.  (AD8, col. 7, ll. 12-15)

9

## The Challenged Claims[2]

Challenged, issued claims 3-13 read as follows, (AD8), with citations to the specification where the inventor prescribed a special definition of a term or terms contained in the claim:

3.      An apparatus for producing image data representative of at least one sequential set of images of a spray plume, each of the images being representative of a density characteristic of the spray plume (1) along a geometric plane that intersects the spray plume, and (ii) at a predetermined instant in time comprising (AD5, col. 1, ll. 32-35, 46-54; col. 2, ll. 41-52, 61-67; AD6, col. 3, ll. 1-12, col. 4, ll. 39-54; AD7, col. 5, ll. 10-22, 42-51; col. 6, ll. 7-13, 26-67):

> an illuminator for providing an illumination of the spray plume along at least one geometric plane that intersects the spray plume (AD2-4 (FIGS 1, 2, & 3); AD5, col. 2, ll. 41-52, 61-67; AD6, col. 3, ll. 1-12, 15-22, 35-40, 43-45, 61-66; col. 4, ll. 39-42, 45-46, 49-51; AD7, col. 5, ll. 51-56, 58-61; col. 6, ll. 22-31, 35-37, 52-60); and,

> an imaging device for generating the image data representative of an interaction between the illumination and the spray plume along the at least one geometric plane (AD2-4 (FIGS. 1, 2, & 3); AD5, col. 2, ll. 41-52, 61-67; AD6, col. 3, ll. 1-12, 15-22, 29-34, 45-48; col. 4, ll. 42-44; AD7, col. 5, lines 14-17; col. 6, ll. 32-35, 46-49, 56-66).

4.      An apparatus according to claim 3, wherein the sequential set of images is representative of a progression in time.  (AD6, col. 3, ll. 13-14; col. 4, ll. 4-12; AD7, col. 5, ll. 10-17, 42-44; col. 6, ll. 46-49)

---

[2]  Claims 1 and 2 of the '400 patent are issued and not subject to reexamination.

5.    An apparatus according to claim 3, wherein a first time-sequential set of images corresponds to an axial cross-sectional density characteristic along a first geometric plane substantially normal to a flow direction centerline, and a second time-sequential set of images corresponds to a longitudinal density characteristic along a second geometric plane substantially parallel to and intersecting the flow direction centerline.  (AD3-4 (Figs. 2 & 3); AD6, col. 3, ll. 15-22; col. 4, ll. 39-54; AD7, col. 6, ll. 52-58)

6.    An apparatus according to claim 3, wherein the interaction between the illumination and the spray plume includes optical scattering. (AD6, col. 3, ll. 23-25)

7.    An apparatus according to claim 3, wherein the interaction between the illumination and the spray plume includes optical absorption. (AD6, col. 3, ll. 26-28)

8.    An apparatus according to claim 3, wherein the imaging device includes a digital imaging system for generating and recording the image data.  (AD2-4 (FIGS. 1, 2 & 3); AD6, col. 3, ll. 29-31)

9.    An apparatus according to claim 8, wherein the digital imaging system includes an image sampling rate of approximately 500 images per second.  (AD6, col. 3, ll. 32-34; AD7, col. 6, ll. 22-25)

10. An apparatus according to claim 3, wherein the illuminator includes a laser system having a fan-shaped output pattern. (AD3-4 (Figs. 2 & 3); AD6, col. 3, ll. 35-36; col. 4, ll. 39-42; AD7, col. 5, ll. 51-61)

11. An apparatus according to claim 10, wherein the fan-shaped output pattern includes a fan angle of approximately 45 degrees, and a laser line thickness of approximately one millimeter at approximately the centerline of the emitted spray. (AD3-4 (Figs. 2 & 3); AD6, col. 3, ll. 37-40; AD7, col. 5, ll. 51-56)

12. An apparatus according to claim 10, wherein the laser system includes a 4 watt, 810 nm laser output. (AD6, col. 3, ll. 41-42; AD7, col. 5, ll. 51-61).

13. A spray data acquisition system according to claim 3, wherein the first and the second geometric planes are substantially orthogonal. (AD3-4 (Figs. 2 & 3); AD6, col. 3, ll. 42-50; col. 4, ll. 45-51)

Challenged, new claims 14 and 15 read as follows, (A467), with citations to the specification where the inventor prescribed a special definition of a term or terms contained in the claim:

14. An apparatus according to claim 3, wherein the spray plume is the aerosol spray emitted by metered nasal spray pumps and/or metered

12

dose inhalers.  (AD2-4 (Figs. 1, 2, & 3); AD5, col. 1, ll. 27-67; col. 2, ll. 1-37; AD6, col. 4, ll. 64-67; AD7, col. 5, ll. 18-22; col. 6, ll. 16-19)

15.    An apparatus according to claim 3, wherein the illuminator is a laser that projects a thin sheet of light.  (AD3-4 (Figs. 2 & 3; AD5, col. 2, ll. 46-49, 61-64; AD6, col. 3, ll. 6-9, 15-22, 35-40, 43-45, 61-66; col. 4, ll. 39-42, 45-46, 49-51; AD7, col. 5, ll. 51-56, 58-61; col. 6, ll. 22-31, 35-37, 52-60)

**Innova's Contempt Defense**

On March 3, 2010, Proveris moved the United States District Court for the District of Massachusetts (the "district court") for a finding that Innova was in willful contempt of a permanent injunction the district court entered against Innova on May 11, 2007, for Innova's admitted infringement of the '400 patent's claims 3-10 and 13.  *Proveris Scientific Corp. v. Innovasystems, Inc.*, 536 F.3d 1256 (Fed. Cir. 2008).  Innova's only defense in the contempt action was its contention that a new limitation should be read into claim 3 from the preamble – an argument Innova did not raise during the underlying infringement action.  Specifically, Innova argued that the language "at a predetermined instant of time" from the preamble, must be read into claim 3 as a limitation.  *Proveris Scientific Corp. v. Innovasystems, Inc.*, 739 F.3d 1367, 1370 (Fed. Cir. 2014) ("*Proveris III*").  The district court concluded, however, that it would not read a limitation into the

preamble to claim 3, and eventually held Innova to be in willful contempt and entered a sanction against Innova for more than $1,000,000. *Proveris III*, 739 F.3d at 1370. Innova appealed.

In an opinion issued on January 13, 2014, the *Proveris III* court concluded that the contempt proceeding was appropriate and that the originally infringing product and the supposedly new product are "functionally identical." 739 F.3d at 1371. The *Proveris III* court also found that "the preamble to claim 3 is the only reference in any independent claim to the inventive concept of capturing a sequence of images in order to characterize the time evolution of the spray plume." *Id.* at 1373. Accordingly, the *Proveris III* court ruled that "the preamble to claim 3 should be construed as importing a limitation into the claim." *Id.* at 1373. Thus, the *Proveris III* court vacated the district court's rulings and remanded the case for proper construction of claim 3 with the preamble limiting the claim, and then re-evaluation of infringement for purposes of contempt. *Id.* Proveris provided the Board with notice of the *Proveris III* decision on January 27, 2014. (A89; A535-A549) At Innova's request, the contempt action has been stayed and administratively closed pending the outcome of the reexamination.

### The Inter Partes Reexamination

After the district court held Innova to be in contempt (and before a sanctions trial), on March 18, 2011, Innova filed a request for inter partes reexamination of

claims 3-13 of the '400 patent.  (A89)  Innova filed a corrected request on April 19, 2011 ("RIPR").  (*Id.*)  In its RIPR, Innova focused solely on the illuminator element of claim 3 to argue that substantial new questions of patentability exist because prior art not considered by the PTO during prosecution of the '400 patent

> either includes a specific disclosure of a laser sheet that illuminates a spray plume along a single geometric plane, or discloses an illumination source that meets the above-referenced feature by illuminating a spray plume along multiple planes, which would necessarily include illuminating the spray plume 'along at least *one geometric plane*.'

(A56)  In other words, Innova based its RIPR on the conceptual argument that, reading the claim limitation of "along a geometric plane" in isolation, an illuminator providing diffuse light necessarily also illuminates along at least one geometric plane because it illuminates everything, like a flashlight or light bulb. Thus, Innova's construction of the limitation "an illuminator for providing an illumination of the spray plume along at least one geometric plane that intersects the spray plume" means, in essence, any light source, including a flashlight or light bulb, for providing any type of illumination, including unstructured/diffuse light, of any type of spray plume, including a steady flow stream of material regardless of duration, along a multitude of planes at the same time.  While Innova argued in the contempt action that the preamble limits claim 3, Innova did <u>not</u> raise that argument in its RIPR.  (*See generally* A47-A143)  The prior art on which Innova based its RIPR and on which the Board affirmed the examiner's decisions is:

15

"An Optical Patternator for Quantitative and On-Line Spray Diagnostics," Rama Deljouravesh, Thesis Submitted to the Department of Mechanical Engineering, Queen's University, Kingston, Ontario, Canada (Oct. 1997) ("Deljouravesh") (A293-A379)

"A Flow Visualisation Study of Airless Spray Painting," Gary S. Settles, published in the Proceedings of the ILASS-Americas '97, May 18-21, 1997, Ottawa, Canada ("Settles")
(A381-A385)

U.S. Patent No. 5,396,333 ("'333 patent" or "Aleshin")
(A387-A394)

"Video Characterization of Flume Patterns of Inhalation Aerosols," S. Miszuk et al., Journal of Pharmaceutical Sciences, Vol. 69, No. 6, 713-717 (June 1980) ("Miszuk")
(A396-A400)

U.S. Patent No. 6,049,382 ("'382 patent" or "Gomez")
(A402-A413)

U.S. Patent No. 3,275,744 ("'744 patent" or "Dietrich")
(A415-A417)

U.S. Patent No. 2,779,233 ("'233 patent" or "Dodge")
(A419-A427)

"Measurement of Particle Size Characteristics of Metered Dose Inhaler (MDI) Aerosols," M. Dolovich, Journal of Aerosol Medicine, Vol. 4, No. 3, 251-263 (1991) ("Dolovich")
(A429-A441)

"Visualization of Liquid Fuel Behavior in a Spark Ignition Engine during Starting and Warm-up," Younggy Shin, published in the KSME International Journal, Vol. 11, No. 5, 582-593 (1997) ("Shin")
(A443-A454)

The examiner agreed with Innova that substantial new questions of patentability

exist based on the prior art and granted the RIPR on June 29, 2011. (A89)

16

On August 29, 2011, Proveris submitted its response to the reexamination, which included new claims 14 and 15. (A467) Proveris also submitted a petition to terminate the reexamination based on Innova's invalidity challenge to claims 3-13 during the infringement action in the district court by relying on some of the same or substantially similar prior art ("Petition to Terminate"). (A89) Innova submitted comments in reply to Proveris's response to the office action and an opposition to the Petition to Terminate on September 28, 2011. On December 10, 2011, an examiner issued an Action Closing Prosecution and a Right of Appeal Notice on February 1, 2012, rejecting claims 3 through 15. (*Id.*) Proveris filed a notice of appeal on March 1, 2012. (*Id.*) The examiner issued its decision on the Petition to Terminate on February 27, 2012, (*id.*), and issued a Supplemental Right Of Appeal Notice on April 27, 2012, which took into consideration its decision on Proveris's Petition to Terminate; yet, still rejected claims 3-15 ("RAN"). (*Id.*; AD9-AD54)

In the RAN, the examiner did not independently construe any limitation or term in claim 3. Instead, the examiner adopted Innova's construction of the one limitation Innova addressed in its RIPR. The examiner rejected Proveris's construction of "an illuminator for providing an illumination of the spray plume along at least one geometric plane that intersects the spray plume" to mean a light source that projects a thin sheet of light that intersects the spray plume, where the

spray plume is the plume of an inhaler-based DDD, (A469-A470, A476-A482), concluding that "such a narrow interpretation of the claimed limitations is not consistent with the 'broadest reasonable interpretation' as well as the customary and ordinary meaning of the claimed limitation." (AD23) The examiner also concluded that Proveris was "arguing a feature 'thin sheet of light' that is not recited in the claim." (*Id.*) Based on those conclusions, the examiner rejected claims 3-8 and 13 as being anticipated by Miszuk; claims 3, 4, 6, and 7 as being anticipated by the '382, '744, and '233 patents, and Dolovich; and claims 3, 4, and 6-8 as being anticipated by Shin. (AD24-AD36)

The examiner rejected dependent claims 5 and 13 as obvious over Deljouravesh in view of the '233 patent. (AD37) With respect to claim 5, the examiner found that it would have been obvious to someone of ordinary skill in the art at the time of the invention to combine the camera directed to "make any desired angle with the axis of the spray as disclosed by the '233 patent" with the plane disclosed by Deljouravesh to take "first and second time-sequential set of images" corresponding to the axis of the spray and transverse to the axis of the spray. (*Id.*) With respect to claim 13, the examiner also found that it would have been obvious to a person of ordinary skill in the art to combine Deljouravesh in view of the '233 patent to produce a system "wherein the first and the second

geometric planes are substantially orthogonal." (AD38) The examiner did not address the "spray plume" element or any other limitation in claim 3.

The examiner rejected dependent claim 9 as obvious over Deljouravesh in view of Shin because, while "Deljouravesh did not explicitly disclose wherein the digital imaging system includes an image sampling rate of approximately 500 images per second," Shin does and it would have been obvious to someone of ordinary skill in the art to use the imaging system in Shin with the system in Deljouravesh. (AD39) Similarly, the examiner rejected claim 9 as being obvious over both the '233 and the '333 patent in view of Shin. (AD39-AD41)

The examiner rejected dependent claims 10 and 11 as being obvious over Dolovich, concluding that it would have been obvious to someone of ordinary skill in the art at the time of the invention to combine the lasers disclosed in Dolovich with the claimed fan angle of 45°. (AD41-AD42) The examiner rejected claim 12 as being obvious over Settles in view of Dolovich, and as being obvious over Dolovich in view of Settles, concluding that at the time of the invention, it "would have been obvious for one of ordinary skill in the art to have looked at the teachings of Dolovich and Settles and with routine experimentation chosen a laser having 4 watt, and 810 nm output for testing spray plume patterns." (AD42-AD44)

19

Regarding new, dependent claims 14 and 15, the examiner first noted that Innova "did not explicitly set forth whether these claims should be rejected under 35 U.S.C. §. 102 or 103." (AD45)  Therefore, the examiner provided alternative bases for rejecting the claims.  In particular, the examiner found claim 14 to be anticipated by Miszuk because Miszuk "explicitly disclosed apparatus to characterize metered-dose aerosols" and "[m]etered nasal spray pumps and/or metered dose inhalers are broadly interpreted as aerosol products."  (AD46)  Alternatively, the examiner found claim 14 to be obvious over Miszuk because, if "Miszuk does not explicitly disclose wherein the spray plume is the aerosol spray emitted by metered nasal spray pumps and/or metered dose inhalers it would have been obvious to one of ordinary skill in the art to adapt the apparatus disclosed by Miszuk to characterize aerosol spray emitted by metered nasal spray pumps and/or metered dose inhalers."  (*Id.*)

The examiner found both claims 14 and 15 to be anticipated by and/or obvious over Deljouravesh, the '333 and '382 patents, Dolovich, and Settles. (AD45-AD51)  With regard to anticipation, the examiner concluded that each of these references includes the limitation in claim 3 addressed by the examiner, as well as the limitations in the new claims.  Alternatively, the examiner found that if the references do not include the limitations, it would have been obvious to one of ordinary skill in the art to adapt the apparatus disclosed in each reference to

20

characterize metered nasal spray pumps and/or metered dose inhalers by using a laser that projects a thin sheet of light.  (*Id.*)  Proveris appealed the 4/27/12 RAN to the Board.  (A89)

### The Appeal to the Board

Proveris filed its Appeal Brief and request for oral hearing on July 30, 2012.

(*Id.*)  The Board focused on three elements of one limitation of claim 3:

> "[A]n illuminator for providing an illumination of the spray plume along at least one geometric plane that intersects the spray plume."

(AD8, col. 8, ll. 3-5 (emphasis added))   Proveris construed "illuminator for providing an illumination" to mean "a light source that projects a thin sheet of light that intersects the spray plume along a geometric plane."  (A497)  Proveris construed "along at least one geometric plane" to mean "one thin sheet of light at a time."  (*Id.*)  In support of these constructions, Proveris explained that the later recited singular form of "an interaction" in claim 3, "defines the limitation to the specific interaction along the one geometric plane selected for the particular test the user wishes to perform."  (*Id.*)  Proveris explained that claim 5 supports its construction of claim 3 by teaching a first time-sequential set of images followed by a second time-sequential set of images.  (A498; *see also* AD8, col. 7, ll. 42-45; col. 8, ll. 1-8; ll. 11-18.)

With regard to the illuminator being a light source that projects a thin sheet of light, and illumination being one thin sheet of light at a time, Proveris directed the Board to numerous disclosures in the specification:



FIG. 2. shows an ***illumination device illuminating*** a transverse axial cross-***sectional slice*** of a spray.  (AD3; AD6, col. 3, ll. 61-63 (emphasis added).)



FIG. 3 shows ***an illumination device illuminating a slice*** of a spray along the spray axis.  (AD4; AD6, col. 3, ll. 64-66 (emphasis added).)

The ***illumination device*** is adapted to simultaneously or sequentially illuminate the spray with ***thin, fan-shaped beams of light*** along the spray axis SA and transverse to the spray axis SA.  (AD6, col. 4, ll. 39-42 (emphasis added).)

22

A first set of data is generated that is representative of a **_transverse cross-sectional slice of the spray plume_**.  (AD6, col. 4, ll. 45-46 (emphasis added).)

A second set of data is generated that is representative of **_a slice of the spray_** along the spray axis.  (AD6, col. 4, ll. 49-51 (emphasis added).)

Preferably, the **_illumination device_** is a continuous-wave illuminant . . . such as a **_laser sheet generator_**.  (AD7, col. 5, ll. 44-47 (emphasis added).)

Preferably, the **_illumination device_** is capable of . . . **_directly projecting a very thin sheet of light_** . . . .  (AD7, col. 5, ll. 51-53 (emphasis added).)

The **_illumination device_** is turned on and **_its light sheet_** is focused to a thickness of approximately 1 mm when **_it illuminates the plane of spray particles_**.  (AD7, col. 6, ll. 22-25 (emphasis added).)

When the spray data acquisition system is used to conduct spray pattern tests, the **_illumination device_** is positioned so that **_it illuminates in a thin sheet_** a predetermined, **_transverse axial cross section of the spray_** . . . .  (AD7, col. 6, ll. 26-29 (emphasis added).)

A calibration target is then temporarily placed **_in the plane of the illumination device's light sheet_** . . . .  (AD7, col. 6, ll. 35-37 (emphasis added).)

When the spray data acquisition system of the invention is used to conduct spray geometry tests, the **_illumination device_** 12 is positioned so that it **_illuminates a plane of particles_** parallel to the flow direction along the centerline of the spray or spray axis SA as shown in FIG. 3. The imaging device 12 is positioned perpendicular to **_the illumination device sheet plane 38_**.  Similar to the spray pattern tests, the calibration target 32 is then temporarily placed **_in the plane of the sheet 38 of light emitted from the illumination device 26_** and the imaging device lens 36 is adjusted until the target 32 comes into focus. (AD7, col. 6, ll. 52-62 (emphasis added).)

23

(A498-A499, A503.)  Proveris also directed the Board to the specification wherein the patentee discloses a "light sheet" with a "thickness of approximately 1 mm when it illuminates the plane of spray particles," (AD7, col. 6, ll. 23-25), and to claim 11, which depends from claim 3 and includes the limitation of "a laser line thickness of approximately one millimeter at approximately the centerline of the emitted spray."  (AD8, col. 8, ll. 36-38.)

As further support for its constructions, Proveris submitted the Declaration of Dino J. Farina ("Farina Declaration"), the named inventor and a person of ordinary skill in the art at the time of the invention.  (A144-A145)  Farina opined that a person of ordinary skill in the art would understand "that a light source that projects light along a 'geometric plane' – a structured light source – is completely different than an unstructured light source."  (A149)  Farina explained:  "an every day light bulb and a flash light are unstructured light sources . . . that will illuminate an entire room or a beam of light, but not a geometric plane."  (*Id.*)  Farina observed that "[t]hese types of unstructured light sources are taught in, for example, Miszuk: the fiber optic bundles, which are equivalent to flashlights."  (*Id.*)  Based on the '400 patent's specification, definitions of the terms "illumination" and "geometric plane," and the knowledge of a person of ordinary skill in the art, Farina opined that "a person of ordinary skill in the art would construe the phrase 'an illuminator for providing an illumination along at least one

24

geometric plane that intersects the spray plume' to mean a light source that projects a thin sheet of light that intersects the spray plume." (A149)

Proveris construed "spray plume" to mean "a 'spray plume' with a duration of approximately one second" – the spray plume of an inhaler-based DDD. (A513) In support of its construction of "spray plume," Proveris directed the Board to the specification:

> The fluid dynamic characterization of the aerosol spray emitted by metered nasal spray pumps and metered dose inhalers is crucial in determining the overall performance of the inhaler as a drug delivery device ('DDD').

(AD5, col. 1, ll. 32-34)

> Since the duration of the spray plume created by a single pumping of the pump 22 is only on the order of one second, it is crucial to have accurate synchronization between the spray pump actuator 18 and the imaging device 12.

(AD6, col. 4, ll. 60-64)  Additionally, Farina opined that in the context of the '400 patent, a person of ordinary skill in the art would understand "spray plume" to be a "spray plume" with a duration of "only approximately one second" and referenced the specification's disclosures of inhaler-based DDDs. (A151)  Farina also noted that Miszuk supports the construction with the statement that "[i]n metered dose aerosols, the total duration of the burst can be as short as 50 msec. . . ." (*Id.*; *see also* A397.)

25

Based on these constructions, Proveris explained how claims 3-4, 6-8, and 13-15 are not anticipated by any of the cited references because each reference is missing <u>at least</u> the element of a light source that projects one thin sheet of light at a time, (A505-A511, A523-A531), as summarized in the following chart:

| Reference | Illuminator |
|---|---|
| Miszuk | Two flexible fiber optic bundles |
| '382 patent | Collimated laser beam |
| '744 patent | Stroboscopic light |
| '233 patent | Photo-light; incandescent light |
| Dolovich | Collimated, circular laser beams |
| Shin | Candescent laser beam |
| Deljouravesh | Laser beams |
| '333 patent | Laser beam |
| Settles | Stroboscopic lighting; laser beam |

(*See also* A122-A166.)  Proveris also explained how claims 5 and 9-15 are not obvious over any of the cited reference combinations.  (A166-A173, A511-A519, A523-A531)

Innova filed a response on August 30, 2012.  (*Id.*)  Innova did <u>not</u> submit any expert or other testimony to contradict the Farina Declaration.  Therefore, the only evidence before the Board from a person of ordinary skill in the art was the testimony provided through the Farina Declaration.  The Board held an oral hearing on October 2, 2013.  The *Proveris III* court issued its decision on January 13, 2014.  Proveris provided the Board with notice of the *Proveris III* ruling on January 27, 2014.  (A535-A549)

26

**The Board's Decision**

The Board issued its Decision on Appeal on January 31, 2014 ("Decision"). (A89)  The Board made factual findings, which amounted to excerpts from the '400 patent and prior art, nothing more, then addressed the construction of "an illuminator for providing an illumination of the spray plume along at least one geometric plane that intersects the spray plume" by focusing on "illumination," "at least one geometric plane," and "spray plume."  (AD65-AD80)

<u>The Board's Claim Construction</u>

The Board implicitly construed "an illuminator for providing an illumination" to mean any light source providing any type of light, including unstructured / diffuse light, because the Board rejected Proveris's construction that in the context of claim 3, "illumination" means "a thin sheet of light."  (AD78-AD79)  The Board reasoned that the "express language of claim 3 merely recites an illumination, not a 'thin sheet of light.'"  (AD78)  The Board also concluded that the specification "at least implies that other forms of illumination, such as illuminating along multiple geometric planes at one time, are contemplated and could be employed."  (*Id.*)  While the Board considered the Farina Declaration, without any testimony to contradict the declaration, the Board concluded that "[t]he stated goals of the patent, and whether a thin sheet of light is required to achieve them, [were] not persuasively addressed."  (AD79)  The Board also noted

27

that the specification does not "discuss (or even mention) structured or unstructured light or any distinction between them." (*Id.*)

The Board implicitly construed "along at least one geometric plane" to mean along any number of planes at the same time, "regardless of timing," by rejecting Proveris's construction that the term means "along one thin sheet of light at a time." (AD77)  The Board dismissed as "not persuasive," Proveris's explanation that the later recited singular form of "an interaction" limits claim 3 to illuminating one geometric plane at a time.  The Board reasoned that "the singular form of 'an interaction' is consistent with the express language of the claim – at least one, i.e. one *or* more than one" because "'a' (or 'an') in a comprising claim means one *or more*." (AD76)  Thus, according to the Board, "claim 3 covers illuminating along one geometric plane (resulting in one interaction) as well as illuminating along multiple geometric planes (resulting in multiple interactions)" at the same time. (*Id.*)

While the Board agreed that "the Specification only depicts illuminating along one plane at a time," it found that the specification also "identifies that at least two geometric planes may be illuminated simultaneously." (AD77) Therefore, the Board concluded that "the illumination of one or more geometric planes that interact with the spray plume may occur one at a time or may occur simultaneously." (*Id.*)  The Board concluded that claim 5 "is not inconsistent"

28

with the examiner's interpretation of claim 3, because claim 3 "requires at least one, i.e. one or more, sequential set of images or [sic] a spray plume where the illumination was along at least one, i.e. one or more, geometric plane." (*Id.*) Additionally, the Board concluded that the "language expressly permits the claim to include more than one sequential set of images where the illumination is along more than one geometric plane, regardless of timing." (*Id.*)

As for its construction of "spray plume," the Board implicitly construed the term to mean any type of spray, regardless of duration, by rejecting Proveris's construction of "spray plume" to mean a "spray plume" of an inhaler-based DDD with a duration of "only approximately one second." (AD80; A151-A152; *see also* AD5, col. 1, ll. 32-34; AD6, col. 4, ll. 60-62.) The Board reasoned that Proveris's construction is "at odds with other teachings of the Specification" citing the disclosure that "the invention may include a spray pump actuator that is capable of controlling the *duration* of the aerosol spray plume." (AD20)

The Board affirmed the examiner's construction of "an illuminator for providing an illumination of the spray plume along at least one geometric plane that intersects the spray plume" to mean, in essence, any light source, including a flashlight or light bulb, for providing any type of illumination, including unstructured/diffuse light, of any type of spray plume, including a steady flow

stream of material regardless of duration, along a multitude of planes at the same time.

The Board's Anticipation and Obviousness Analysis

With its broad constructions of three elements of just one limitation in claim 3, the Board marched through its analysis of the prior art to affirm the examiner's rejection of claim 3 as anticipated by Miszuk, Dolovich, Shin, and the '233, '382, and '444 patents. (AD81) For the same reasons, the Board affirmed the examiner's rejection of dependent claims 4, 6-8, and 13.

The Board also affirmed the examiner's rejection of dependent claims 5 and 13 as obvious over the combination of Deljouravesh and the '233 patent, concluding that the '233 patent did not teach away "from using planar light because it discloses using diffuse light." (AD83) Despite Innova not submitting any contrary testimony, the Board found unpersuasive the Farina Declaration wherein he explained that "the time-sequential set of images disclosed in claim 5 would not be visible using the technology of Deljouravesh and the '233 patent, regardless of the desired angle of the camera," because diffuse light would not illuminate the disclosed time-sequential set of images. (AD84; A168)

The Board affirmed the examiner's rejection of claim 9 as obvious over combinations of Deljouravesh and Shin, Dodge and Shin, and the '333 patent and Shin. The Board reached this decision by, again, finding unpersuasive the Farina

30

Declaration and rejecting Proveris's claim constructions, and concluding that a skilled artisan would combine the cited references even though references such as the '333 patent disclose and teach characterization of a steady flow stream of material. (AD84-AD85) Similarly, the Board affirmed the examiner's rejection of claims 10 and 11 as obvious over Dolovich, and claim 12 as obvious over a combination of Settles and Deljouravesh. The Board also based these decisions on its rejection of Proveris's construction "limiting the illumination to a thin sheet." (AD86)

With regard to new, dependent claims 14 and 15, the Board affirmed the examiner's rejection of claim 14 for the same reasons it rejected independent claim 3. (AD87) The Board affirmed the examiner's rejection of claim 15 based on Deljouravesh, the '333 patent, and Settles, finding that "a skilled artisan would understand that a laser and accompanying lens of the cited prior art that project a thin sheet of light would satisfy the claimed limitation." (*Id.*) Consequently, the Board found claims 14 and 15 to be "anticipated/obvious" by the cited prior art. (*Id.* at n.3) While the Board issued its Decision after the *Proveris III* ruling, the Board did <u>not</u> address the preamble as limiting claim 3 in any way.

### The Request for Rehearing

On February 28, 2014, after the *Proveris III* court ruled that the preamble is limiting, Proveris filed a request for rehearing. (A89) Proveris argued that with

the preamble limiting claim 3, the preamble must be incorporated into the construction of claim 3, and that the Board's construction of "an illuminator for providing an illumination of the spray plume along at least one geometric plane that intersects the spray plume" is inconsistent with the preamble. Additionally, Proveris argued that the preamble limits claim 3 to a specific embodiment, again arguing that "along a geometric plane" means only one plane at a time in the context of claim 3. (A555-A562)    Proveris concluded that, because of the erroneous claim construction and the preamble limiting claim 3, the Board's decisions affirming the examiner's rejection of claims 3-15 should be reversed. (A562-A565)

Innova filed a response to the request for rehearing on March 28, 2014. The Board issued its decision denying the request for rehearing on November 26, 2014. (A89).  The Board first noted that, while its "Decision did not discuss the preamble expressly, it was considered;" however, the Board did <u>not</u> incorporate any limitations from the preamble into its determination of Proveris's rehearing request.  (AD90)  Instead, the Board simply disagreed "that the preamble limits claim 3 to a specific embodiment," and rejected Proveris's "construction that 'along at least one geometric plane' means one geometric plane at a time." (AD92-AD93)    Again, the Board concluded that the phrase "along at least one geometric plane" means "one or more geometric planes" at the same time because

of the embodiment that "describes simultaneously or sequentially illuminating the spray axis and traverse to the spray axis," despite the fact that claim 3's preamble discloses "at least one sequential set of images" – not <u>simultaneous</u> <u>sets</u> of images, or <u>simultaneous</u> <u>or</u> sequential <u>sets</u> of images – "each of the images being representative of <u>a</u> density characteristic of the spray plume (i) along <u>a</u> geometric plane that intersects the spray plume. (*Id.* (emphasis added); *see also* AD8, col. 7, ll. 42-45; col. 8, l. 1.) Proveris filed a notice of appeal to this Court on January 16, 2015.

## SUMMARY OF THE ARGUMENT

This appeal turns on the construction of the '400 patent's claim 3, the only independent claim at issue. The Board erred by affirming a construction of claim 3 that is based on only one limitation, and that is inconsistent with the broadest reasonable interpretation of the claim in view of the specification. In particular, the Board ignored the preamble to claim 3 despite the *Proveris III* court's ruling that it limits the claim. The Board also ignored claim terms outside of the preamble, improperly focusing in isolation on terms within just one limitation: "an illuminator for providing an illumination of the spray plume along at least one geometric plane that intersects the spray plume." The Board affirmed a construction of that limitation that is so completely at odds with the claim language in its entirety, the prosecution history, and the specification that, if the Court

33

affirms the construction, the invention would be unworkable. The Board's affirmance of the examiner's construction of claim 3 runs afoul of both the ruling in *Proveris III* and governing principles for claim construction, and should be reversed.

The Board also erred by affirming the examiner's rejection of issued claims 3-13 and new claims 14 and 15. The Board reviewed the examiner's decisions in the context of the erroneous construction of claim 3. With such a broad construction of the claim, the Board had no difficulty finding that cited references anticipate claim 3, as well as claims 4, 6-8, and 13-15, and that claims 5, 9, and 13-15 are obvious over certain combinations of the references. The Board's (and examiner's) conclusions are erroneous and should be reversed.

In sum, the Court should reverse the Board's Decision and affirm all of the challenged claims. Alternatively, the Court should vacate the Board's Decision and remand the case for proper construction of claim 3, including the preamble and the other claim limitations. Only then should the Board reexamine the challenged claims in view of the prior art.

# ARGUMENT

## I.    STANDARD OF REVIEW

"Claim construction is a legal question, reviewed de novo" when based on the intrinsic record.  *In re Abbott Diabetes Care Inc.*, 696 F.3d 1142, 1148 (Fed. Cir. 2012); *see also Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 574 U.S. __, 135 S. Ct. 831, 840-841 (2015); *In re Papst Licensing Digital Camera Patent Litigation*, 778 F.3d 1255, 1261 (Fed. Cir. 2015); *In re Imes*, 778 F.3d 1250, 1252 (Fed. Cir. 2015).    Subsidiary factual findings regarding extrinsic evidence in dispute, evidentiary underpinnings such as "competing fact-related claims by different experts," "must be reviewed for clear error on appeal."  *Teva*, 135 S. Ct. at 841. Otherwise, the Court reviews factual findings made by the Board (and/or examiner) for substantial evidence.[3]  *In re Imes*, 778 F.3d at 1252 & n.1.

"Claims under examination before the PTO are given their broadest reasonable interpretation;" however, the interpretation must be "consistent with the specification."  *In re Abbott Diabetes Care Inc.*, 696 F.3d 1142, 1148 (Fed. Cir. 2012) (emphasis added); *see also Phillips v. AWH Corp.,* 415 F.3d 1303, 1317 (Fed. Cir. 2005) ("[l]ike the specification, the prosecution history provides

---

[3]   *But see Cadence Pharma. Inc. v. Exela PharmSci Inc.*, 780 F.3d 1364, 1368 (Fed. Cir. 2015) ("[i]n reviewing questions of claim construction and obviousness, we review underlying factual determinations for clear error and ultimate determinations *de novo*").  Even if the Court reviews the Board's factual findings for clear error, its conclusions still should be reversed.

evidence of how the PTO and the inventor understood the patent"). Accordingly, "claim terms are construed in light of the specification and prosecution history, not in isolation." *Pacing Technologies, LLC v. Garmin International, Inc.*, 778 F.3d 1021, 1024 (Fed. Cir. 2015); *see also In re Trans Texas Holdings Corp.,* 498 F.3d 1290, 1298 (Fed. Cir. 2007). In other words, "proper claim construction . . . demands interpretation of the entire claim in context, not a single element in isolation." *Hockerson-Halberstadt, Inc. v. Converse Inc.*, 183 F.3d 1369, 1374 (Fed. Cir. 1999) (emphasis added); *see also ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1088 (Fed. Cir. 2003) ("[w]hile certain terms may be at the center of the claim construction debate, the context of the surrounding words of the claim also must be considered. . . ." (emphasis added)). Moreover, "claims are interpreted with an eye toward giving effect to all terms in the claim." *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006) (emphasis added).

Claim terms should be given their ordinary and customary meaning "to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips,* 415 F.3d at 1313 (emphasis added); *see also Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). Further, because claim terms must be construed in light of the specification and prosecution history, definitions and other information provided in the specification must be taken into account. *See In re Morris,* 127

F.3d 1048, 1054 (Fed. Cir. 1997). Indeed, "a patentee may choose to be his own lexicographer and use terms in a manner other than their ordinary meaning, as long as the special definition of the term is clearly stated in the patent specification or file history." *Vitronics*, 90 F.3d at 1582. Stated differently, "even if the meaning is plain on the face of the claim language, the patentee can, by acting with sufficient clarity, disclaim such a plain meaning or prescribe a special definition." *World Class Tech. Corp. v. Ormco Corp.*, 769 F.3d 1120, 1123 (Fed. Cir. 2014). Therefore, "it is always necessary to review the specification to determine whether the inventor has used any terms in a manner inconsistent with their ordinary meaning. The specification acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication." *Pacing Tech.*, 778 F.3d at 1025 (emphasis added). In fact, the specification "is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Id.*

"Where the specification makes clear that the invention does not include a particular feature, that feature is deemed to be outside the reach of the claims of the patent, even though the language of the claims, read without reference to the specification, might be considered broad enough to encompass the feature in question." *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 137, 1341 (Fed. Cir. 2001); *see also Pacing Tech.*, 778 F.3d at 1025 (patentee's

description of features of "present invention" limit scope of invention). Moreover, "where the patent describes multiple embodiments, every claim does not need to cover every embodiment." *Pacing Tech.*, 778 F.3d at 1026.

To the extent extrinsic evidence "can help educate the court regarding the field of the invention" or "what a person of ordinary skill in the art would understand the claim terms to mean, it is permissible" and may be considered in the context of the intrinsic evidence. *Phillips*, 415 F.3d at 1319. Extrinsic evidence "consists of all evidence external to the patent and prosecution history, including the expert and inventor testimony, dictionaries, and learned treatises." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370, 116 S. Ct. 1384, 135 L. Ed. 2d 577 (1996). Even prior art, "whether or not cited in the specification or the file history," may be helpful "to demonstrate how a disputed term is used by those skilled in the art." *Vitronics*, 90 F.3d at 1584; *see also Finisar Corp. v. DirecTV Group, Inc.,* 523 F.3d 1323, 1336 (Fed. Cir. 2008) (the meaning of prior art requires analysis of the understanding of a person of ordinary skill in the art); *Scripps Clinic & Res. Found. v. Genentech, Inc.,* 927 F.2d 1565, 1576 (Fed. Cir. 1991) (same). Where the Board's (examiner's) construction of a claim is "inconsistent with the broadest reasonable interpretation in view of the specification," the Court should reverse the rejection of the claims at issue. *In re Imes*, 778 F.3d at 1252-1253.

38

## II.    THE    COURT    SHOULD    REVERSE    THE    BOARD'S CONSTRUCTION OF THE '400 PATENT'S CLAIM 3.

The Board erred by affirming a construction of claim 3 that is wholly inconsistent with the broadest reasonable interpretation of the claim in view of the specification; therefore, the Court should reverse the construction.  The Board, like the examiner, construed in isolation particular terms from one limitation without the context of the claim in its entirety.  Moreover, and again like the examiner, the Board ignored express language in the specification prescribing special definitions understood by persons of ordinary skill in the art at the time of the invention that both limit the scope of the challenged claims and exclude certain features the Board included by construing claim 3 as broadly as it did, such as an illuminator for providing unstructured / diffuse light.  Compounding its errors, the Board failed to construe the preamble as limiting after the *Proveris III* ruling.  In short, the Board's construction of claim 3 should be reversed and the challenged claims affirmed.  *See In re Imes*, 778 F.3d at 1252-1253.

## A. The Board Erred By Not Incorporating Limitations From The Preamble Into Its Claim Construction.

At the outset, the Board erred by not incorporating the preamble into its construction of claim 3 after the *Proveris III* court ruled the preamble to limit the claim. All limitations in a claim must be considered when the claim is construed – not simply one or two particular limitations in isolation. *ACTV*, 346 F.3d at 1088; *Hockerson-Halberstadt*, 183 F.3d at 1374. The preamble reads:

> An apparatus for producing image data representative of at least one sequential set of images of a spray plume, each of the images being representative of a density characteristic of the spray plume (1) along a geometric plane that intersects the spray plume, and (ii) at a predetermined instant in time comprising:

(AD8 col. 7, ll. 42-45; col. 8, ll. 1-2) With the *Proveris III* ruling, at a minimum, "sequential set of images" limits the claim because the *Proveris III* court concluded: "the preamble of claim 3 is the only reference in any independent claim to the inventive concept of capturing a sequence of images in order to characterize the time evolution of the spray plume." 739 F.3d at 1373 (emphasis added). Yet, despite Proveris rightly informing the Board that the preamble is now "a part of the entire claimed language of claim 3" and, thus, "now pertinent to the claim construction of other claim limitations," (A555), the Board failed to incorporate into its analysis even the language the *Proveris III* court ruled to be limiting, finding only that the preamble language "a geometric plane" should not be "limited to only one geometric plane." (AD90-AD91) The Board's failure amounts to

reversible error.  *ACTV*, 346 F.3d at 1088; *Hockerson-Halberstadt*, 183 F.3d at 1374.

**B.    The Court Should Reverse the Board's Construction of the Limitation "an illuminator for providing an illumination of the spray plume along at least one geometric plane that intersects the spray plume."**

The Board also erred in affirming the examiner's construction of the limitation "an illuminator for providing an illumination of the spray plume along at least one geometric plane that intersects the spray plume."  The Board focused in isolation on only certain terms within the limitation while ignoring other terms in the claim (e.g., the preamble), the object of the invention, the prosecution history, express definitions prescribed by the inventor in the specification, and the specification as a whole.  *See Bicon*, 441 F.3d at 950; *ACTV*, 346 F.3d at 1088; *Hockerson-Halberstadt*, 183 F.3d at 1374.  The result was a construction that is inconsistent with the broadest reasonable interpretation of the claim in view of the specification.

**1.    The Board's construction is inconsistent with the embodiment claimed in the preamble.**

The Board's construction is inconsistent with claim 3 because the preamble limits the claim to one embodiment.  To support its construction of "along at least one geometric plane" to mean multiple planes at the same time, the Board cited the disclosure in the specification:    "[t]he illumination device is adapted to

41

simultaneously or sequentially illuminate the spray with thin, fan-shaped beams of light along the spray axis SA and transverse to the spray axis SA." (AD6 col. 4, ll. 39-42; AD77)    As explained, *supra*, at 8, that disclosure describes two embodiments – one that simultaneously illuminates the spray with two thin, fan-shaped beams of light along the spray axis SA and transverse to the spray axis SA; and a second one that sequentially illuminates the spray with one thin, fan-shaped beam of light at a time, the first one to illuminate either along the spray axis or transverse to the spray axis and then, following the first one, a second one to illuminate the plane not illuminated the first time.  (*See* AD8, col. 8, ll. 11-18.)  At most, the disclosure cited by the Board teaches simultaneous illumination along only two geometric planes that are substantially orthogonal.  What the patentee claimed in the preamble to claim 3, however, is <u>only</u> the embodiment for the <u>sequential illumination</u> of the spray plume along <u>one geometric plane at a time.</u> (AD8, col. 7, ll. 43 ("sequential set of images" not simultaneous sets of images); col. 7, l. 45 ("along a geometric plane" not along a plurality of planes.)  The Board's construction is inconsistent with the preamble and should be reversed.

> **2.    The Board's construction of "an illuminator for providing an illumination" is inconsistent with the broadest reasonable interpretation in view of the specification.**

The Board erroneously construed "illumination" to mean any type of light, including unstructured/diffuse light, essentially looking no further than the plain

meaning of "illumination." (AD78) The Board acknowledged the specification's disclosures of "thin sheet of light," but concluded that the specification "at least implies that other forms of illumination, such as illuminating along multiple geometric planes at one time, are contemplated and could be employed." (*Id.*) The Board confused the discussion of various potential embodiments with the actual claim language, which excludes the simultaneous illumination embodiment by claiming only the sequential illumination embodiment. (AD8, col. 7, ll. 42-45; col. 8, ll. 1-2) "[W]here the patent describes multiple embodiments, every claim does not need to cover every embodiment." *Pacing Tech.*, 778 F.3d at 1026. The Board's construction is inconsistent with the broadest reasonable interpretation and should be reversed.

### 3. The Board's construction of "along at least one geometric plane" is inconsistent with the broadest reasonable interpretation in view of the specification.

The Board erred by determining that the context of claim 3 in its entirety, including its use of "a," "an," and "at least one," does not limit "along at least one geometric plane" to "one plane at a time." While "a," "an," and "at least one" can mean "one or more" for claim construction, what the words mean in a particular claim is determined by reading the entire claim in context. *See Baldwin. Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1342-1343 (Fed. Cir. 2008); *Howmedica Osteonics Corp. v. Wright Med. Tech., Inc.*, 540 F.3d 1337, 1344 (Fed. Cir. 2008).

Under *Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, the indefinite articles "a" and "an" do <u>not</u> mean "one or more" "where the language of the claims themselves, the specification, or the prosecution history necessitate a departure from the rule" that the indefinite articles mean "one or more." 512 F.3d at 1343. Similarly, the term "at least one" does <u>not</u> mean "one or more" when the context necessitates only one. *Howmedica Osteonics Corp. v. Wright Med. Tech., Inc.*, 540 F.3d at 1344 ("at least one condylar element" meant only one condylar element based on "plain language" of claim at issue).

In this case, use of "a," "an," and "at least one," within the context of claim 3, including the preamble, limit "along at least one geometric plane" to only <u>one geometric plane at a time</u>: "<u>each</u> of the images being representative of <u>a density characteristic</u> of the spray plume (a) along <u>a</u> geometric plane that intersects the spray plume," (AD8, col. 7, l. 44-45; col. 8, l. 1); "an illuminator for providing <u>an illumination</u>," (AD8, col. 8, ll. 3-5); "an imaging device for generating the image data representative of <u>an</u> interaction between <u>the illumination</u> and the spray plume along <u>the</u> at least one geometric plane," (AD8 col. 8, ll. 6-8) (emphasis added). The claim does not require images of "multiple density characteristics" along "multiple planes," or an imaging device for generating image data representative of "multiple interactions" between "multiple illuminations" and the spray plume along "multiple geometric planes," "more than one geometric plane," or "a

44

plurality of planes." Indeed, "plurality" is an accepted term in patent drafting to mean "two or more." *E.g.*, *In re: 55 Brake LLC*, No. 2014-1554, 2015 WL 1610170, at *2 (Fed. Cir. Apr. 13, 2015) (nonprecedential); *In re Abbott Diabetes Care*, 696 F.3d at 1144. Even the '333 patent (Aleshin) distinguishes illuminating "more than one" from illuminating "one" by disclosing that "[t]he device of the present invention may also include a mechanical arrangement for moving the plane of light through the powder stream to illuminate a <u>plurality</u> of different cross-sections." (A391 (emphasis added).) Had the patentee intended claim 3 to mean that more than one geometric plane be illuminated at any one time, he could have drafted "along a plurality of planes." He did not. He drafted claim 3 to disclose one geometric plane at a time, as is clear from claim 3 in its entirety.

Additionally, the Board erred by finding the Farina Declaration unpersuasive. (AD79) No other testimony of a person of ordinary skill in the art was before the Board. Farina declared that a person of ordinary skill in the art would understand "that a light source that projects light along 'a geometric plane' – a structured light source – is completely different than an unstructured light source." (A149) Farina then described the difference. (*Id.*) With no other testimony before the Board, the <u>only</u> evidence regarding how a person of ordinary skill in the art would interpret "along at least one geometric plane" was the Farina Declaration. Particularly considering the support from the patent for the opinions

and conclusions provided by Farina, the Board's conclusion that the testimony was unpersuasive is not supported by substantial evidence and clearly erroneous. *See In re Imes*, 778 F.3d at 1252 & n.1; *Cadence Pharm. Inc. v. Exela PharmSci Inc.*, 780 F.3d 1364, 1368 (Fed. Cir. 2015). In short, the Board's construction of "along at least one geometric plane" is inconsistent with the broadest reasonable interpretation in view of the specification and should be reversed.

### 4. The Board's construction of "spray plume" is inconsistent with the broadest reasonable interpretation in view of the specification.

The Board erred by construing "spray plume" to mean any type of spray, regardless of duration. The Board's construction fails because the specification expressly disclaims the plain meaning of "spray plume," and defines the term to mean inhaler-based DDD "spray plumes" with a duration of approximately "one second." (AD5, col. 1, ll. 32-35; AD6, col. 4, ll. 60-62; *see also* A151-A152) In rejecting Proveris's construction, the Board reasoned that it is "at odds with other teachings of the Specification" citing the disclosure that "the invention may include a spray pump actuator that is capable of controlling the *duration* of the aerosol spray plume," which the Board concluded "supports varying spray plume duration, and should not be limited only to an extremely transient, short-cycle spray." (AD80) The Board's reasoning is based on a fundamental misunderstanding that the duration of a "one second" spray plume cannot be

46

controlled. That misunderstanding is belied by express disclosures in the specification regarding controlling duration of the "spray plume" as part of inhaler-based DDD testing. (*See* AD5, col. 1, ll. 27-35; col. 2, ll. 58-61; AD6 col. 4, ll. 26-30, 55-64; AD7 col. 6, ll. 16-19.) Simply because an aerosol "spray plume" may last only approximately "one second" does not mean that its duration cannot be controlled by a spray pump actuator.

Moreover, nowhere in the specification is a steady flow stream of material such as a fuel injection system (Shin), an impinging spray paint jet (Settles), or a steady gasoline flow (the '233 patent), discussed or even mentioned. In fact, the inventor implicitly disclaimed from the definition of "spray plume" a steady flow stream of material with the express statement that "the duration of the spray plume created by a single pumping of the pump 22 is only on the order of one second." (AD6 col. 4, ll. 60-62) Further, the patentee expressly disclaimed impinging sprays as disadvantageous. (AD5, col. 2, ll. 16-23) The Board's (and examiner's) construction of "spray plume" to mean any type of spray plume, regardless of duration and including a steady flow stream of material, is inconsistent with the broadest reasonable interpretation in view of the specification and should be reversed.

## III. THE COURT SHOULD REVERSE THE BOARD'S DECISIONS AFFIRMING THE EXAMINER'S REJECTIONS OF CLAIMS 3-13 AND NEW CLAIMS 14 AND 15 OF THE '400 PATENT AS ANTICIPATED AND/OR OBVIOUS.

The Board erred by affirming the examiner's decisions to reject the challenged claims as anticipated and/or obvious. "Anticipation under 35 U.S.C. § 102 is a question of fact, while obviousness under 35 U.S.C. § 103 is a question of law based on underlying findings of fact." *Flo Healthcare Solutions LLC v. Kappos*, 697 F.3d 1367, 1375 (Fed. Cir. 2012). The Court reviews the Board's legal conclusions de novo and its factual findings for substantial evidence. *Flo Healthcare*, 697 F.3d at 1375-1376. Here, crucial factual findings by the Board are not supported by substantial evidence and its legal conclusions are erroneous. Therefore, the Court should reverse the Board's Decisions regarding anticipation and obviousness, and affirm the challenged claims.

### A. Claims 3-4, 6-8, and 13-15 Are Not Anticipated By The Cited References.

The Board's (and examiner's) factual findings that claims 3-4, 6-8, and 13-15 should be rejected as anticipated by the cited references are not supported by substantial evidence and should be reversed. "To hold that a prior art reference anticipates a claim, the Board must expressly find that <u>every</u> limitation in the claim was <u>identically shown</u> in the single reference." *Gechter v. Davidson*, 116 F.3d 1454, 1460 (Fed. Cir. 1997) (emphasis added). In other words, if a reference is

missing even one of a challenged claim's limitations, the reference does not anticipate the claim. Therefore, a decision regarding anticipation must contain the "whether, how, and why" each prior art reference contains each limitation in a claim – not just one disputed limitation. *Gechter*, 116 F.3d at 1460.

The Board's affirmance of the examiner's findings should be reversed because, at the outset, neither the Board nor the examiner reviewed the cited references for <u>each</u> limitation in claim 3; therefore, neither the Board nor the examiner expressly found that "<u>every</u> limitation in the claim was <u>identically shown</u> in</u>" any of the cited references. *Id.* (emphasis added). Neither the Board nor the examiner expressly found any limitation regarding "an imaging device for generating the image data . . . ." Additionally, the Board ignored the preamble, despite the *Proveris III* court's ruling that "sequential set of images" limits the claim because it is the only reference to "the inventive concept of capturing a sequence of images in order to characterize the time evolution of the spray plume." 739 F.3d at 1373. Without considering the preamble or the "imaging device for generating image data" limitation, neither the Board nor the examiner "expressly [found] that every limitation in the claim was identically shown in the single reference." *Gechter*, 116 F.3d at 1460. On that basis alone, the Board's Decision should be reversed.

Moreover, each cited reference lacks at least one element of the limitation the PTO did address. The Board affirmed the examiner's rejection of claim 3, as well as claims 4, 6-8, and 13-15, as anticipated by Miszuk, Dolovich, Shin, and the '233 (Dodge), '382 (Gomez), and '744 (Dietrich) patents. (AD81) The Board recognized that Miszuk, Shin, and the '233 and '744 patents do not identically show the element of an illuminator for projecting a thin sheet of light because they "all disclose illuminating the entire spray plume" with diffuse light; yet, erroneously agreed with the examiner that "along at least one geometric plane" is not limited to a thin sheet of light illuminating only one geometric plane at a time, and includes diffuse light. (*Id.*) Basing the rejection of claim 3 as anticipated by Miszuk, Shin, and the '233 and '744 patents on that improper construction was erroneous.

The Board also erred by finding that Dolovich and the '382 patent identically show each of the elements when neither reference discloses a light source that projects a thin sheet of light along one geometric plane at a time. Dolovich discloses a collimated, circular laser beam that is incapable of illumination along a geometric plane, and "presents a view of three-dimensional spherical particles that allows the diffraction angle data to be collected for determining the size of the spherical particles." (A163) Dolovich also discloses a

50

photomultiplier that merely detects when a particle passes through each of two beams.  (*Id.*)

The '382 patent discloses a collimated laser beam intended to allow diffraction off of spherical particles, which is incapable of illumination along a geometric plane.  Moreover, the "plane" disclosed in the '382 patent is not a light sheet – it is "an intangible (mathematically superimposed) Cartesian measurement coordinate plane."  (A159-A160)  Additionally, the '382 patent does not disclose, teach, or suggest an "imaging device," just sensors for the "the analysis and measurement of light scattered off of spherical particles by obtaining 'electrical signals proportional to the scattered and attenuated light intensities.'"  (A160 (quoting the '382 patent at col. 2, ll. 42-43))

The Board also erred in affirming the rejection of claims 14 and 15 as anticipated by Deljouravesh, the '333 patent, and Settles.  (AD87-AD88)  None of these references identically shows a light source that projects only one thin sheet of light at a time so that each image taken is representative of a density characteristic of a "spray plume" that is only approximately "one second."

In sum, before even addressing the other claim limitations, none of the references identically shows a light source for projecting one thin sheet of light at a time.  Therefore, none of the cited references identically shows each limitation of claim 3 or even each element of the limitation "an illuminator for providing an

illumination of the spray plume along at least one geometric plane that intersects the spray plume." Accordingly, none of the references anticipates claim 3, or claims 4, 6-8, and 13-15 dependent from claim 3. The Board erred in affirming the examiner's rejection of these claims as anticipated by Miszuk, Dolovich, Shin, and the '233, '382, and '744 patents, and with respect to claims 14 and 15, by Deljouravesh, the '333 patent, and Settles.

### B. Claims 5 and 9-15 Are Patentable Over The Cited Prior Art Combinations.

The Board erred in affirming the examiner's rejections of claims 5 and 9-15 as obvious. "A claimed invention is unpatentable if the differences between it and the prior art are such that <u>the subject matter as a whole</u> would have been obvious at the time the invention was made to a person having ordinary skill in the pertinent art." *C.W. Zumbiel Co. v. Kappos*, 702 F.3d 1371, 1379 (Fed. Cir. 2012) (emphasis added). "The ultimate determination of whether an invention would have been obvious is a legal conclusion based on underlying findings of fact." *Zumbiel*, 702 F.3d at 1379. The underlying factual inquiries are: (1) the scope and content of the prior art, (2) the differences between the prior art and the claims at issue, (3) the level of ordinary skill in the field of the invention, and (4) "secondary considerations such as commercial success, long felt but unsolved needs, failure of others, etc." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406, 127 S. Ct. 1727, 1734, 167 L. Ed. 2d 705 (2007) (quoting *Graham v. John Deere Co. of Kansas*

*City*, 383 U.S. 1, 86 S. Ct. 684, 15 L.Ed.2d 545 (1966)); *see also Zumbiel*, 702 F.3d at 1379.

It is important for the examiner to identify "'a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention does' in an obviousness determination." *Takeda Chem. Indus., Ltd. v. Alphapharm Pty., Ltd.*, 492 F.3d 1350, 1356-1357 (Fed. Cir. 2007) (quoting *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 127 S. Ct. 1727, 1731 (2007)). "[R]ejections on obviousness grounds cannot be sustained by mere conclusory statements; instead, there must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness." *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006). "A reference may be said to teach away when a person of ordinary skill, upon reading the reference, would be discouraged from following the path set out in the reference, or would be led in a direction divergent from the path that was taken by the applicant." *In re Gurley*, 27 F.3d 551, 553 (Fed. Cir. 1994). "The degree of teaching away will of course depend on the particular facts; in general, <u>a reference will teach away if it suggests that the line of development flowing from the reference's disclosure is unlikely to be productive of the result sought by the applicant.</u>" *In re Gurley*, 27 F.3d at 553 (emphasis added). The Board erred by finding the Farina Declaration unpersuasive and affirming the examiner's obviousness rejections.

**1.     Neither the Board nor the examiner made sufficient factual findings for a proper obviousness analysis.**

The Court should reverse the rejections for obviousness because, as a threshold matter, neither the Board nor the examiner made sufficient underlying factual findings to support the rejections.  The Board's factual findings regarding the prior art and claims at issue merely re-state passages from the references and claims.  (AD65-AD75)  The Board did not fully address the scope and content of the prior art, or the differences between the prior art and the claims at issue, particularly with the subject matter as a whole in mind.  Even worse, neither the Board nor the examiner made any factual findings regarding the level of ordinary skill in the field of the invention, or secondary considerations such as commercial success, long felt but unsolved needs, etc.  The specification expressly discloses a long felt but unsolved need for a way to characterize the time evolution of an inhaler-based DDD spray plume.  (AD5, col. 1, ll. 32-35, 58-61; co. 2, ll. 30-34)  At a minimum, the Board should have found that the invention solved a long felt need in the testing of inhaler-based DDDs.  The failure to make any factual findings regarding these secondary considerations or the level of ordinary skill in the art, on its own, provides the Court with ample justification for reversing the conclusions of obviousness.

### 2. Claims 5 and 13 are patentable over the combination of Deljouravesh and the '233 patent.

A person of ordinary skill in the art would not combine Deljouravesh and the '233 patent because they teach characterization of a steady flow stream of material, a type of spray plume that the patentee disclaimed when he expressly defined "spray plume" to be limited to having a duration of approximately one second. (AD6, col. 4, ll. 60-62; *see also* A151-A152, A167)  Moreover, the '233 patent teaches away from the use of planar light by teaching how to ensure that the disclosed light sources produce diffuse light, which means that combining Deljouravesh with the apparatus of the '233 patent (or the '333 patent) would not produce visible images that represent a density characteristic of the spray plume. (A167-A168, A172-A173)  Further, neither the examiner nor the Board provided any reasons why a person of ordinary skill in the art would combine these references when the object of the invention is to characterize the time evolution of density characteristics of spray plumes lasting approximately one second.  (AD36-AD38, ADAD83-AD84)

### 3. Claim 9 is patentable over the cited combinations.

Claim 9 is patentable over Deljouravesh in view of Shin, the '233 patent in view of Shin, and the '333 patent in view of Shin.  The Board erred by affirming the examiner's findings that while Deljouravesh and the '233 and '333 patents do not disclose a digital imaging system with "an image sampling rate of

approximately 500 images per second," (AD8, col. 8, ll. 28-30), in disclosures regarding a fuel injection system, Shin does, and it would have been obvious to combine the sampling rate disclosed in Shin with the apparatuses disclosed in Deljouravesh, and the '233 and '333 patents to achieve the object of the invention. (AD38-AD41; AD84-AD85)   This conclusion is erroneous.   Combining the camera in Shin with the apparatus in Deljouravesh "would render the Deljouravesh apparatus useless" and "would also change the principle of operation of Shin." (A168-A169)  Combining the camera in Shin with the apparatus in either the '233 or the '333 patent, "would not produce the results obtained by use of the apparatus disclosed in the '400 patent's claim 3."  (A169-A170)  Therefore, it would not have been obvious to a person of ordinary skill in the art to combine these references.  Further, neither the examiner nor the Board provided any reasons why a person of ordinary skill in the art at the time of the invention would combine these references when the object of the invention is to characterize the time evolution of density characteristics of spray plumes lasting approximately one second.  (AD38-AD41; AD84-AD85)

> **4.    Claims 10 and 11 are patentable over Dolovich, and Claim 12 is patentable over combinations of Settles and Dolovich.**

The Board erred by affirming the examiner's obviousness rejections of claims 10-12, which the Board justified by disagreeing with Proveris's "construction limiting the illumination to a thin sheet."  (AD85-AD86.)   Here

56

again, neither the examiner nor the Board provided any reasons why a person of ordinary skill in the art at the time of the invention would look to Dolovich, or combine Dolovich and Settles, to achieve the object of the '400 patent's invention with "a laser system having fan-shaped output pattern," including one that is "approximately 45 degrees with a laser line thickness of approximately one millimeter at approximately the centerline of the emitted spray," and "wherein the laser system includes a 4 watt, 810 nm laser output." (AD8, col. 8, ll. 31-40; *see also* AD41-AD44, AD85-AD86)   Capturing a sequence of images in order to characterize the time evolution of a density characteristic of a spray plume, would not have been obvious from the subject matter of Dolovich and Settles as a whole. Dolovich discusses a technique for particle sizing and/or velocity – laser diffraction-based measurements – by using a collimated beam to view scattering angles off of the particles.  Settles discusses viewing the transfer effectiveness of an impinging, steady flow spray paint system.  (A171-A172)   Dolovich, and Dolovich and Settles, teach away because the invention presents only a two-dimensional view of spray particles, and is intended to overcome the disadvantages caused by impinging sprays.  (*Id.*; AD5, col. 2, ll. 16-26)

### 5.   Claims 14 and 15 are patentable over the cited references.

The Board also erred in affirming the examiner's rejection of new claims 14 and 15 as obvious over each of Deljouravesh, the '333 patent, and Settles.  (AD87-

AD88)   With respect to claim 14, the examiner admitted that none of these references "explicitly disclose wherein the spray plume is the aerosol spray emitted by metered nasal spray pumps and/or metered dose inhalers," but found that the new claim did not "result in a structural difference between the claimed invention and the prior art" because the prior art structures would be capable of "performing the intended use" of the metered nasal spray pumps and/or metered dose inhalers. (AD47-AD48, AD51)  Both the Board and the examiner failed to explain how the apparatus of Deljouravesh, which requires compensation calculations to generate image data, the apparatus of the '333 patent, which discusses a steady flow stream, or the impinging steady flow spray paint system of Settles, could possibly be adapted to obtain image data representative of the time-evolution of a density characteristic of a spray plume lasting approximately one second, such as the spray plume of an inhaler-based DDD.

The examiner also rejected claims 14 and 15 as obvious over Miszuk, the '382 patent, and Dolovich, (AD45-AD51); however, the Board did not "address the additional rejections of claims 14 and 15."   (AD87 n.3)   The examiner's decisions based on these references are also erroneous and should be reversed for the same reasons the rejections based on Deljouravesh, the '333 patent, and Settles should be reversed.

## CONCLUSION

The Court should reverse the Board's construction of claim 3. The Board failed to consider every limitation in the claim, a failure that is particularly egregious given the *Proveris III* court ruling that the preamble language "sequential set of images" is limiting. The Board also dismissed the object of the invention and the specification, including express language that prescribed special definitions, to reach a construction that is wholly inconsistent with the broadest reasonable interpretation of the claim in view of the specification. Therefore, the construction should be reversed.

The Court should also reverse the Board's affirmance of the examiner's rejection of issued claims 3-13 and new claims 14-15 as anticipated and/or obvious over the cited prior art. The Board based its affirmance on its erroneous construction of claim 3, in the face of prior art that does not include every claim limitation, teaches away from the invention, and would render the invention unworkable under any of the cited combinations.

Alternatively, the Court should vacate the Board's Decision and remand the case for construction of all of claim 3's limitations, including the preamble, and then reexamination of validity in view of the prior art.

/s/ Barry J. Schindler

BARRY J. SCHINDLER
LENNIE A. BERSH
200 Park Avenue
Florham Park, NJ 07932
Tel. No.: (973) 360-7900
Fax No.: (973) 295-1251
schindlerb@gtlaw.com

SUSAN HANMER FARINA
PROVERIS SCIENTIFIC CORPORATION
290 Donald Lynch Boulevard, Suite 100
Marlborough, MA 01752
Tel.: (508) 460-8822
Fax: (508) 460-8942
sfarina@proveris.com

Dated:  May 11, 2015

# ADDENDUM

US006785400B1

(12) **United States Patent**
Farina

(10) Patent No.: **US 6,785,400 B1**
(45) **Date of Patent:** **Aug. 31, 2004**

(54) **SPRAY DATA ACQUISITION SYSTEM**

(75) Inventor: **Dino J. Farina**, Waltham, MA (US)

(73) Assignee: **Image Therm Engineering, Inc.**, Sudbury, MA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 550 days.

(21) Appl. No.: **09/640,246**

(22) Filed: **Aug. 16, 2000**

**Related U.S. Application Data**

(60) Provisional application No. 60/149,281, filed on Aug. 17, 1999.

(51) **Int. Cl.**[7] ................................................ **G06K 9/00**
(52) **U.S. Cl.** ........................ **382/100**; 356/414; 424/40; 424/76.2
(58) **Field of Search** ............................ 382/100; 424/59, 424/84, 130.1, 404, 489, 1.13, 40, 76.2; 423/210; 356/414, 409, 436, 437; 128/200.23, 207.14; 451/6, 39

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,357,670 | A | 11/1982 | McFarlane |
| 4,415,245 | A * | 11/1983 | Camillo et al. .............. 356/338 |
| 4,614,300 | A | 9/1986 | Falcoff |
| 4,965,841 | A | 10/1990 | Kaneko et al. |
| 4,992,952 | A | 2/1991 | Sasaki |
| 5,075,014 | A | 12/1991 | Sullivan .................... 210/747 |
| 5,337,926 | A | 8/1994 | Drobish et al. |
| RE34,914 | E * | 4/1995 | Funkenbusch et al. ... 210/198.2 |
| 5,561,527 | A * | 10/1996 | Krone-Schmidt et al. ... 356/414 |
| 5,879,713 | A * | 3/1999 | Roth et al. .................. 424/489 |
| 6,149,071 | A | 11/2000 | MacCallumMhor et al. |
| 6,193,936 | B1 * | 2/2001 | Gardner et al. ............. 422/186 |
| 6,256,597 | B1 | 7/2001 | Wang et al. |
| 6,508,112 | B1 | 1/2003 | Verhoeven |

OTHER PUBLICATIONS

Dvorak, P., "How to See Aerosol Spray Patterns and Plumes," *Machine Design, 72*(13): 122 (Jul. 6, 2000).
Badredin, Amira M., "Real-Time Analysis of Fuel Spray Images," *IEEE*, pp. 622–624 (1987).

Lopera, J. F. G., et al., "Improved Entropic Edge–DEtection." Paper supported by grant MAR97–0464–C04–02 of Spanish Government. No date given.

Pastor, J. V., et al., "Analysis Methodology of Diesel Spray and Flame by Means of In–Cylinder Endoscopic Imaging," (The Institution of Electrical Engineers). Savoy Place, London: IEE (2000).

Sellens, Rick and Deljouravesh, Rama, "Non–Orthogonal Optical Spray Pattern Analysis," Ninth International Symposium on Applications of Laser Techniques to Fluid Mechanics, Lisbon, Portugal, Jul. 1998.

Sankar, S.V., et al., "Time–Resolved Measurement of Liquid Mass Distribution in a Fuel Injector Spray Using an Optical Patternator,"*Institute for Liquid Atomization and Spray Systems, ILASS Americas* '97, pp. 266–270, Ottawa, ON, Canada, May 18–21, 1997.

Wang, G., et al., "An Optical Spray Pattern Analyzer," *Institute for Liquid Atomization and Spray Systems, ILASS Americas* '97, pp. 261–265, Ottawa, ON, Canada, May 18–21, 1997.

* cited by examiner

*Primary Examiner*—Bhavesh M. Mehta
*Assistant Examiner*—Abolfazl Tabatabai
(74) *Attorney, Agent, or Firm*—Hamilton, Brook, Smith & Reynolds, P.C.

(57) **ABSTRACT**

A spray data acquisition system includes a pumping device responsive to an applied force to generate an aerosol spray plume along a spray axis. The system further includes a spray pump actuator that is capable of controlling the pumping force and the duration of the aerosol spray plume produced by the pumping device. The system also includes an illumination device that illuminates the aerosol spray plume along at least one first geometric plane that intersects the aerosol spray plume. The system further includes an imaging device that acquires data representative of an interaction between the illumination and the aerosol spray plume along at least one geometric plane.

**13 Claims, 3 Drawing Sheets**



**AD 001**



FIG. 1



**FIG. 2**



## FIG. 3

US 6,785,400 B1

# SPRAY DATA ACQUISITION SYSTEM

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application claims the benefit of U.S. Provisional Application No. 60/149,281, filed Aug. 17, 1999, the contents of which are incorporated herein by reference in their entirety, and from which priority is claimed.

This application is related to the following U.S. application filed contemporaneously herewith, of common assignee, the contents of which are incorporated herein in their entirety by reference:

"SPRAY DATA ANALYSIS AND CHARACTERIZATION SYSTEM," invented by Dino J. Farina, U.S. patent application Ser. No. 09/640,346.

## STATEMENT REGARDING FEDERALLY SPONSORED RESEARCH

Not Applicable

## REFERENCE TO MICROFICHE APPENDIX

Not Applicable

## BACKGROUND OF THE INVENTION

The present invention relates to systems for and methods of characterizing aerosol spray patterns, and more particularly, to systems and methods that illuminate an aerosol spray plume and utilize optical-techniques to characterize the associated spray pattern.

The fluid dynamic characterization of the aerosol spray emitted by metered nasal spray pumps and metered dose inhalers is crucial in determining the overall performance of the inhaler as a drug delivery device ("DDD"). In addition to treating direct respiratory ailments, inhaler-based DDDs are now increasingly being used to deliver drugs such as flu vaccines, insulin and migraine headache relievers because they deliver their dose of medication to tissues that can more efficiently absorb the drug and bring relief to patients more conveniently. Spray characterization is also an integral part of the regulatory submissions necessary for Food and Drug Administration ("FDA") approval of research and development, quality assurance and stability testing procedures for new and existing inhaler-based DDDs.

Thorough characterization of the spray's geometry has been found to be the best indicator of the overall performance of most inhaler-based DDDs. In particular, measurements of the spray's divergence angle (plume geometry) as it exits the device; the spray's cross-sectional ellipticity, uniformity and particle/droplet distribution (spray pattern); and the time evolution of the developing spray have been found to be the most representative performance quantities in the characterization of an inhaler-based DDD.

During research and development, these measurements are typically used to optimally match the spray pump's performance characteristics with the fluid properties of the liquid/solid medicine solution, resulting in a more cost-effective and efficient product design. However, accurate, reliable and easy-to-use protocols and a system for inhaler-based DDD spray characterization do not exist. During quality assurance and stability testing, plume geometry and spray pattern measurements are key identifiers for verifying consistency and conformity with the approved data criteria for the inhaler-based DDD.

The currently adopted inhaler spray testing standard that is in use today at pharmaceutical companies involves firing the spray pump at a solid, thin-layer chromatography ("TLC") plate having a coating that fluoresces in response to incident ultraviolet ("UV") radiation. The TLC plate is positioned at a fixed height above the exit port of the pump. The pattern of the spray deposited on the plate is then analyzed.

In a conventional test configuration, the analysis of an exposed plate begins with illumination of the plate with UV radiation. The incident UV radiation causes the plate's coating to fluoresce and helps to highlight the outline of the spray pattern. Marking instruments and mechanical calipers are then used to draw and measure an outline of the deposited patterns on the plate. Measurements of the spray, pattern's ellipticity in terms of major-and minor-diameters are recorded.

One disadvantage to this configuration is that the presence of the TLC plate radically alters the natural fluid dynamics of the spray causing it to switch from a free aerosol jet to an impinging jet.

Another disadvantage to this configuration is that a large of amount of the spray particles bounce off the plate, causing artifacts in the pattern that do not exist in an unconstrained spray. This is especially problematic for dry powder-based DDDs because the particles don't tend to stick to the TLC plate at all causing artificially low spray pattern densities to be measured and reported.

Yet another disadvantage to this configuration is that the measurements of the spray pattern are very sensitive to the operator's judgement and prone to low reliability.

A further disadvantage to this configuration is that the associated measurement technique is restricted to measurements only of the static aspects of the spray pattern; it cannot be used to investigate any time-evolving or plume geometry properties of the spray.

It is an object of the present invention to substantially overcome the above-identified disadvantages and drawbacks of the prior art.

## SUMMARY OF THE INVENTION

In one preferred embodiment, the invention provides a device for producing image data representative of at least one sequential set of images of a spray plume. Each of the images is representative of a density characteristic of the spray plume (i) along a geometric plane that intersects the spray plume, and (ii) at a predetermined instant in time. The device includes an illuminator for providing an illumination of the spray plume along at least one geometric plane that intersects the spray plume. The device also includes a transducer for generating the image data representative of an interaction between the illumination and the spray plume along the geometric plane.

The foregoing and other objects are achieved by the invention which in one aspect comprises a spray data acquisition system that includes a housing for supporting a pumping device. The pumping device is responsive to an applied force to generate an aerosol spray plume through an exit port thereon along a spray axis. The system further includes a spray pump actuator that is capable of controlling the pumping force and the duration of the aerosol spray plume produced by the pumping device. The system also includes an illumination device that illuminates the aerosol spray plume along at least one first geometric plane that intersects the aerosol spray plume. The system further includes an imaging device that acquires data representative of an interaction between the illumination and the aerosol spray plume along at least one geometric plane.

**AD 005**

US 6,785,400 B1

3

In another aspect, the invention comprises an apparatus for producing image data representative of at least one sequential set of images of a spray plume. Each of the images is representative of a density characteristic of the spray plume (i) along a geometric plane that intersects the spray plume, and (ii) at a predetermined instant in time. The apparatus includes an illuminator for providing an illumination of the spray plume along at least one geometric plane that intersects the spray plume. The apparatus further includes a transducer for generating the image data representative of an interaction between the illumination and the spray plume along the at least one geometric plane.

In another embodiment of the invention, the sequential set of images is representative of a progression in time.

In another embodiment of the invention, a first time-sequential set of images corresponds to an axial cross-sectional density characteristic along a first geometric plane substantially normal to a flow direction centerline, and a second time-sequential set of images corresponds to a longitudinal density characteristic along a second geometric plane substantially parallel to and intersecting the flow direction centerline.

In another embodiment of the invention, the interaction between the illumination and the spray plume includes optical scattering.

In another embodiment of the invention, the interaction between the illumination and the spray plume includes optical absorption.

In another embodiment of the invention, the transducer includes a digital imaging system for generating and recording the image data.

In another embodiment of the invention, the digital imaging system includes an image sampling rate of approximately 500 images per second.

In another embodiment of the invention, the illuminator includes a laser system having a fan-shaped output pattern.

In another embodiment of the invention, the fan-shaped output pattern includes a fan angle of approximately 45 degrees, and a laser line thickness of approximately one millimeter, measured at the centerline of the spray.

In another embodiment of the invention, the laser system includes a 4 watt, 810 nm laser output.

In another embodiment of the invention, the illumination device illuminates the spray plume along a second geometric plane that intersects the aerosol spray plume, and the imaging device acquires data representative of a second interaction between the illumination and the aerosol spray plume along a second geometric plane. In one embodiment, the first and the second geometric planes are substantially orthogonal.

## BRIEF DESCRIPTION OF DRAWINGS

The foregoing and other objects of this invention, the various features thereof, as well as the invention itself, may be more fully understood from the following description, when read together with the accompanying drawings in which:

FIG. 1 is a schematic showing a spray data acquisition system, according to an embodiment of the invention;

FIG. 2. shows an illumination device illuminating a transverse axial cross-sectional slice of a spray in the embodiment of FIG. 1; and

FIG. 3 shows an illumination device illuminating a slice of a spray along the spray axis in the embodiment of FIG. 1.

4

## DESCRIPTION OF THE PREFERRED EMBODIMENTS

The spray data acquisition system of the present invention provides images of the time-evolution, particle distribution, and divergence angle of aerosol sprays. The spray data acquisition system is a non-intrusive, optical-based design system that is capable of capturing information representative of the time evolution of an aerosol spray for substantially complete geometrical (divergence angle and plume geometry) and pattern (cross-sectional uniformity and ellipticity) imaging. The modular hardware of the system allows easy customization to meet the needs of a variety of spray testing applications in research & development, stability testing and production environments.

FIG. 1 shows a spray data acquisition system 10 which generates data representative of the characteristics of an aerosol spray as emitted from a spray pump 22. The system 10 includes a spray pump housing 21 for the spray pump 22, an actuator 18, an illumination device 26 and an imaging device 12. The spray pump housing 21 is provided to position the spray pump 22 so as to direct an aerosol spray through a port in the housing 21 along a spray axis SA.

The imaging device 12 of the present invention's data acquisition system 10 includes a camera head 14 and a control unit 16. Associated with the actuator 18 is a spray actuator control unit 20 and a force control element 19, responsive to the spray control unit 20, for controlling a pumping force and a duration of an aerosol spray plume of the spray pump 22. The actuator 18 is preferably an electro-mechanical transducer that converts electrical control signals from the control unit 20, although other techniques known in the art for generating a pumping force may also be used, e.g., hydraulic, pneumatic, simple mechanical linkage, etc. The actuator 18 selectively activates the pump 22 to produce a spray plume for evaluation by the system 10. The centerline of the aerosol spray plume is shown as the spray axis SA.

The illumination device 26 is adapted to simultaneously or sequentially illuminate the spray with thin, fan-shaped beams of light along the spray axis SA and transverse to the spray axis SA. The imaging device 12 is adapted to acquire data representative of the optical density distribution of the portions of the spray illuminated by the illumination device 26. A first set of data is generated that is representative of a transverse cross-sectional slice of the spray plume. This set of data is useful in providing information relating to the spray divergence and the degree of spray uniformity in various directions radiating from the spray axis. A second set of data is generated that is representative of a slice of the spray along the spray axis. This set of data is useful in providing information on the spray divergence and the degree of spray uniformity along the spray axis and other axes diverging from the exit port.

The spray pump actuator 18, the force control element 19 and the control unit 20 are programmable so as to control key parameters associated with aerosol spray pumping, including pumping force and duration. In addition, the actuator 18 includes an output trigger signal that triggers the imaging device when the spray pump is actuated. Since the duration of the spray plume created by a single pumping of the pump 22 is only on the order of one second, it is crucial to have accurate synchronization between the spray pump actuator 18 and the imaging device 12. The InnovaSystems (Pennsauken, N.J.) Nasal Spray Pump Actuator is an example of a preferable actuator for use with the present invention. The InnovaSystems actuator includes built-in

AD 006

US 6,785,400 B1

5

programmability to control many of the key parameters involved with aerosol spray pumping described herein. In addition, the InnovaSystems actuator is equipped with a digital output signal that can trigger the imaging device when the pump is fired. This signal is compatible with the digital input trigger of the National Instruments PCI-1424 and Dalsa CA-D6-0256 (an example of a preferable image acquisition device 12) and provides nearly perfect synchronization for the system 10.

The imaging device 12 is preferably capable of an image acquisition speed (i.e. framing rate) and spatial resolution to accurately capture the time evolution of a spray for both geometry and pattern testing. The imaging device 12 preferably provides a framing rate in the neighborhood of 1000 frames/second (fps) at a resolution of 256×256 pixels and 8-bit intensity to accurately capture the time evolution of the spray for both the plume geometry and spray pattern testing. Such acquisition speed and spatial resolution values result in an 80 to 100 fold increase in the amount of pertinent information about the complete fluid dynamics of an aerosol spray plume compared to the TLC-plate method currently being used. As described herein, the combination of the PCI-1424 image acquisition board from National Instruments (Austin, Tex.) and the CA-D6-0256 high speed digital camera from Dalsa (Waterloo, Ontario, Canada) is an, example of a preferable imaging device 12. The CA-D6-0256 has a programmable framing rate from 1 to 955 fps at a resolution of 256×256 pixels with 256 grayscales (8-bit). In addition, the PCI-1424 image acquisition board communicates directly with the camera and is capable of acquiring and displaying these images in a computer-based software system. Additionally, the camera is fitted with a Cinegon lens from Schneider Optics (Hauppauge, N.Y.) that effectively focuses and transmits the laser light being reflected by the particles onto the camera's image sensor. The power and wavelength specification of the preferred illumination device (the Magnum 4000, described herein) matches favorably to the spectral response of the Cinegon lens and the Dalsa CA-D6-0256. Thus, the preferred camera and laser combination produces bright images that clearly show the spray particles.

The illumination device 26 is preferably capable of illuminating time-evolving spray particles at a frame rate of approximately 500 fps. Preferably, the illumination device is a continuous-wave illuminant (but can also be strobed in unison with the image acquisition to provide better freezing of the in-flight particles) such as a laser sheet generator. Furthermore, the light from the illumination device 26 is capable of being shaped into a thin sheet for accurate illumination of the particles for both the spray pattern and divergence angle measurements. Preferably, the illumination device is capable of producing approximately 4W of illumination power and directly projecting a very thin sheet of light at a wavelength of 810 nm with a fan angle of 45° though other fan angles can be used depending on the situation. The Magnum 4000 laser sheet generator from Lasiris (St. Laurent, Quebec, Canada) is an example of a preferred illumination device 26. This solid-state diode laser produces 4W of illumination power and directly projects a very thin sheet of light at a wavelength of 810 nm, and is available with fan angles of 30, 45 and 60°.

In one preferred embodiment, the mechanical mounting hardware for the spray data acquisition system 10 is designed so that spray pump housing, the spray pump actuator 18, the illumination device 26 and the imaging device 12 can be precisely, adjustably positioned and locked in place on a standard 2" thick optics bench. In this

6

embodiment, the hardware also includes a custom designed calibration target to facilitate spatial calibration and perspective correction of the acquired images. In other embodiments, the various components of the spray data acquisition system 10 may be mounted relative to one another via other methods known to those in the art.

The control unit 16 of the imaging device 12 is responsive to the spray actuator control unit 20. In one embodiment, the control unit 16 of the imaging device 12 is connected to a computer system 24 for subsequent computer analysis of information acquired by the imaging device 12, so as to characterize the parameters associated with the spray plume being analyzed. Alternatively, the information gathered from the imaging device 12 can be analyzed according to other methods known to those of ordinary skill in the art.

In operation, the spray pump 22 is filled with test fluid and placed into the mouth of the actuator 18, which has been pre-calibrated for compression force and duration as per standard pharmaceutical spray testing guidelines. The imaging device 12 is set to capture at 500 fps giving a resolution of 256×256 pixels. The input trigger is armed and set to wait for the actuator 18 to fire. The illumination device 26 is turned on and its light sheet is focused to a thickness of approximately 1 mm when it illuminates the plane of spray particles.

When the spray data acquisition system 10 is used to conduct spray pattern tests, the illumination device 26 is positioned so that it illuminates in a thin sheet 28 a predetermined, transverse axial cross section of the spray directly downstream of the spray pump tip 30 as shown in FIG. 2. The centerline of the aerosol spray plume is shown as spray axis SA. The imaging device 12 is positioned so that it can view the spray pattern from above at a slight off-axis angle to prevent the spray particles from directly impinging on the imaging device 12 and lens 36. A calibration target 32 is then temporarily placed in the plane of the illumination device's light sheet 28 and the imaging device lens 36 is adjusted until the target 32 comes into focus. An image of the focused target 32 is then captured with the imaging device 12 and can be downloaded to a computer or analyzed mechanically according to methods known to those of ordinary skill in the art. This target image 32 is used as a basis for calibrating the physical coordinate system of the spray pattern images and to perform the necessary perspective correction to the images to account for the off-axis viewing angle. The target image 32 is then removed from the scene and the trigger 34 is fired on the actuator 18 causing the imaging device 12 to start capturing the time-evolving images of the spray pattern. This takes about 2 seconds. Alternatively, the images can be analyzed according to methods known to those of ordinary skill in the art.

When the spray data acquisition system of the invention is used to conduct spray geometry tests, the illumination device 12 is positioned so that it illuminates a plane of particles parallel to the flow direction along the centerline of the spray or spray axis SA as shown in FIG. 3. The imaging device 12 is positioned perpendicular to the illumination device sheet plane 38. Similar to the spray pattern tests, the calibration target 32 is then temporarily placed in the plane of the sheet 38 of light emitted from the illumination device 26 and the imaging device lens 36 is adjusted until the target 32 comes into focus. Since in this case the imaging device 12 views the scene normally, no perspective correction is necessary so the target image 32 is used solely for calibrating the physical coordinate system of the spray geometry images. Again, the target image 32 is then removed from the scene and the actuator trigger 34 is fired. Alternatively, the

US 6,785,400 B1

7

images can be analyzed according to methods known to those of ordinary skill in the art.

The SprayVIEW Spray Characterization System User's Guide, Version 1.0, published by Image Therm Engineering, Inc., 1999, is an exemplary User's Manual for a spray data acquisition system according to the present invention. This user's guide is a manual for an entire spray characterization system, including information regarding acquisition, processing, set up, calibration, safety issues, et al. Thus, some of the information in the User's Manual is beyond the scope of this specification.

The invention may be embodied in other specific forms without departing from the spirit or essential characteristics thereof. The present embodiments are therefore to be considered in respects as illustrative and not restrictive, the scope of the invention being indicated by the appended claims rather than by the foregoing description, and all changes which come within the meaning and range of the equivalency of the claims are therefore intended to be embraced therein.

What is claimed is:

1. A spray data acquisition system comprising:

a housing for supporting a pumping device whereby the pumping device is responsive to an applied force to generate an aerosol spray plume through an exit port thereon along a spray axis;

a spray pump actuator, wherein the spray pump actuator is capable of controlling a pumping force and a duration of the aerosol spray plume of the pumping device;

an illumination device for illuminating the aerosol spray plume along at least one geometric plane that intersects the aerosol spray plume; and,

an imaging device for acquiring data representative of a first interaction between the illumination and the aerosol spray plume along the at least one geometric plane.

2. A spray data acquisition system according to claim 1, wherein the illumination device illuminates the spray plume along a second geometric plane that intersects the aerosol spray plume, and the imaging device acquires data representative of a second interaction between the illumination and the aerosol spray plume along a second geometric plane.

3. An apparatus for producing image data representative of at least one sequential set of images of a spray plume, each of the images being representative of a density characteristic of the spray plume (i) along a geometric plane that

8

intersects the spray plume, and (ii) at a predetermined instant in time, comprising:

an illuminator for providing an illumination of the spray plume along at least one geometric plane that intersects the spray plume; and,

an imaging device for generating the image data representative of an interaction between the illumination and the spray plume along the at least one geometric plane.

4. An apparatus according to claim 3, wherein the sequential set of images is representative of a progression in time.

5. An apparatus according to claim 3, wherein a first time-sequential set of images corresponds to an axial cross-sectional density characteristic along a first geometric plane substantially normal to a flow direction centerline, and a second time-sequential set of images corresponds to a longitudinal density characteristic along a second geometric plane substantially parallel to and intersecting the flow direction centerline.

6. An apparatus according to claim 3, wherein the interaction between the illumination and the spray plume includes optical scattering.

7. An apparatus according to claims 3, wherein the interaction between the illumination and the spray plume includes optical absorption.

8. An apparatus according to claim 3, wherein the imaging device includes a digital imaging system for generating and recording the image data.

9. An apparatus according to claim 8, wherein the digital imaging system includes an image sampling rate of approximately 500 images per second.

10. An apparatus according to claim 3, wherein the illuminator includes a laser system having a fan-shaped output pattern.

11. An apparatus according to claim 10, wherein the fan-shaped output pattern includes a fan angle of approximately 45 degrees, and a laser line thickness of approximately one millimeter at approximately the centerline of the emitted spray.

12. An apparatus according to claim 10, wherein the laser system includes a 4 watt, 810 nm laser output.

13. A spray data acquisition system according to claim 3, wherein the first and the second geometric planes are substantially orthogonal.

* * * * *



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 95/001,578 | 04/19/2011 | Dino J Farina | 3028-0039 | 5314 |

32361        7590        04/27/2012
GREENBERG TRAURIG (NY)
MET LIFE BUILDING
200 PARK AVENUE
NEW YORK, NY 10166

| EXAMINER |
|---|
| DEB, ANJAN K |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3992 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 04/27/2012 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

**AD 009**

 UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patents and Trademark Office
P.O.Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

**DO NOT USE IN PALM PRINTER**

THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS

KENEALY VAIDYA LLP
515 EAST BRADDOCK ROAD
SUITE B
ALEXANDRIA, VA 22314

Date:

MAILED

APR 2 7 2012

CENTRAL REEXAMINATION UNIT

## Transmittal of Communication to Third Party Requester
### Inter Partes Reexamination

REEXAMINATION CONTROL NO. : 95001578
PATENT NO. : 6785400
TECHNOLOGY CENTER : 3999
ART UNIT : 3992

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above identified Reexamination proceeding. 37 CFR 1.903.

Prior to the filing of a Notice of Appeal, each time the patent owner responds to this communication, the third party requester of the inter partes reexamination may once file written comments within a period of 30 days from the date of service of the patent owner's response. This 30-day time period is statutory (35 U.S.C. 314(b)(2)), and, as such, it cannot be extended. See also 37 CFR 1.947.

If an ex parte reexamination has been merged with the inter partes reexamination, no responsive submission by any ex parte third party requester is permitted.

All correspondence relating to this inter partes reexamination proceeding should be directed to the Central Reexamination Unit at the mail, FAX, or hand-carry addresses given at the end of the communication enclosed with this transmittal.

PTOL-2070(Rev.07-04)

**AD 010**

| Transmittal of Communication to Third Party Requester Inter Partes Reexamination | Control No. 95/001,578 | Patent Under Reexamination FARINA ET AL. |
|---|---|---|
| | Examiner ANJAN DEB | Art Unit 3992 |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address. --*

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above-identified reexamination proceeding. 37 CFR 1.903.

Prior to the filing of a Notice of Appeal, each time the patent owner responds to this communication, the third party requester of the *inter partes* reexamination may once file written comments within a period of 30 days from the date of service of the patent owner's response. This 30-day time period is statutory (35 U.S.C. 314(b)(2)), and, as such, it <u>cannot</u> be extended. See also 37 CFR 1.947.

If an *ex parte* reexamination has been merged with the *inter partes* reexamination, no responsive submission by any *ex parte* third party requester is permitted.

**All correspondence** relating to this inter partes reexamination proceeding should be directed to the **Central Reexamination Unit** at the mail, FAX, or hand-carry addresses given at the end of the communication enclosed with this transmittal.

| **Right of Appeal Notice** **(37 CFR 1.953)** SUPPLEMENTAL | Control No. 95/001,578 | Patent Under Reexamination FARINA ET AL. |
|---|---|---|
| | Examiner ANJAN DEB | Art Unit 3992 |

**-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address. --**

Responsive to the communication(s) filed by:
Patent Owner on   March 1, 2012
Third Party(ies) on
Patent owner and/or third party requester(s) may file a notice of appeal with respect to any adverse decision with payment of the fee set forth in 37 CFR 41.20(b)(1) within **one-month or thirty-days (whichever is longer)**. See MPEP 2671. In addition, a party may file a notice of **cross** appeal and pay the 37 CFR 41.20(b)(1) fee **within fourteen days of service** of an opposing party's timely filed notice of appeal. See MPEP 2672.

**All correspondence** relating to this inter partes reexamination proceeding should be directed to the **Central Reexamination Unit** at the mail, FAX, or hand-carry addresses given at the end of this Office action.

If no party timely files a notice of appeal, prosecution on the merits of this reexamination proceeding will be concluded, and the Director of the USPTO will proceed to issue and publish a certificate under 37 CFR 1.997 in accordance with this Office action.

The proposed amendment filed _____   ☐ will be entered   ☐ will not be entered*

*Reasons for non-entry are given in the body of this notice.

1a. ☒ Claims 3-15 are subject to reexamination.

1b. ☒ Claims 1 and 2 are not subject to reexamination.

2. ☐ Claims _____ have been cancelled.

3. ☐ Claims _____ are confirmed. [Unamended patent claims].

4. ☐ Claims _____ are patentable. [Amended or new claims].

5. ☒ Claims 3-15 are rejected.

6. ☐ Claims _____ are objected to.

7. ☐ The drawings filed on _____  ☐ are acceptable.  ☐ are not acceptable.

8. ☐ The drawing correction request filed on _____ is ☐ approved. ☐ disapproved.

9. ☐ Acknowledgment is made of the claim for priority under 35 U.S.C. 119 (a)-(d) or (f). The certified copy has:
   ☐ been received.   ☐ not been received.   ☐ been filed in Application/Control No. _____.

10. ☐ Other _____

**Attachments**

1. ☐ Notice of References Cited by Examiner, PTO-892
2. ☒ Information Disclosure Citation, PTO/SB/08
3. ☐ _____

**AD 012**

Application/Control Number: 95/001,578                                    Page 2
Art Unit: 3992

## TABLE OF CONTENTS

1.0    SUMMARY ...................................................................................................4

2.0    SUMMARY OF THE PROCEEDINGS ......................................................5

3.0    STATUS OF CLAIMS .................................................................................6

4.0    REFERENCES CITED .................................................................................6

5.0    ISSUES .........................................................................................................7

6.0    PROPOSED CLAIM REJECTIONS ...........................................................9

7.0    RESPONSE TO ARGUMENTS .................................................................11

8.0    CLAIM REJECTIONS 35 USC § 102 ........................................................13

   8.1    Miszuk (cl. 3-8, 13) ..............................................................................13

   8.2    '382 patent (cl. 3, 4, 6 and 7) ...............................................................17

   8.3    '744 patent (cl. 3, 4, 6 and 7) ...............................................................19

   8.4    '233 patent (cl. 3, 4, 6 and 7) ...............................................................20

   8.5    Dolovich (cl. 3, 4, 6 and 7) ..................................................................22

   8.6    Shin (cl. 3, 4, 6-8) ................................................................................23

9.0    CLAIM REJECTIONS 35 USC § 103 ........................................................25

   9.1    Deljouravesh ivo '233 Patent (cl. 5, 13) ..............................................25

   9.2    Deljouravesh ivo Shin (cl. 9) ...............................................................27

   9.3    '233 Patent ivo Shin (cl. 9) ..................................................................28

   9.4    '333 Patent ivo Shin (cl. 9) ..................................................................29

   9.5    Dolovich (cl. 10, 11) ............................................................................30

   9.6    Settles ivo Dolovich (cl. 12) ................................................................31

Application/Control Number: 95/001,578                    Page 3
Art Unit: 3992

9.7    Dolovich ivo Settles (cl. 12) ...................................................................32

10.0   REJECTION OF NEW CLAIMS 14 AND 15 ..............................................33

10.1    CLAIM REJECTION 35 USC § 112, 2nd Paragraph .................................33

10.1.1  112 2nd (cl. 15) .................................................................................33
10.2    CLAIM REJECTION 35 USC § 102/103 ..................................................34

10.2.1  Miszuk (cl. 14) ...............................................................................34
10.2.2  Deljouravesh (cl. 14, 15) ...............................................................35
10.2.3  '333 Patent (cl. 14, 15) ..................................................................37
10.2.4  '382 Patent (cl. 14, 15) ..................................................................38
10.2.5  Dolovich (cl. 14, 15) ......................................................................39
10.2.6  Settles (cl. 14, 15) ..........................................................................40
11.0   CONCLUSION ...........................................................................................41

11.1    Right of Appeal Notice ...........................................................................41

11.2    Correspondence and Inquiry as to Office Actions ...................................42

Application/Control Number: 95/001,578                                    Page 4
Art Unit: 3992

## DETAILED ACTION INTER PARTES REEXAMINATION

### 1.0    SUMMARY

This right of appeal notice is <u>supplemental</u> to the right of appeal notice mailed on

February 1, 2012.

In the decision mailed February 27, 2012, the Office *sua sponte* determined that the

estoppel provisions of 35 U.S.C. 317(b) apply to any rejection in this proceeding of any of

claims 3-10 and 13 that is limited to the application of one or more of the '333 patent,

Deljouravesh, and Settles references. Accordingly, the estoppel provisions of 35 U.S.C. 317(b)

apply to the following rejections, which were applied in the February 1, 2012 right of appeal

notice:

- The rejection of claims 3, 4, 6-8, 10 and 11 under 35 U.S.C. 102(b) as being

  anticipated by Deljouravesh.

- The rejection of claims 3-10 and 13 under 35 U.S.C. 102(b) as being anticipated

  by U.S. Patent No. 5,396,333 (the '333 patent).

- The rejection of claims 3-7 and 13 under 35 U.S.C. 102(b) as being anticipated by

  Settles.

- The rejection of claim 5 under 35 U.S.C. 103(a) as being obvious over

  Deljouravesh in view of the '333 patent.

Pursuant to the February 27, 2012 petition decision, the above-listed rejections will not

be further maintained by the Office, and have been withdrawn. No further rejection of any of

claims 3-10 and 13 of the '400 patent, that is limited to the application of one or more of the '333

Application/Control Number: 95/001,578                                                    Page 5
Art Unit: 3992

patent, Deljouravesh, and Settles references, will be made in the present reexamination

proceeding.

Because the above-listed rejections have been withdrawn pursuant to the estoppel

provisions of 35 U.S.C. 317(b), the withdrawal of these rejections is not a "non-adoption of" or a

"determination not to make" of these rejections within the meaning of 37 CFR 41.61. Any

notice of appeal or cross-appeal of the present determination not to make or maintain a rejection

of any of claims 3-10 and 13 of the '400 patent, which is limited to the application of one or

more of the '333 patent, Deljouravesh, and Settles references, will be held to be defective.


## 2.0    SUMMARY OF THE PROCEEDINGS

| Date | Proceedings |
|------|-------------|
| 04/19/2011 | Third Party filed request for reexamination of claims 3-13 of US Patent Number 6,785,400. |
| 06/29/2011 | Reexam Ordered for claims 3-13 |
| 06/29/2011 | Non-Final Action, claims 3-13 are rejected |
| 08/29/2011 | Patent Owner's Arguments/Remarks Made in an Amendment adding new claims 14-15. |
| 08/29/2011 | Patent Owner's Petition 35 USC 317, 37 CFR 1.907, MPEP 2612 to Terminate Inter Party Reexamination |
| 09/28/2011 | Third Party Requester Comments after Non-final Action in response to Patent Owner's Amendment. |
| 09/28/2011 | Third Party Requester's Opposition filed in response to Patent Owner's Petition |

**AD 016**

Application/Control Number: 95/001,578                                        Page 6
Art Unit: 3992

08/29/2011

12/10/2011   Action Closing Prosecution (nonfinal)

02/01/2012   Right of Appeal Notice

02/27/2012   Reexam Petition by Patent Owner under 37 C.F.R. 1.182 Decision - Dismissed

## 3.0    STATUS OF CLAIMS

Claims 3-15 are rejected.

Claims 1 and 2 are not subject to reexamination.

## 4.0    REFERENCES CITED

1. "Video Characterization of Flume Patterns of Inhalation Aerosols," S. Miszuk et al.,

   Journal of Pharmaceutical Sciences, Vol. 69, No. 6, 713-717 (June 1980) ("Miszuk")

2. "An Optical Patternator for Quantitative and On-Line Spray Diagnostics" Rama

   Deljouravesh, Thesis Submitted to the Department of Mechanical Engineering, Queen's

   University, Kingston, Ontario, Canada (October 1997) ("Deljouravesh").

3. U.S. Patent No. 5,396,333 ("the '333 patent").

4. U.S. Patent No. 6,049,382 ("the '382 patent").

5. U.S. Patent No. 3,275,744 ("the '744 patent").

6. U.S. Patent No. 2,779,233 ("the '233 patent").

7.   "Measurement of Particle Size Characteristics of Metered Dose Inhaler (MDI) Aerosols,"

      M. Dolovich, Journal of Aerosol Medicine, Vol. 4, No.3, 251-263 (1991) ("Dolovich").

8.   "A Flow Visualisation Study of Airless Spray Painting" by Gary S Settles, published in

      the Proceedings of the ILAS S-Americas ' 97, May 18-21, 1997, Ottawa, Canada.

      ("Settles").

9.   "Visualization of Liquid Fuel Behavior in a Spark Ignition Engine during Starting and

      Warm-up" by Younggy Shin, published in the KSME International Journal, Vol. 11, No.

      5, pp. 582-593, 1997, ("Shin").

## 5.0    ISSUES

| No | Issue |
|----|-------|
| 1. | Whether Miszuk alone anticipates claims 3-8 and 13 of the '400 patent. |
| 2. | Whether '382 patent alone anticipates claims 3, 4, 6 and 7 of the '400 patent. |
| 3. | Whether '744 patent alone anticipates claims 3, 4, 6 and 7 of the '400 patent. |
| 4. | Whether '233 patent alone anticipates claims 3, 4, 6-8 and renders obvious in combination with other prior art claim 9 of the '400 patent. |
| 5. | Whether Dolovich alone anticipates claims 3, 4, 6, 7, and the newly added claims 14 and 15 or renders obvious claims 10-12 of the '400 patent. |
| 6. | Whether Shin alone anticipates claims 3, 4, 6-8 of the '400 patent. |

Application/Control Number: 95/001,578                                    Page 8
Art Unit: 3992

7.    Whether Deljouravesh in combination with other references ('233 patent, Shin) renders

obvious claims 5, 9 and 13 of the '400 patent

## 6.0    PROPOSED CLAIM REJECTIONS

| No | Proposed Rejections §102 | Adopted/ Not Adopted |
|----|--------------------------|----------------------|
| 1. | Claims 3-8, 13 of the '400 patent should be rejected under 35 U.S.C. §102(b) as being anticipated by Miszuk (Request page 14, and Third Party Requester's Comments page 8 Section IV). | Adopted |
| 2. | Claims 3, 4, 6, 7, of the '400 patent should be rejected under 35 U.S.C. §102(b) as being anticipated by the '382 patent (Request page 14, and Third Party Requester's Comments page 8 Section IV). | Adopted |
| 3. | Claims 3, 4, 6, 7, of the '400 patent should be rejected under 35 U.S.C. §102(b) as being anticipated by the '744 patent (Request page 14, and Third Party Requester's Comments page 8 Section IV). | Adopted |
| 4. | Claims 3, 4, 6, 7, of the '400 patent should be rejected under 35 U.S.C. §102(b) as being anticipated by the '233 patent (Request page 14, and Third Party Requester's Comments page 8 Section IV). | Adopted |
| 5. | Claims 3, 4, 6, 7, of the '400 patent should be rejected under 35 U.S.C. §102(b) as being anticipated by Dolovich (Request page 14 and Third Party Requester's Comments page 8 Section IV). | Adopted |
| 6. | Claims 3, 4, 6-8, of the '400 patent should be rejected under 35 U.S.C. §102(b) as being anticipated by Shin (Request page 14 and Third Party Requester's Comments page 8 Section IV). | Adopted |
|    | **Proposed Rejections §103** | |

| | | |
|---|---|---|
| 7. | Claims 5 and 13 of the '400 patent should be rejected under 35 U.S.C. §103(a) as being obvious over Deljouravesh in view of the '233 patent (Request pages 14-15). | Adopted |
| 8. | Claim 9 of the '400 patent should be rejected under 35 U.S.C. §103(a) as being obvious over Deljouravesh in view of Shin (Request page 14). | Adopted |
| 9. | Claim 9 of the '400 patent should be rejected under 35 U.S.C. §103(a) as being obvious over '233 patent in view of Shin (Request page 15). | Adopted |
| 10. | Claim 9 of the '400 patent should be rejected under 35 U.S.C. §103(a) as being obvious over '333 patent in view Shin (Request page 15). | Adopted |
| 11. | Claim 11 of the '400 patent should be rejected under 35 U.S.C. §103(a) as being obvious over Dolovich (Request page 15). | Adopted |
| 12. | Claim 12 of the '400 patent should be rejected under 35 U.S.C. §103(a) as being obvious over Settles in view of Dolovich (Request page 15). | Adopted |
| 13. | Claim 12 of the '400 patent should be rejected under 35 U.S.C. §103(a) as being obvious over Dolovich in view of Settles (Request page 15). | Adopted |
| | **Proposed Rejections of New Claims 14 and 15 -- 35 U.S.C. 112** | |
| 14. | Newly added claims 14 and 15 should be rejected under 35 U.S.C. 112 (Third Party Requester's Comments page 6, section B) | Adopted with Modification |
| | **Proposed Rejections of New Claims 14 and 15 -- 35 U.S.C. 102/103** | |
| 15. | Newly added claim 14 should be rejected over the cited prior art Miszuk | Adopted |

Application/Control Number: 95/001,578                                    Page 11

Art Unit: 3992

| | (Third Party Requester's Comments pages 8 and 9, section IV) | with Modification |
|---|---|---|
| 16. | Newly added claims 14 and 15 should be rejected over the cited prior art Deljouravesh (Third Party Requester's Comments pages 8 and 9, section IV) | Adopted with Modification |
| 17. | Newly added claims 14 and 15 should be rejected over the cited prior art '333 Patent (Third Party Requester's Comments pages 8 and 9, section IV) | Adopted with Modification |
| 18. | Newly added claims 14 and 15 should be rejected over the cited prior art '382 Patent (Third Party Requester's Comments pages 8 and 9, section IV) | Adopted with Modification |
| 19. | Newly added claims 14 and 15 should be rejected over the cited prior art Dolovich (Third Party Requester's Comments pages 8 and 9, section IV) | Adopted with Modification |
| 20. | Newly added claims 14 and 15 should be rejected over the cited prior art Settles (Third Party Requester's Comments pages 8 and 9, section IV) | |

## 7.0   RESPONSE TO ARGUMENTS

Patent Owner's main arguments are as follows:

None of the nine references cited above discloses, teaches or suggests the required claim limitation of "illumination of the spray plume along at least one geometric plane" -- that is, a light source that projects a th

sheet of light that intersects the spray plume (PO argument page 10, lines 10-12). More specifically, PO is ar

that the claimed limitation "illumination of the spray plume along at least one geometric plane" means havin

light source that projects a thin sheet of light that intersects the spray plume and that the prior art does not dis

a light source that projects a thin sheet of light that intersects the spray plume. Patent Owner's argument is nc

convincing because such a narrow interpretation of the claimed limitations is not consistent with the "broade:

reasonable interpretation" as well as the customary and ordinary meaning of the claimed limitation. Examine

agrees with Third Party Requester's position (see TPR comments filed 9/28/11 which is incorporated herein l

reference) that


Patent Owner is arguing a feature "thin sheet of light" that is not recited in the claim.


In response to Patent Owner's argument that the references fail to show certain features of applicant's

invention, it is noted that the features upon which applicant relies (i.e., "thin sheet of light") are not recited in

the rejected claim(s).  Although the claims are interpreted in light of the specification, limitations from the

specification are not read into the claims.  See *In re Van Geuns*, 988 F.2d 1181, 26 USPQ2d 1057 (Fed. Cir.

1993).

In view of the above arguments, examiner maintains the same position as indicated in the office actio

filed 06/29/2011 and set forth in the claim rejections below that each of the cited references disclose

"illumination of the spray plume along at least one geometric plane". Therefore the rejection of claim 3 unde

35 U.S.C. 102(b) as being anticipated by each of the cited references including Miszuk, '382 patent, '744

patent, '233 patent, Dolovich and Shin is maintained by the examiner.

**8.0    CLAIM REJECTIONS 35 USC § 102**

A person shall be entitled to a patent unless –
(a) the invention was known or used by others in this country, or patented or described in a printed
publication in this or a foreign country, before the invention thereof by the applicant for a patent.

(b) the invention was patented or described in a printed publication in this or a foreign country or in public
use or on sale in this country, more than one year prior to the date of application for patent in the United
States.

(e) the invention was described in (1) an application for patent, published under section 122(b), by another
filed in the United States before the invention by the applicant for patent or (2) a patent granted on an
application for patent by another filed in the United States before the invention by the applicant for patent,
except that an international application filed under the treaty defined in section 351(a) shall have the effects
for purposes of this subsection of an application filed in the United States only if the international
application designated the United States and was published under Article 21(2) of such treaty in the English
language.

**8.1    Miszuk (cl. 3-8, 13)**

**Claims 3-8 and 13 of the '400 patent are rejected under 35 U.S.C. §102(b) as being**

**anticipated by Miszuk (Request page 14).**

The above rejection was proposed by the third party requester in the request for

reexamination, and is **adopted** as proposed in the request on pages 16-17, 28-30, 35-37, 39, 48

and Claim Chart, with additional clarifications provided by the examiner as follows:

**Claim 3.  An apparatus for producing image data representative of at least one**

**sequential set of images of a spray plume, each of the images being representative of a**

**density characteristic of the spray plume (i) along a geometric plane that intersects the**

**spray plume, and (ii) at a predetermined instant in time, comprising:**

Miszuk disclosed video technique to characterize spray flume (plume) from aerosol

products (Miszuk: 713-14).

**an illuminator for providing an illumination of the spray plume along at least one**

**geometric plane that intersects the spray plume; and,**

Miszuk disclosed an illuminator ("Light source") that was adjusted to deliver the

scattered light from the plume droplets forward to the viewing lens (Fig. 2)(Miszuk: page 714,

left col. lines 13-15).

> For adequate visualization of the micrometer-sized aerosol droplets,
> a high-intensity light source was adjusted to deliver the scattered light
> from the flume droplets forward to the viewing lens (Fig. 2). For optimum

Figures 3 and 4 of Miszuk each disclose an imaging system that includes a light source.

As shown in Fig. 5 of Miszuk, the light source passes through an area of the plume to illuminate

a flume pattern, therefore Miszuk disclosed providing an illumination of the spray plume along

at least one geometric plane that intersects the spray plume.

**an imaging device for generating the image data representative of an interaction between**

**the illumination and the spray plume along the at least one geometric plane.**

Miszuk describes video techniques and systems for characterizing spray flume patterns

from aerosol products, including metered dose aerosols inhalers (Miszuk: Abstract) and

disclosed "The output is a video image of the aerosol flume pattern that can be viewed on a video

field basis...When flumes patterns were observed on a frame-to-frame basis, flume size increased

progressively up to the fourth frame." (Miszuk: second column of page 714). Interaction between

spray plume and illumination for capture by camera is shown in Fig. 3.

**Claim 4.  An apparatus according to claim 3, wherein the sequential set of images is**

**representative of a progression in time.**

Miszuk disclosed sequential set of images ("frame-to-frame basis") and disclosed that

flume patterns were displayed on a television monitor from which the desired individual frames

of flume patterns were photographed using a view camera (page 713). Additionally, Miszuk

disclosed that the total life of the flume patterns is available from the time it passes from the

actuator until it is dispersed in the atmosphere.

> Videotapes of flume patterns of the corticosteroid oral inhalers A and
> B were played and examined. Flume patterns were observed individually
> on a frame-to-frame basis; flume size increased progressively up to the

> **System Output**.—The output is a video image of the aerosol flume
> pattern that can be viewed on a video field basis (each field is spaced 16.7
> msec apart). The total life of the flume pattern is available from the time
> it passes from the actuator until it is dissipated in the atmosphere. When
> flume patterns were observed on a frame-to-frame basis, flume size in-
> creased progressively up to the fourth frame (66.7 msec after flume

**Claim 5.  An apparatus according to claim 3, wherein a first time-sequential set of images**

**corresponds to an axial cross-sectional density characteristic along a first geometric plane**

**substantially normal to a flow direction centerline, and a second time-sequential set of**

images corresponds to a longitudinal density characteristic along a second geometric plane

substantially parallel to and intersecting the flow direction centerline.

Miszuk disclosed "Two orthogonal video images are utilized to describe the complex

shape and direction of the flume pattern" (Miszuk at line 2 page 713) and disclosed that "For

optimum contrast in orthogonal views, two flexible fiber optic bundles were used to ensure

uniformity of the scattered light intensity in both views." (Miszuk at second full paragraph of

page 714.) "Since the flume pattern is three dimensional, a single two-dimensional image cannot

completely characterize its complex shape and direction unless the pattern is symmetrical."

(Miszuk at 713-714) and "a combination of two simultaneous orthogonal views is required to

describe the character and direction of the flume pattern adequately." (Miszuk at page 714).


**Claim 6.  An apparatus according to claim 3, wherein the interaction between the**

**illumination and the spray plume includes optical scattering.**

Miszuk disclosed  interaction between the illumination and the spray plume includes

optical scattering ("scattered light")(Miszuk: page 714, 2nd paragraph, shown below).

> For adequate visualization of the micrometer-sized aerosol droplets,
> a high-intensity light source was adjusted to deliver the scattered light
> from the flume droplets forward to the viewing lens (Fig. 2). For optimum
> contrast in orthogonal views, two flexible fiber optic bundles were used
> to ensure uniformity of the scattered light intensity in both views. A high


**Claim 7.  An apparatus according to claims 3, wherein the interaction between the**

**illumination and the spray plume includes optical absorption.**

Optical absorption is inherently disclosed as Miszuk disclosed interaction between the illumination and the spray plume and a certain amount of light will be inherently absorbed by the spray plume droplets.

**Claim 8.  An apparatus according to claim 3, wherein the imaging device includes a digital imaging system for generating and recording the image data.**

Miszuk disclosed digital imaging system for generating and recording the image data.

> During playback, these flume patterns were displayed on a television monitor[4] from which the desired individual frames of flume pattern were photographed using a view camera[5]. Since video tape resolution is degraded by 50% whenever an individual frame is viewed, an accessory digital image enhancer[6] was employed to improve image contrast by gray-scale adjustment. The benefit of this adjustment was most visible

**Claim 13.  A spray data acquisition system according to claim 3, wherein the first and the second geometric planes are substantially orthogonal.**

Miszuk disclosed that two orthogonal views are required to describe the character and direction of the flume pattern adequately (Miszuk: page 714 1st sentence).

> **Imaging Requirements**—Since the flume pattern is three dimensional, a single two-dimensional image cannot completely characterize its complex shape and direction unless the pattern is symmetrical. When the flume pattern is asymmetric, a combination of two simultaneous orthogonal views is required to describe the character and direction of the flume pattern adequately.

8.2     '382 patent (cl. 3, 4, 6, 7)

**AD 028**

**Claims 3, 4, 6 and 7 of the '400 patent are rejected under 35 U.S.C. §102(b) as being anticipated by the '382 patent (Request page 14).**

This rejection was proposed by the third party requester in the request for reexamination, and is **adopted** as proposed in the request on pages 21,22,28,36,37 and the Claim Chart which is herein incorporated by reference, with additional clarifications provided by the examiner as follows:

With reference to claim 3, 4, 6 and 7, '382 patent teaches illuminator 1 (laser) generating a laser beam 2 is passed through a measurement plane. Laser beam 2 propagates along the x0 direction and is linearly polarized along the x0-z0 plane with z0 being aligned with the measurement plane normal direction  passed through a measurement plane (col. 2 lines 47-49, col. 3 lines 28-41). The '382 patent explicitly disclosed "measurement plane intersecting the spray" (col. 2 lines 36-37).

> Specifically, the apparatus and procedure is able to deter-
> 5  mine spatially resolved information proportional to the spray
> number density (particles per unit volume) in a measurement
> plane intersecting the spray. In addition, and combining this

Thus, the '382 patent disclosed "an illuminator for providing an illumination of the spray plume along at least one geometric plane that intersects the spray plume." Additionally, the '382 patent disclosed " transverse means is also disposed to move the spray along the laser beam direction and perpendicular to it as to sequentially obtain a tomographic record of the scattering and attenuation activity in points of the spray forming a Cartesian grid within the measurement plane." ('382 patent at Abstract; and  Col. 2, lines 47-64).

**8.3    '744 patent (cl. 3, 4, 6, 7)**

**Claims 3, 4, 6 and 7 of the '400 patent are rejected under 35 U.S.C. §102(b) as being anticipated by the '744 patent (Request page 14).**

This rejection was proposed by the third party requester in the request for reexamination, and is **adopted** as proposed in the request on pages 21,22 and the Claim Chart which is herein incorporated by reference, with additional clarifications provided by the examiner as follows:

With respect to claims 3,4,6 and 7 the '744 patent disclosed illuminator 12 (stroboscopic light source) is placed in a position where, when energized it will brightly illuminate the portion of the spray being seen by the camera 13 (col. 2 lines 28-30). The portion of the spray includes a geometric plane portion as shown in the Figure (reproduced below).



['744 patent: Figure]

With respect to claims 4, 6 and 7, '744 patent disclosed a system for spray analysis wherein specimens of particle distribution in the spray are recorded in rapid succession (Col. 1, lines 61-6) and the successive images on the mosaic of vidicon tube 14 will consist of minute charged zones corresponding, in position, number and size, to the particles in the spray at the instant of the flash from light source 12, and the resulting video signal will constitute a train of corresponding electrical impulses (Col. 2, lines 60-65). Regarding optical scattering and optical absorption in claims 6 and 7 respectively these are naturally occurring phenomena and as such inherently disclosed as interaction between the illumination and the spray a certain amount of light will be inherently scattered and absorbed by spray particles.

**8.4    '233 patent (cl. 3, 4, 6, 7)**

**Claims 3, 4, 6 and 7 of the '400 patent are rejected under 35 U.S.C. §102(b) as being**

**anticipated by the '233 patent (Request page 14).**

This rejection was proposed by the third party requester in the request for reexamination,

and is **adopted** as proposed in the request on pages 21,22 and the Claim Chart which is herein

incorporated by reference, with additional clarifications provided by the examiner as follows:

With reference to claims 3, 4, 6 and 7,  the '233 patent teaches photographic method for

acquiring data on spray performance comprising illuminator 17 (light source) for illuminating

drops of spray 15 with transmitted light and camera 16 for analyzing the spray (Fig. 1)(col. 1

lines 16-17, col. 2 lines 38-43). The '233 patent teaches that  the spray axis 18 is substantially

normal to the optical axis of the camera 16 (col. 2, lines 44-45) and that the camera optical axis

may be directed to make any desired angle with the axis of the spray 15 (col. 2, lines 62-64).

Thus the '233 patent disclosed "an illuminator for providing an illumination of the spray plume

along at least one geometric plane that intersects the spray plume".

The '233 patent disclosed photographic method for acquiring data on spray performance

and characteristics (Col. 1, lines 16-17) and camera 16 is used to record spray 15 (Fig. 1). Thus

the '233 patent disclosed "imaging device for generating the image data representative of an

interaction between the illumination and the spray plume along the at least one geometric plane."

With respect to claim 4, the '233 patent disclosed capturing data with respect to plume

over a period of time, and disclosed a time delay unit 25 (Fig. 3) for controlling time between

successive images, therefore the resultant data will be representative of a progression in time (see

for example '233 patent, col. 5 lines 3-25).

With respect to claims 6 and 7, optical scattering and optical absorption are naturally

occurring phenomena, therefore these are  inherently disclosed as interaction between the

illumination and the spray a certain amount of light will be inherently scattered and absorbed by

spray particles.

## 8.5    Dolovich (cl. 3, 4, 6, 7)

**Claims 3, 4, 6 and 7 of the '400 patent and newly added claims 14 and 15 are
rejected under 35 U.S.C. §102(b) as being anticipated by Dolovich (Request page 14).**

This rejection was proposed by the third party requester in the request for reexamination,

and is **adopted** as proposed in the request on pages 21,22 and the Claim Chart which is herein

incorporated by reference, with additional clarifications provided by the examiner as follows:

With reference to claim 3,  Dolovich teaches illuminator (laser) for imaging a spray

plume which characterize a slice of the spray (page 256). Thus Dolovich teaches "an illuminator

for providing an illumination of the spray plume along at least one geometric plane that

intersects the spray plume". Additionally, Dolovich disclosed a photomultiplier for use as an

imaging device to capture the data necessary for use in analyzing the spray flume of the MDI

(page 258, 2nd paragraph). Thus, Dolovich disclosed an imaging device for generating the image

Application/Control Number: 95/001,578                                      Page 23

Art Unit: 3992

data representative of an interaction between the illumination and the spray plume along the at

least one geometric plane.

    With respect to claim 4, Dolovich disclosed capturing data with respect to spray in real

time (abstract), therefore the resultant data will be representative of a progression in time ( '233

patent, col. 5 lines 3-25).

    With respect to claim 6, Dolovich disclosed particle sizing system based upon light

scattering techniques (abstract).

    With respect to claim 7, optical absorption is naturally occurring phenomenon, therefore

it is inherently disclosed as interaction between the illumination and the spray a certain amount

of light will be inherently absorbed by spray particles.

    With respect to newly added claim 14, Dolovich disclosed metered nasal spray and

metered dose inhalers ("aerosol spray").

8.6    **Shin (cl. 3, 4, 6-8)**

    **Claims 3, 4, 6-8 of the '400 patent are rejected under 35 U.S.C. §102(b) as being**

**anticipated by Shin (Request page 14).**

Application/Control Number: 95/001,578                                    Page 24
Art Unit: 3992

This rejection was proposed by the third party requester in the request for reexamination,

and is **adopted** as proposed in the request on pages 21,22 and the Claim Chart which is herein

incorporated by reference, with additional clarifications provided by the examiner as follows:


With reference to claims 3 and 4,  Shin article describes apparatus and test methods for

visualizing liquid fuel behavior. Shin discloses the use of a CCD camera and light source to

obtain images of a spray plume. In particular, the last paragraph of page 583 continuing to page

584 of Shin provides the following disclosure:

> The high speed CCD camera used in this study
> was a Kodak Ektapro system. The sensor consists
> of an $192 \times 239$ pixel NMOS array. The recording
> rates used for the current set of experiments were
> 500, 1,000 and 2,000 frames/sec. A 90 mm f/2.5
> camera lens was used for imaging. The field of
> view was illuminated by a collimated 650W can-
>
> descent light source which was carefully placed to
> avoid direct reflection of the light into the camera.
> The images were recorded in image files and
> transferred onto video tapes.

In view of the above disclosure, Shin describes both "an illuminator for providing an

illumination of the spray plume along at least one geometric plane that intersects the spray

plume" and "an imaging device for generating the image data representative of an interaction

between the illumination and the spray plume along the at least one geometric plane." Since Shin

disclosed capturing data with respect to spray plume over a period of time (frame/sec), the

resulting data will be representative of a progression in time.

With respect to claims 6 and 7, optical scattering and absorption are naturally occurring

phenomenon, therefore it is inherently disclosed as interaction between the illumination and the

spray a certain amount of light will be inherently scattered and absorbed by spray particles.

With respect to claim 8, Shin disclosed a high speed CCD camera (Shin page 583),

therefore Shin disclosed  wherein the imaging device includes a digital imaging system for

generating and recording the image data.

## 9.0    CLAIM REJECTIONS 35 USC § 103

**35 USC § 103**

The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all obviousness

rejections set forth in this Office action:

(a) A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102
of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject
matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art
to which said subject matter pertains.  Patentability shall not be negatived by the manner in which the invention was made.

## 9.1    Deljouravesh ivo '233 Patent (cl. 5, 13)

Application/Control Number: 95/001,578                           Page 26
Art Unit: 3992

     **Claim 5 and 13 of the '400 patent are rejected under 35 U.S.C. §103(a) as being obvious over Deljouravesh in view of the '233 patent.**

     This rejection was proposed by the third party requester in the request for reexamination, and is **adopted** as proposed in the request on pages 32-34 and 49 and Claim Chart (page 8), with additional clarifications provided by the examiner as follows:

     With respect to claim 5, Deljouravesh disclosed all of the claimed limitations as set forth above including laser light scattering (LALLS) for real-time determination of volume and mass concentration through droplet size measurement of medical sprays.

     Deljouravesh did not explicitly disclose first and second time-sequential set of images corresponding to an axial cross-sectional density characteristic along a first geometric plane substantially normal to a flow direction centerline and a longitudinal density characteristic along a second geometric plane substantially parallel to and intersecting the flow direction centerline respectively.

     The '233 patent disclosed that the camera optical axis may be directed to make any desired angle with the axis of the spray 15. The spray 15 may be conical, cylindrical, etc. ('233 patent column 2, lines 62-70).

     At the time the invention was made it would have been obvious for one of ordinary skill in the art to provide a camera optical axis that may be directed to make any desired angle with the axis of the spray as disclosed by the '233 patent for taking first and second time-sequential set of images corresponding to an axial cross-sectional density characteristic along a first geometric plane substantially normal to a flow direction centerline and a longitudinal density

Application/Control Number: 95/001,578                                      Page 27
Art Unit: 3992

characteristic along a second geometric plane substantially parallel to and intersecting the flow

direction centerline respectively in the system disclosed by Deljouravesh to permit analysis of all

portions of a powder stream and to provide a three-dimensional representation of the powder

stream.


With respect to claim 13, Deljouravesh disclosed all of the claimed limitations as set

forth 4.2 above with the exception of "wherein the first and the second geometric planes are

substantially orthogonal."

The '233 disclosed that the camera optical axis may be directed to make any desired angle

with the axis of the spray 15." In addition, the '233 patent indicates the spray 15 may be conical,

cylindrical etc. (see '233 patent Column 2, line 62-70).

At the time the invention was made it would have been obvious for one of ordinary skill in the

art to provide the Deljouravesh apparatus the ability to obtain images of first and second

geometric planes which are substantially orthogonal, as recited claim 13 of the '400 patent, as the

'233 patent disclosed how to accomplish this exact function in a spray analyzer device. The '233

patent specifically contemplates the possibility that different angles of data captured by a camera

may be helpful in analyzing a spray event. In view of the above, the Deljouravesh reference

when combined with the teaching of the '233 patent render all the features of claim 13 obvious.

## 9.2    Deljouravesh ivo Shin (cl. 9)

Claim 9 of the '400 patent is rejected under 35 U.S.C. §103(a) as being obvious over

Deljouravesh in view of the Shin patent.

This rejection was proposed by the third party requester in the request for reexamination, and is **adopted** as proposed in the request on page 41 and Claim Chart (page 10), with additional clarifications provided by the examiner as follows:

With respect to claim 9, Deljouravesh disclosed all of the claimed limitations as set forth above including laser light scattering (LALLS) for real-time droplet size measurement of medical sprays using a Sony XC-77RR CCD video camera capable of varying shutter speed (Paragraph 2.2.3).

Deljouravesh did not explicitly disclose wherein the digital imaging system includes an image sampling rate of approximately 500 images per second.

Shin disclosed high speed CCD camera using a recording rate of 500 frames/sec (Shin Page 583-584).

At the time the invention was made it would have been obvious for one of ordinary skill in the art to provide in the system of Deljouravesh a camera capable of image sampling rate of approximately 500 images per second as disclosed by Shin to capture spray data.

**9.3    '233 Patent ivo Shin (cl. 9)**

**Claim 9 of the '400 patent is rejected under 35 U.S.C. §103(a) as being obvious over '233 patent in view of Shin (Request page 15).**

This rejection was proposed by the third party requester in the request for reexamination, and is **adopted** as proposed in the request on page 41 and Claim Chart (page 10), with additional clarifications provided by the examiner as follows:

With respect to claim 9, '233 patent disclosed that time interval between flashes must be less than the recovery time of a single photo light and the exact length of the time interval is not critical but it must be reproducible ('233 patent at Col. 5, lines 54-61).

The '233 patent did not explicitly disclose wherein the digital imaging system includes an image sampling rate of approximately 500 images per second.

Shin disclosed high speed CCD camera using a recording rate of 500 frames/sec (Shin Page 583-584).

At the time the invention was made it would have been obvious for one of ordinary skill in the art to provide in the system disclosed by '233 patent a camera capable of image sampling rate of approximately 500 images per second as disclosed by Shin to capture spray data.

**9.4    '333 Patent ivo Shin (cl. 9)**

Claim 9 of the '400 patent is rejected under 35 U.S.C. §103(a) as being obvious over '333 patent in view of Shin (Request page 15).

This rejection was proposed by the third party requester in the request for reexamination, and is **adopted** as proposed in the request on page 42 and Claim Chart (page 10), with additional clarifications provided by the examiner as follows:

With respect to claim 9, '333 patent disclosed an Intelledex Model No. 386HR, to digitize the video signals received by the camera 46 for processing ('333 patent, column 4 lines 14-16).

Application/Control Number: 95/001,578                                   Page 30

Art Unit: 3992

The '333 patent did not explicitly disclose wherein the digital imaging system includes an

image sampling rate of approximately 500 images per second.

Shin disclosed high speed CCD camera using a recording rate of 500 frames/sec (Shin Page 583-

584).

At the time the invention was made it would have been obvious for one of ordinary skill

in the art to provide in the system disclosed by '233 patent a camera capable of image sampling

rate of approximately 500 images per second as disclosed by Shin to capture spray data.


9.5    **Dolovich (cl. 10, 11)**

**Claims 10 and 11 of the '400 patent are rejected under 35 U.S.C. §103(a) as being**

**obvious over Dolovich (Request page 15).**

This rejection was proposed by the third party requester in the request for reexamination,

and is **adopted** as proposed in the request on page 45 and Claim Chart (page 10), with additional

clarifications provided by the examiner as follows:


With respect to claims 10 and 11, Dolovich disclosed the use of lasers rather than white

light provides better resolution and increased accuracy, both for diffraction systems, which

characterize a slice of the MDI aerosol spray as well as the single particle counters, which utilize

the signals produced by the particles to measure their velocity as they cross the laser beams

(Dolovich: page 256).

Dolovich did not expressly disclose the claimed fan angle of $45^0$.

At the time the invention was made it would have been obvious for one of ordinary skill

**AD 041**

in the art to provide a fan angle of $45^0$ to measure spray velocity as they cross the laser beams

disclosed by Dolovich.

### 9.6    Settles ivo Dolovich (cl. 12)

Claim 12 of the '400 patent is rejected under 35 U.S.C. §103(a) as being obvious

over Settles in view of Dolovich (Request page 15).

This rejection was proposed by the third party requester in the request for reexamination,

and is **adopted** as proposed in the request on page 46 and Claim Chart (page 12), with additional

clarifications provided by the examiner as follows:

With respect to claim 12, Settles disclosed a 2.75W CW Argon-ion laser beam, which

was spread into a sheet by a simple glass rod (Settles: first line of first full paragraph of page 2).

Settles did not expressly disclose laser having 4 watt, 810 nm output.

Dolovich disclosed that the use of lasers rather than white light provides better resolution

and increased accuracy, both for diffraction systems, which characterize a slice of the MDI

aerosol spray as well as the single particle counters, which utilize the signals produced by the

particles to measure their velocity as they cross the laser beams. Dolovich also describes several

examples of lasers that can be used in a spray flume analysis system, including the Malvern

2600B laser diffraction system and the APS 33B (Dolovich at 256).

At the time the invention was made it would have been obvious for one of ordinary skill

in the art to have looked at the teachings of Dolovich and Settles and with routine

experimentation chosen a laser having 4 watt, and 810 nm output for testing spray plume

patterns. The specific power and wavelength as claimed can be made through optimization for

data capture as a mere optimization of a known apparatus for application to a particular scientific

purpose [also see MPEP 2144.05: "where the general conditions of a claim are disclosed in the

prior art, it is not inventive to discover the optimum or workable ranges by routine

experimentation." In re Aller, 220 F.2d 454, 456, 105 USPQ 233, 235].


9.7    **Dolovich ivo Settles (cl. 12)**

**Claim 12 of the '400 patent is rejected under 35 U.S.C. §103(a) as being obvious
over Dolovich in view of Settles (Request page 15).**

This rejection was proposed by the third party requester in the request for reexamination,

and is **adopted** as proposed in the request on pages 46-47 and Claim Chart (page 12), with

additional clarifications provided by the examiner as follows:


With respect to claim 12, Dolovich disclosed that the use of lasers rather than white light

provides better resolution and increased accuracy, both for diffraction systems, which

characterize a slice of the MDI aerosol spray as well as the single particle counters, which utilize

the signals produced by the particles to measure their velocity as they cross the laser beams.

Dolovich also describes several examples of lasers that can be used in a spray flume analysis

system, including the Malvern 2600B laser diffraction system and the APS 33B (Dolovich at

256).


Dolovich did not expressly disclose laser having 4 watt, and 810 nm output.

Settles disclosed a 2.75W CW Argon-ion laser beam, which was spread into a sheet by a simple glass rod (Settles: first line of first full paragraph of page 2).

At the time the invention was made it would have been obvious for one of ordinary skill in the art to have looked at the teachings of Dolovich and Settles and with routine experimentation chosen a laser having 4 watt, and 810 nm output for testing spray plume patterns. The specific power and wavelength as claimed can be made through optimization for data capture as a mere optimization of a known apparatus for application to a particular scientific purpose [also see MPEP 2144.05: "where the general conditions of a claim are disclosed in the prior art, it is not inventive to discover the optimum or workable ranges by routine experimentation." In re Aller, 220 F.2d 454, 456, 105 USPQ 233, 235].

## 10.0   REJECTION OF NEW CLAIMS 14 AND 15

### 10.1   CLAIM REJECTION 35 USC § 112, 2nd Paragraph

The following is a quotation of the second paragraph of 35 U.S.C. 112:

The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.

### 10.1.1  112 2nd (cl. 15)

**Claim 15 is rejected under 35 U.S.C. 112, 2nd paragraph, as being indefinite for failing to particularly point out and distinctly claim the subject matter which applicant regards as the invention.**

Third Party Requester proposed that newly added claim 15 should be rejected under 35 USC § 112 as being indefinite to the extent that it does not define the invention with particularity

Application/Control Number: 95/001,578                    Page 34

Art Unit: 3992

(Third Party Requester's Comments page 6, section B) and is adopted with modification by the

examiner by rejecting claim 14 under 35 U.S.C. 112, 2nd paragraph.

Claim 15 is rejected under 35 U.S.C. 112, second paragraph, as being indefinite for

failing to particularly point out and distinctly claim the subject matter which applicant regards as

the invention. Claim 15 limitation recites "...wherein the illuminator is a laser that source that

projects a thin sheet of light". This language is indefinite because it can be construed to mean

either (i) the illuminator delivers (i.e., projects) only one sheet of light at the spray plume or (ii)

is simply capable of delivering a thin sheet of light (e.g., a light bulb projects a multitude of thin

sheets of light). Additionally, the term "thin" is indefinite because '400 patent specification does

not define what "thin" means.

## 10.2    CLAIM REJECTION 35 USC § 102/103

The following rejections are adopted with modification as proposed by the Third Party

Requester in their Comments filed 9/28/2011 (see Comments: Section IV pages 8 and 9). Third

Party Requester argued that dependent claims 14 and 15 does not add features that render it

patentable over the prior art of record but did not explicitly set forth whether these claims should

be rejected under 35 U.S.C. 102 or 103.

### 10.2.1  Miszuk (cl. 14)

**Claim 14 is rejected under 35 U.S.C. 102(b) as anticipated by or, in the alternative,**

**under 35 U.S.C. 103(a) as obvious over Miszuk.**

14. (New)    An apparatus according to claim 3, wherein the spray plume is the aerosol
spray emitted by metered nasal spray pumps and/or metered dose inhalers.


Miszuk disclosed apparatus according to claim 3 as set forth in section 8.1 above to

characterize spray flume (plume) emitted by aerosol products including inhalation aerosol

(Miszuk: 713-14). Miszuk explicitly disclosed apparatus to characterize metered-dose aerosols

(see Miszuk: Abstract). Metered nasal spray pumps and/or metered dose inhalers are broadly

interpreted as aerosol products.

In the alternative that Miszuk does not explicitly disclose wherein the spray plume is the

aerosol spray emitted by metered nasal spray pumps and/or metered dose inhalers it would have

been obvious to one of ordinary skill in the art to adapt the apparatus disclosed by Miszuk to

characterize aerosol spray emitted by metered nasal spray pumps and/or metered dose inhalers. A

recitation of the intended use of the claimed invention must result in a structural difference

between the claimed invention and the prior art in order to patentably distinguish the claimed

invention from the prior art.  If the prior art structure is capable of performing the intended use,

then it meets the claim.



10.2.2 Deljouravesh (cl. 14, 15)

Claims 14 and 15 are rejected under 35 U.S.C. 102(b) as anticipated by or, in the

alternative, under 35 U.S.C. 103(a) as obvious over Deljouravesh.

With respect to claim 14, Deljouravesh disclosed apparatus according to claim 3 as set

forth in section 8.2 above to characterize spray flume (Fig. 3.2).

Application/Control Number: 95/001,578                                    Page 36
Art Unit: 3992

Deljouravesh does not explicitly disclose wherein the spray plume is aerosol spray

emitted by metered nasal spray pumps and/or metered dose inhalers. A recitation of the intended

use of the claimed invention must result in a structural difference between the claimed invention

and the prior art in order to patentably distinguish the claimed invention from the prior art. If the

prior art structure is capable of performing the intended use, then it meets the claim.

At the time the invention was made it would have been obvious to one of ordinary skill in

the art to adapt the apparatus disclosed by Deljouravesh to characterize aerosol spray emitted by

metered nasal spray pumps and/or metered dose inhalers.


**15. (New)  An apparatus according to claim 3, wherein the illuminator is a laser that**

**projects a thin sheet of light.**

With respect to claim 15, Deljouravesh disclosed illuminator is a laser that projects a thin

sheet of light ("light sheet") (Chapter 4.2.1 reproduced below).

---

## 4.2.1 Light source and sheet producing optics

A 632.8nm Melles Griot cylindrical Helium Neon laser was used for illumination. The unit has a nominal output of 5mW in the $TEM_{00}$ mode and produces a beam which is 0.8mm in diameter ($1/e^2$). The unit is light and compact and is placed on a micro-positioning plate to allow alignment with the glass rod used to produce the light sheet. It is powered by a compact DC power supply, which consists of a step-up transformer and a voltage regulator/rectifier and does not require any adjustments once turned on.

To produce a light sheet a 1.8mm diameter glass rod was utilized. A section of a glass rod with nominal diameter of 3.0mm was melted and stretched to reduce its diameter. The diameter of the glass rod was reduced to increase the included angle of the light sheet to about 45°. Several attempts were made at producing a glass

---

**AD 047**

Application/Control Number: 95/001,578                                          Page 37
Art Unit: 3992

**10.2.3 '333 Patent (cl. 14, 15)**

Claims 14 and 15 are rejected under 35 U.S.C. 102(b) as anticipated by or, in the

alternative, under 35 U.S.C. 103(a) as obvious over the '333 patent.


The '333 patent disclosed apparatus for observation and analysis of a cross-section of a

stream of material which may be either a particle or fluid stream wherein the illuminator is a

laser that projects a thin sheet of light ("plane of light")(col. 2 line 7). The '333 patent disclosed

illuminator comprising a laser light source for generating a beam of light to a plane of light to

illuminate a selected cross-section of the stream for observation and analysis of the stream of

material ('333 patent, col. 2 lines 1-18).

With respect to claim 14, the '333 patent does not explicitly disclose wherein the spray

plume is the aerosol spray emitted by metered nasal spray pumps and/or metered dose inhalers.

A recitation of the intended use of the claimed invention must result in a structural difference

between the claimed invention and the prior art in order to patentably distinguish the claimed

invention from the prior art. If the prior art structure is capable of performing the intended use,

then it meets the claim.

At the time the invention was made it would have been obvious to one of ordinary skill in

the art to adapt the apparatus disclosed by '333 patent to characterize aerosol spray emitted by

metered nasal spray pumps and/or metered dose inhalers.


With respect to claim 15, '333 patent disclosed a laser that projects a plane of light. A

thin sheet of light is broadly interpreted as a plane of light disclosed in the '333 patent.

In the alternative that '333 patent does not explicitly disclose "a thin sheet of light" it would have been obvious to one of ordinary skill in the art to provide laser that projects a thin sheet of light so as to illuminate a selected cross-section of the spray plume (powder stream) for observation and analysis thereof ('333 patent: col. 2 lines 5-10).

### 10.2.4  '382 Patent (cl. 14, 15)

**Claims 14 and 15 are rejected under 35 U.S.C. 102(b) as anticipated by or, in the alternative, under 35 U.S.C. 103(a) as obvious over '382 patent.**

With respect to claims 14 and 15, '382 patent disclosed illuminator 1 comprising a laser generating a laser beam 2 is passed through a measurement plane.

With respect to claim 14, disclosed a spray but did not explicitly disclose wherein the spray plume is the aerosol spray emitted by metered nasal spray and/or metered dose inhalers. A recitation of the intended use of the claimed invention must result in a structural difference between the claimed invention and the prior art in order to patentably distinguish the claimed invention from the prior art. If the prior art structure is capable of performing the intended use, then it meets the claim.

At the time the invention was made it would have been obvious to one of ordinary skill in the art to adapt the apparatus disclosed by '382 patent to characterize aerosol spray emitted by metered nasal spray pumps and/or metered dose inhalers.

With respect to claim 15, if in the alternative that '382 patent does not explicitly disclose "a thin sheet of light" it would have been obvious to one of ordinary skill in the art to provide

laser that projects a thin sheet of light so as to illuminate a selected cross-section of the spray

plume (powder stream) for observation and analysis thereof.


**10.2.5 Dolovich (cl. 14, 15)**

**Claims 14 and 15 are rejected under 35 U.S.C. 102(b) as anticipated by or, in the**

**alternative, under 35 U.S.C. 103(a) as obvious over Dolovich.**

With respect to claims 14 and 15, Dolovich disclosed teaches illuminator comprising a

laser for imaging a spray plume which characterizes a slice of the spray (page 256).

With respect to claim 14, disclosed a spray but did not explicitly disclose wherein the

spray plume is the aerosol spray emitted by metered nasal spray and/or metered dose inhalers. A

recitation of the intended use of the claimed invention must result in a structural difference

between the claimed invention and the prior art in order to patentably distinguish the claimed

invention from the prior art. If the prior art structure is capable of performing the intended use,

then it meets the claim.

At the time the invention was made it would have been obvious to one of ordinary skill in

the art to adapt the apparatus disclosed by Dolovich to characterize aerosol spray emitted by

metered nasal spray pumps and/or metered dose inhalers.


With respect to claim 15, if in the alternative that Dolovich does not explicitly disclose "a

thin sheet of light" it would have been obvious to one of ordinary skill in the art to provide laser

that projects a thin sheet of light so as to illuminate and characterize a slice of the spray.

**10.2.6 Settles (cl. 14, 15)**

**Claims 14 and 15 are rejected under 35 U.S.C. 102(b) as anticipated by or, in the alternative, under 35 U.S.C. 103(a) as obvious over Settles.**

With respect to claims 14 and 15, Settles disclosed teaches illuminator comprising a laser for imaging a spray plume which characterize a slice of the spray (Fig. 2).

With respect to claim 14, disclosed a spray but did not explicitly disclose wherein the spray plume is the aerosol spray emitted by metered nasal spray and/or metered dose inhalers. A recitation of the intended use of the claimed invention must result in a structural difference between the claimed invention and the prior art in order to patentably distinguish the claimed invention from the prior art.  If the prior art structure is capable of performing the intended use, then it meets the claim.

At the time the invention was made it would have been obvious to one of ordinary skill in the art to adapt the apparatus disclosed by Settles to characterize aerosol spray emitted by metered nasal spray pumps and/or metered dose inhalers.

With respect to claim 15, Settles explicitly disclosed a laser beam, which was spread into a sheet. If in the alternative that Settles does not explicitly disclose "a thin sheet of light" it would have been obvious to one of ordinary skill in the art to provide laser that projects a thin sheet of light so as to illuminate the spray along at least one geometric plane.

## 11.0    CONCLUSION

### 11.1    Right of Appeal Notice

This is a RIGHT OF APPEAL NOTICE (RAN); see MPEP § 2673.02 and § 2674. The decision in this Office action as to the patentability or unpatentability of any original patent claim, any proposed amended claim and any new claim in this proceeding is a FINAL DECISION.

No amendment can be made in response to the Right of Appeal Notice in an inter partes reexamination. 37 CFR 1.953(c). Further, no affidavit or other evidence can be submitted in an inter partes reexamination proceeding after the right of appeal notice, except as provided in 37 CFR 1.981 or as permitted by 37 CFR 41.77(b)(1). 37 CFR 1.116(f).

Each party has a thirty-day or one-month time period, whichever is longer, to file a notice of appeal. The patent owner may appeal to the Board of Patent Appeals and Interferences with respect to any decision adverse to the patentability of any original or proposed amended or new claim of the patent by filing a notice of appeal and paying the fee set forth in 37 CFR 41.20(b)(1). The third party requester may appeal to the Board of Patent Appeals and Interferences with respect to any decision favorable to the patentability of any original or proposed amended or new claim of the patent by filing a notice of appeal and paying the fee set forth in 37 CFR 41.20(b)(1).

Application/Control Number: 95/001,578                                    Page 42
Art Unit: 3992

In addition, a patent owner who has not filed a notice of appeal may file a notice of cross

appeal within fourteen days of service of a third party requester's timely filed notice of appeal

and pay the fee set forth in 37 CFR 41.20(b)(1). A third party requester who has not filed a

notice of appeal may file a notice of cross appeal within fourteen days of service of a patent

owner's timely filed notice of appeal and pay the fee set forth in 37 CFR 41.20(b)(1).

Any appeal in this proceeding must identify the claim(s) appealed, and must be signed by

the patent owner (for a patent owner appeal) or the third party requester (for a third party

requester appeal), or their duly authorized attorney or agent.

Any party that does not file a timely notice of appeal or a timely notice of cross appeal

will lose the right to appeal from any decision adverse to that party, but will not lose the right to

file a respondent brief and fee where it is appropriate for that party to do so. If no party files a

timely appeal, the reexamination prosecution will be terminated, and the Director will proceed to

issue and publish a certificate under 37 CFR 1.997 in accordance with this Office action.

## 11.2   Correspondence and Inquiry as to Office Actions

All correspondence relating to this inter-partes reexamination proceeding should be

directed:

By Mail to:   Mail Stop Inter Partes Reexam

Attn: Central Reexamination Unit

Commissioner for Patents

United States Patent & Trademark Office

P.O. Box 1450

Alexandria, VA 22313-1450

By FAX to: (571) 273-9900

Central Reexamination Unit

**AD 053**

> By hand:    Customer Service Window
>
> Randolph Building
>
> 401 Dulany Street
>
> Alexandria, VA 22314

Registered users of EFS-Web may alternatively submit such correspondence via the electronic filing system EFS-Web, at https://sportal.uspto.gov/authenticate/authenticateuserlocalepf.html. EFS-Web offers the benefit of quick submission to the particular area of the Office that needs to act on the correspondence. Also, EFS-Web submissions are "soft scanned" (i.e., electronically uploaded) directly into the official file for the reexamination proceeding, which offers parties the opportunity to review the content of their submissions after the "soft scanning" process is complete.

Any inquiry concerning this communication or earlier communications from the examiner, or as to the status of this proceeding, should be directed to the Central Reexamination Unit at telephone number (571) 272-7705.

**/Anjan K Deb/**

**Primary Examiner, Art Unit 3992**

**Conferees:**

**/Sudhanshu C. Pathak/**

Supervising Patent Examiner, Art Unit 3992

**/Pia Tibbits/**

Primary Examiner, Art Unit 3992

Receipt Date: 03/18/2011
Doc description: Information Disclosure Statement (IDS) Filed

95001578 - GAU: 3992 (07/31/2012 - 10)
Approved for use through 07/31/2012. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | | |
|---|---|---|
| Application Number | | 09640246 |
| Filing Date | | 2000-08-16 |
| First Named Inventor | | Dino Farina |
| Art Unit | | |
| Examiner Name | | |
| Attorney Docket Number | | 3028-0039 |

### U.S.PATENTS

| Examiner Initial* | Cite No | Patent Number | Kind Code[1] | Issue Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|---|
| | 1 | 5396333 | A | 1995-03-07 | Aleshin et al. | |
| | 2 | 6049382 | A | 2000-04-11 | Lazaro Gomez | |
| | 3 | 3275744 | | 1966-09-27 | V.E. Dietrich | |
| | 4 | 2779233 | | 1957-01-29 | R.A. Dodge et al. | |

If you wish to add additional U.S. Patent citation information please click the Add button.

### U.S.PATENT APPLICATION PUBLICATIONS

| Examiner Initial* | Cite No | Publication Number | Kind Code[1] | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|---|
| | 1 | | | | | |

If you wish to add additional U.S. Published Application citation information please click the Add button.

### FOREIGN PATENT DOCUMENTS

| Examiner Initial* | Cite No | Foreign Document Number[3] | Country Code[2] i | Kind Code[4] | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear | T[5] |
|---|---|---|---|---|---|---|---|---|

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH.  /A.D./

AD 055

| Receipt date: 03/18/2011 | Application Number | 09640246 | 95001578 - GAU: 3992 |
|---|---|---|---|
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** ( Not for submission under 37 CFR 1.99) | Filing Date | 2000-08-16 | |
| | First Named Inventor | Dino Farina | |
| | Art Unit | | |
| | Examiner Name | | |
| | Attorney Docket Number | 3028-0039 | |

| | 1 | | | | | | | ☒ |
|---|---|---|---|---|---|---|---|---|

If you wish to add additional Foreign Patent Document citation information please click the Add button

### NON-PATENT LITERATURE DOCUMENTS

| Examiner Initials* | Cite No | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc), date, pages(s), volume-issue number(s), publisher, city and/or country where published. | T5 |
|---|---|---|---|
| | 1 | "An Optical Patternator for Quantitative and On-Line Spray Diagnostics" Rama Deljouravesh, Thesis Submitted to the Department of Mechanical Engineering, Queen's University, Kingston, Ontario, Canada (October 1997) ("Deljouravesh"). | ☐ |
| | 2 | "Measurement of Particle Size Characteristics of Metered Dose Inhaler (MDI) Aerosols," M. Dolovich, Journal of Aerosol Medicine, Vol. 4, No. 3, 251-263 (1991) ("Dolovich"). | ☐ |
| | 3 | "A Flow Visualisation Study of Airless Spray Painting" by Gary S Settles, published in the Proceedings of the 10th Annual Conference on Liquid Atomization and Spray Systems, ILASS-Americas '97, May 18-21, 1997, Ottawa, Canada. ("Settles"). | ☐ |
| | 4 | "Visualization of Liquid Fuel Behavior in a Spark Ignition Engine during Starting and Warm-up" by Younggy Shin, published in the KSME International Journal, Vol. 11, No. 5, pp. 582-593, 1997. ("Shin"). | ☐ |
| | 5 | "Video Characterization of Flume Patterns of Inhalation Aerosols," S. Miszuk et al., Journal of Pharmaceutical Sciences, Vol. 69, No. 6, 713-717 (June 1980) ("Miszuk et al."). | ☐ |

If you wish to add additional non-patent literature document citation information please click the Add button

### EXAMINER SIGNATURE

| Examiner Signature | /Anjan Deb/ | Date Considered | 04/27/2012 |
|---|---|---|---|

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through a citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

1 See Kind Codes of USPTO Patent Documents at www.USPTO.GOV or MPEP 901.04. 2 Enter office that issued the document, by the two-letter code (WIPO Standard ST.3). 3 For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document. 4 Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible. 5 Applicant is to place a check mark here if English language translation is attached.

EFS Web 2.1.17

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /A.D./

| Receipt date: 03/18/2011 | Application Number | 09640246 | 95001578 GAU: 3992 |
|---|---|---|---|
| **INFORMATION DISCLOSURE** | Filing Date | 2000-08-16 | |
| **STATEMENT BY APPLICANT** | First Named Inventor | Dino Farina | |
| ( Not for submission under 37 CFR 1.99) | Art Unit | | |
| | Examiner Name | | |
| | Attorney Docket Number | 3028-0039 | |

### CERTIFICATION STATEMENT

Please see 37 CFR 1.97 and 1.98 to make the appropriate selection(s):

☐ That each item of information contained in the information disclosure statement was first cited in any communication from a foreign patent office in a counterpart foreign application not more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(1).

**OR**

☐ That no item of information contained in the information disclosure statement was cited in a communication from a foreign patent office in a counterpart foreign application, and, to the knowledge of the person signing the certification after making reasonable inquiry, no item of information contained in the information disclosure statement was known to any individual designated in 37 CFR 1.56(c) more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(2).

☐ See attached certification statement.

☐ The fee set forth in 37 CFR 1.17 (p) has been submitted herewith.

☒ A certification statement is not submitted herewith.

### SIGNATURE

A signature of the applicant or representative is required in accordance with CFR 1.33, 10.18. Please see CFR 1.4(d) for the form of the signature.

| Signature | /david j. kenealy/ | Date (YYYY-MM-DD) | 2011-03-18 |
|---|---|---|---|
| Name/Print | David J. Kenealy | Registration Number | 40411 |

This collection of information is required by 37 CFR 1.97 and 1.98. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 1 hour to complete, including gathering, preparing and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /A.D./

**AD 057**

**Privacy Act Statement**

The Privacy Act of 1974 (P.L. 93-579) requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1.    The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C. 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether the Freedom of Information Act requires disclosure of these record s.

2.    A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.

3.    A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.

4.    A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).

5.    A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.

6.    A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).

7.    A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.

8.    A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspections or an issued patent.

9.    A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

~~ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH.~~ /A.D/

**AD 058**

| *Search Notes* | Application/Control No. | Applicant(s)/Patent under Reexamination |
|---|---|---|
| | 95/001,578 | FARINA ET AL. |
| | Examiner | Art Unit |
| | ANJAN DEB | 3992 |

## SEARCHED

| Class | Subclass | Date | Examiner |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

## INTERFERENCE SEARCHED

| Class | Subclass | Date | Examiner |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |

## SEARCH NOTES (INCLUDING SEARCH STRATEGY)

| | DATE | EXMR |
|---|---|---|
| Searched US application 09/640246 that led to US 6,785,400 | 6/20/2011 | AD |
| Searched IDS | 4/26/2012 | AD |
| | | |
| | | |
| | | |
| | | |
| | | |

AD 059

| Index of Claims | | Application/Control No. | Applicant(s)/Patent under Reexamination |
|---|---|---|---|
| | | 95/001,578 | FARINA ET AL. |
| | | Examiner | Art Unit |
| | | ANJAN DEB | 3992 |

| √ | Rejected | – | (Through numeral) Cancelled | N | Non-Elected | A | Appeal |
|---|---|---|---|---|---|---|---|
| = | Allowed | ÷ | Restricted | I | Interference | O | Objected |

| Claim | | Date | | | | | | | | Claim | | Date | | | | | | | | Claim | | Date | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Final | Original | 6/21/11 | 12/1/11 | 4/26/12 | | | | | | Final | Original | | | | | | | | | Final | Original | | | | | | | | |
| | 1 | N | N | N | | | | | | | 51 | | | | | | | | | | 101 | | | | | | | | |
| | 2 | N | N | N | | | | | | | 52 | | | | | | | | | | 102 | | | | | | | | |
| | 3 | √ | √ | √ | | | | | | | 53 | | | | | | | | | | 103 | | | | | | | | |
| | 4 | √ | √ | √ | | | | | | | 54 | | | | | | | | | | 104 | | | | | | | | |
| | 5 | √ | √ | √ | | | | | | | 55 | | | | | | | | | | 105 | | | | | | | | |
| | 6 | √ | √ | √ | | | | | | | 56 | | | | | | | | | | 106 | | | | | | | | |
| | 7 | √ | √ | √ | | | | | | | 57 | | | | | | | | | | 107 | | | | | | | | |
| | 8 | √ | √ | √ | | | | | | | 58 | | | | | | | | | | 108 | | | | | | | | |
| | 9 | √ | √ | √ | | | | | | | 59 | | | | | | | | | | 109 | | | | | | | | |
| | 10 | √ | √ | √ | | | | | | | 60 | | | | | | | | | | 110 | | | | | | | | |
| | 11 | √ | √ | √ | | | | | | | 61 | | | | | | | | | | 111 | | | | | | | | |
| | 12 | √ | √ | √ | | | | | | | 62 | | | | | | | | | | 112 | | | | | | | | |
| | 13 | √ | √ | √ | | | | | | | 63 | | | | | | | | | | 113 | | | | | | | | |
| | 14 | | √ | √ | | | | | | | 64 | | | | | | | | | | 114 | | | | | | | | |
| | 15 | | √ | √ | | | | | | | 65 | | | | | | | | | | 115 | | | | | | | | |
| | 16 | | | | | | | | | | 66 | | | | | | | | | | 116 | | | | | | | | |
| | 17 | | | | | | | | | | 67 | | | | | | | | | | 117 | | | | | | | | |
| | 18 | | | | | | | | | | 68 | | | | | | | | | | 118 | | | | | | | | |
| | 19 | | | | | | | | | | 69 | | | | | | | | | | 119 | | | | | | | | |
| | 20 | | | | | | | | | | 70 | | | | | | | | | | 120 | | | | | | | | |
| | 21 | | | | | | | | | | 71 | | | | | | | | | | 121 | | | | | | | | |
| | 22 | | | | | | | | | | 72 | | | | | | | | | | 122 | | | | | | | | |
| | 23 | | | | | | | | | | 73 | | | | | | | | | | 123 | | | | | | | | |
| | 24 | | | | | | | | | | 74 | | | | | | | | | | 124 | | | | | | | | |
| | 25 | | | | | | | | | | 75 | | | | | | | | | | 125 | | | | | | | | |
| | 26 | | | | | | | | | | 76 | | | | | | | | | | 126 | | | | | | | | |
| | 27 | | | | | | | | | | 77 | | | | | | | | | | 127 | | | | | | | | |
| | 28 | | | | | | | | | | 78 | | | | | | | | | | 128 | | | | | | | | |
| | 29 | | | | | | | | | | 79 | | | | | | | | | | 129 | | | | | | | | |
| | 30 | | | | | | | | | | 80 | | | | | | | | | | 130 | | | | | | | | |
| | 31 | | | | | | | | | | 81 | | | | | | | | | | 131 | | | | | | | | |
| | 32 | | | | | | | | | | 82 | | | | | | | | | | 132 | | | | | | | | |
| | 33 | | | | | | | | | | 83 | | | | | | | | | | 133 | | | | | | | | |
| | 34 | | | | | | | | | | 84 | | | | | | | | | | 134 | | | | | | | | |
| | 35 | | | | | | | | | | 85 | | | | | | | | | | 135 | | | | | | | | |
| | 36 | | | | | | | | | | 86 | | | | | | | | | | 136 | | | | | | | | |
| | 37 | | | | | | | | | | 87 | | | | | | | | | | 137 | | | | | | | | |
| | 38 | | | | | | | | | | 88 | | | | | | | | | | 138 | | | | | | | | |
| | 39 | | | | | | | | | | 89 | | | | | | | | | | 139 | | | | | | | | |
| | 40 | | | | | | | | | | 90 | | | | | | | | | | 140 | | | | | | | | |
| | 41 | | | | | | | | | | 91 | | | | | | | | | | 141 | | | | | | | | |
| | 42 | | | | | | | | | | 92 | | | | | | | | | | 142 | | | | | | | | |
| | 43 | | | | | | | | | | 93 | | | | | | | | | | 143 | | | | | | | | |
| | 44 | | | | | | | | | | 94 | | | | | | | | | | 144 | | | | | | | | |
| | 45 | | | | | | | | | | 95 | | | | | | | | | | 145 | | | | | | | | |
| | 46 | | | | | | | | | | 96 | | | | | | | | | | 146 | | | | | | | | |
| | 47 | | | | | | | | | | 97 | | | | | | | | | | 147 | | | | | | | | |
| | 48 | | | | | | | | | | 98 | | | | | | | | | | 148 | | | | | | | | |
| | 49 | | | | | | | | | | 99 | | | | | | | | | | 149 | | | | | | | | |
| | 50 | | | | | | | | | | 100 | | | | | | | | | | 150 | | | | | | | | |

AD 060

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE PATENT TRIAL AND APPEAL BOARD

_____

INNOVASYSTEMS, INC.
Third Party Requester and Respondent

v.

PROVERIS SCIENTIFIC CORPORATION
Patent Owner and Appellant

_____

Appeal 2013-007392
Reexamination Control 95/001,578
Patent 6,785,400 B1
Technology Center 3900

_____

Before KEVIN F. TURNER, STEPHEN C. SIU, and
JENNIFER L. McKEOWN, *Administrative Patent Judges*.

McKEOWN, *Administrative Patent Judge*.

DECISION ON APPEAL

Appeal 2013-007392
Reexamination Control 95/001,578
Patent 6,785,400 B1

Patent Owner Proveris Scientific Corporation ("Patent Owner")
appeals under 35 U.S.C. §§ 134(b) and 315(a) the Examiner's decision to
reject claims 3-13.[1]  Third Party Requestor InnovaSystems, Inc.
("Requestor") responds to the appeal.[2]

We have jurisdiction under 35 U.S.C. §§ 134 and 315.

We heard oral arguments from Patent Owner on October 2, 2013, the
written transcript of which is part of the record.

We AFFIRM.

## STATEMENT OF THE CASE

United States Patent 6,785,400 B1 (hereinafter the "'400 Patent"),
issued to Dino J. Farina on August 31, 2004, is the subject of the current
*inter partes* reexamination.  The '400 Patent was also the subject of a
litigation between the Patent Owner and Requestor.  *See* PO App. Br. 2.

## THE INVENTION

The invention relates to systems and methods for characterizing
aerosol spray patterns through illuminating an aerosol spray plume and
utilizing optical-techniques.  Spec. 1:26-30.  The system includes, for

---

[1] *See* Patent Owner's Appeal Brief, filed July 30, 2012 (hereinafter "PO
App. Br."), at 3; Examiner's Answer, mailed February 5, 2013,
incorporating by reference the Examiner's Right of Appeal Notice, mailed
April 27, 2012 (hereinafter "RAN").
[2] *See* Third Party Requestor's Appeal Brief, filed May 29, 2012 (hereinafter
"TPR App. Br."), at 2. Patent Owner also responds to the Requestor's
appeal. *See* Patent Owner's Respondent Brief, filed August 30, 2012
(hereinafter "PO Resp. Br."), at 1.

2

**AD 062**

Appeal 2013-007392
Reexamination Control 95/001,578
Patent 6,785,400 B1

example, a pumping device to generate an aerosol spray plume, an illumination device to illuminate the spray plume along at least one geometric plane that intersects the spray plume, and an imaging device that acquires data representative of an interaction between the illumination and the spray plume. Abstract.

Claim 3, which is illustrative of the appealed subject matter, reads as follows:

> 3. An apparatus for producing image data representative of at least one sequential set of images of a spray plume, each of the images being representative of a density characteristic of the spray plume (1) along a geometric plane that intersects the spray plume, and (ii) at a predetermined instant in time comprising:
> an illuminator for providing an illumination of the spray plume along at least one geometric plane that intersects the spray plume; and,
> an imaging device for generating the image data representative of an interaction between the illumination and the spray plume along the at least one geometric plane.

PO App. Br., Claims App'x.

## PRIOR ART REJECTIONS

The prior art references, relied upon by Appellant in the proposed rejections that have not been adopted, are:

| Dodge et al. | 2,779,233 | Jan. 29, 1957 |
| Dietrich | 3,275,744 | Sept. 27, 1966 |
| Aleshin et al. | 5,396,333 | Mar. 7, 1995 |
| Gomez | 6,049,382 | Apr. 11, 2000 |

3

Appeal 2013-007392
Reexamination Control 95/001,578
Patent 6,785,400 B1

S. Miszuk et al., "Video Characterization of Flume Patterns of Inhalation Aerosols," Journal of Pharmaceutical Sciences, Vol. 69, No.6, 7l3-717 (June 1980) (hereinafter "Miszuk").

Rama Deljouravesh, "An Optical Patternator for Quantitative and On-Line Spray Diagnostics," Thesis Submitted to the Department of Mechanical Engineering, Queen's University, Kingston, Ontario, Canada (October 1997) (hereinafter "Deljouravesh").

M. Dolovich, "Measurement of Particle Size Characteristics of Metered Dose Inhaler (MDI) Aerosols," Journal of Aerosol Medicine, Vol. 4, No. 3, 251-263 (1991) (hereinafter "Dolovich").

Gary S Settles, "A Flow Visualisation Study of Airless Spray Painting," published in the Proceedings of the ILASS-Americas '97, May 18-21, 1997, Ottawa, Canada (hereinafter "Settles").

Younggy Shin, "Visualization of Liquid Fuel Behavior in a Spark Ignition Engine during Starting and Warm-up", published in the KSME International Journal, Vol. 11, No.5, pp. 582-593, 1997 (hereinafter "Shin").

Patent Owner also relies on the Declaration of Dino Farina, dated August 29,2011 (PO Resp. Br., Evid. App'x., Ex. A) (hereinafter "Farina Decl.").

4

**AD 064**

Appeal 2013-007392
Reexamination Control 95/001,578
Patent 6,785,400 B1

## ISSUES

1.    Did the Examiner err in construing "an illuminator for illuminating the spray plume along at least one geometric plane"?

2.    Did the Examiner err in finding that the cited prior art discloses an illuminator for providing an illumination of the spray plume along at least one geometric plane that intersects the spray plume as recited in claim 3?

3. Did the Examiner err in finding dependent claims 4-15 anticipated or obvious in view of the cited prior art?

## DISCUSSION

### Findings of Fact

The record supports the following findings of fact (FF) by at least a preponderance of the evidence. *In re Caveney*, 761 F.2d 671, 674 (Fed. Cir. 1985) (explaining the general evidentiary standard for proceedings before the Office).

### The '400 Patent

FF1.  The '400 Patent generally relates to a system for characterizing aerosol spray patterns. Spec. 1:26-28. The system illuminates an aerosol spray plume and utilizes optical-techniques to characterize the associated spray pattern. *Id.* at 1:28-30; Abstract.

FF2.  The Specification notes that characterization of the spray's geometry is the best indicator of overall performance of most inhaler-based drug delivery device (hereinafter "DDD"). Important characteristics include the spray's divergence angle (plume geometry), the spray's cross-sectional

5

**AD 065**

Appeal 2013-007392
Reexamination Control 95/001,578
Patent 6,785,400 B1

ellipticity, uniformity and particle/droplet distribution (spray pattern), and
the time evolution of the developing spray.  Spec. 1:45-54; *see also* Spec.
1:61-65 (explaining that during quality assurance and stability testing, plume
geometry and spray pattern measurements are key characteristics to be
reviewed).

FF3.  Fig 1, depicted below, is a schematic showing an embodiment
of the spray data acquisition system.



FIG. 1

**Fig. 1 of the '400 Patent Depicting a Spray Data Acquisition System
Including a Pumping Device, Illumination Device, and Imaging Device**

FF4.  The Specification describes that a pumping device generates an
aerosol spray plume and an illuminator illuminates the spray plume along at
least one geometric plane that intersects the spray plume.  Spec. 2:41-67.
An imaging device or transducer then acquires data representative of the
interaction between the illumination and the spray plume along the at least
one geometric plane.  *Id.*  The image sampling rate of the imaging device or
system may be, for example, approximately 500 images per second.
Spec. 3:33-35.

FF5.  Further, according to the Specification, the system "is capable of
capturing information representative of the time evolution of an aerosol

6

**AD 066**

Appeal 2013-007392
Reexamination Control 95/001,578
Patent 6,785,400 B1

spray for substantially complete geometrical (divergence angle and plume

geometry) and pattern (cross-section uniformity and ellipticity) imaging."

Spec. 4:8:12.

FF6.  In the disclosed embodiment, the position of the illumination

device is rotated depending on whether the system is performing spray

pattern tests or spray geometry tests.  For spray pattern tests, the illumination

device illuminates a thin sheet along a transverse axial cross section of the

spray, as shown in Fig. 2 below.  Spec. 6:26-30.



FIG. 2

**Fig. 2 of the '400 Patent Depicting the Illumination Device
Projecting a Thin Sheet of Light along the Spray Axis**

For spray geometry tests, as shown in Fig. 3, the illumination device

illuminates a plane of particles parallel to the flow direction along the

centerline of the spray or spray axis SA.  Spec. 6:52-56.

FF7.  The illumination device may "simultaneously or sequentially

illuminate the spray with thin, fan-shaped beams of light along the spray axis

SA and traverse to the spray axis SA."  Spec. 4:39-42.

7

Appeal 2013-007392
Reexamination Control 95/001,578
Patent 6,785,400 B1

FF8. The Specification further describes

Preferably, the illumination device is a continuous-wave illuminant…such as a laser sheet generator. Furthermore, the light from the illumination device 26 is capable of being shaped into a thin sheet for accurate illumination of the particles for both the spray pattern and 50 divergence angle measurements. Preferably, the illumination device is capable of producing approximately 4W of illumination power and directly projecting a very thin sheet of light at a wavelength of 810 nm with a fan angle of 45° though other fan angles can be used depending on the 55 situation. Spec. 5:44-56.

FF9. The Magnum 4000 laser sheet generator, which directly projects a very thin sheet of light, is an example of a preferred illumination device. Spec. 5:57-61.

FF10. The Specification further discloses that the system includes a spray pump actuator that is capable of controlling the pumping force and duration of the aerosol spray plume produced by the pumping device. Spec. 2:58-61; *see also* Spec. 4:55-58.

*Miszuk*

FF11. Miszuk discloses a technique to characterize the intermittent flume patterns associated with the short bursts of metered-dose aerosols. Miszuk, Abstract. Particularly, two orthogonal video images are utilized to describe the complex shape and direction of the flume pattern. *Id.*

FF12. In Miszuk, the aerosol droplets are illuminated by a high intensity light source. Miszuk, p. 714 and Figs. 3 and 4. The scattered light from the flume droplets are then delivered to the viewing lens of a video camera. Miszuk, p. 714. As shown in Figs. 5-7, the entire spray plume is illuminated by the light source.

8

**AD 068**

Appeal 2013-007392
Reexamination Control 95/001,578
Patent 6,785,400 B1

FF13. Miszuk explains that because the flume pattern is three dimensional, a single two dimensional image cannot completely characterize the flume pattern. Miszuk, p. 713-714. Instead, according to Miszuk, two simultaneous orthogonal video images are needed to completely describe the complex shape and direction of the flume pattern. Miszuk, p. 714.

FF14. For the optimum contrast in these orthogonal views, Miszuk suggests using two flexible fiber optic bundles to ensure uniformity of the scattered light in both views. *Id.*

*Dolovich*

FF15. Dolovich generally relates to measuring the particle size characteristics of metered dose inhaler (hereinafter "MDI") aerosols to predict the deposition efficiency and behavior in the lung. Dolovich, §§Abstract and Introduction.

FF16. Dolovich identifies different particle sizing techniques, such as techniques employing aerodynamic principles or light scattering methods. Dolovich p. 252 (Particle Sizing Techniques); *see also* Dolovich, Table 2.

FF. 17. Dolovich describes an optical sizing diffraction system where "a laser beam intersects a portion of the aerosol spray." Dolovich, p. 257 (Optical Sizing Methods). In particular, the system "characterizes a slice of the MDI aerosol spray." Dolovich, p. 256 (Optical Sizing Methods).

FF18. A laser, as opposed to white light, is used for better resolution and increased accuracy. Dolovich, p. 256 (Optical Sizing Methods).

FF19. Dolovich additionally discloses photomultipliers that detect light as the particulars travel through the laser beam to capture data used to

9

**AD 069**

Appeal 2013-007392
Reexamination Control 95/001,578
Patent 6,785,400 B1

analyze the change in particular size at fixed points along the horizontal axis of the aerosol flume.  Dolovich p. 258 (2nd and 3rd paragraphs).

*Gomez*

FF16.  Gomez generally is directed to an apparatus and procedure for characterizing spray plumes by generating a collimated laser beam that is passed through a measurement plane of the spray.  Gomez, Abstract.  In particular, the collimated laser beam is directed through the axis of a Cartesian measurement system (x0,y0), which is the measurement plane, and propagates along the x-axis.  Spec. 3:28-41.

FF16.  Scattering collection means collects the scattered spray material and another collection means obtains the attenuation of the laser beam passing through the measurement plane.  Gomez, Abstract and 2:48-65.  Both collection means are coupled to photodetectors and signal processing units able to generate electrical signals proportional to the received light intensities.  Gomez, Abstract.

*Dietrich*

FF17.  Generally, Dietrich discloses a spray analysis apparatus.  As shown in the Figure, a stroboscopic light source 12 is placed adjacent to the spray.  When energized, the stroboscopic light source will brightly illuminate a portion of the spray.  Dietrich, Figure and 2:24-30.

FF18.  In Dietrich, the light source may be any conventional type that upon triggering will produce short-duration light flashes of great intensity.  Dietrich 2:24-30.

10

**AD 070**

Appeal 2013-007392
Reexamination Control 95/001,578
Patent 6,785,400 B1

FF19.  Dietrich also describes a camera with a conventional scanning system.  Dietrich, 2:33-34.

*Dodge*

FF20.  Dodge, like Dietrich, is directed to photographic analysis of sprays.  Dodge, Abstract.  As shown in Figs. 1 and 3, a photo light is placed adjacent to the spray, on the opposite side of the spray from the camera. With this arrangement, the drops of the spray appear in silhouette on pictures made by the camera.  Dodge, Figs. 1 and 3 and 2:38-47.

FF21.  The light passes through a diffusing cell before illuminating the spray and arriving at the camera.  Dodge 2:50-53.  The intensity of the light may also be modified by the introduction of a suitable neutral light filter.  Dodge 2:56-60.

FF22.  Dodge further teaches that the optical axis of the camera may be directed to make any desired angle with the axis of the spray.   Dodge 2:62-64.

*Aleshin*

FF23.  Aleshin generally relates to a device for observation and analysis of a cross-sectional portion of a stream of material.  Aleshin, Abstract.  The device includes a laser light source to generate a laser beam and focusing lens to convert the beam into a plane of light.  *Id.*

FF24.  More specifically, as shown below in Fig. 1, a diode laser light source generates a beam of light and a line generator means converts the beam of light into a line of light along a plane.  This plane of light is

11

Appeal 2013-007392
Reexamination Control 95/001,578
Patent 6,785,400 B1

projected through a powder stream to illuminate a selected cross-section for observation and analysis. Aleshin, 3:7-22.



FIG. 1

**Fig. 1 of Aleshin Depicting the Observation and Analysis Device**

FF25. According to Aleshin, a laser light source is preferred because it is less divergent therefore produces a more refined line or plane of light. Aleshin further notes though that any light source that adequately illuminates the selected cross section of the powder stream and highlights the interior portion may be used. Aleshin 3:31-36.


*Shin*

FF26. Shin describes an apparatus and test methods for visualizing liquid fuel behavior. Shin, Abstract.

12

**AD 072**

Appeal 2013-007392
Reexamination Control 95/001,578
Patent 6,785,400 B1

FF 27. The fuel is illuminated by a collimated candescent light and a CCD camera records a set of images of the liquid fuel during start-up. Shin p. 583-584.

FF28. Shin additionally discloses using a high speed CCD camera with a recording rate of 500 frames/sec. *Id.*

*Settles*

FF26. Settles is directed to a flow visualization study of airless spray painting. In one described analysis method, an argon-ion laser beam is spread into a sheet by a simple glass rod to illuminate a plane of light. Settles, p. 146 (Experimental Methods). The plane of light is applied to three perpendicular planes as shown in Fig. 2 below.



**Fig. 2 of Settles Depicting Three Planes of Light**

FF27. Settles also identifies that "[t]his Planar Laser Scattering (PLS) technique is well-suited to examine complex particle-laden flows." Id.

FF28. An S-VHS videotape using a 1/250 sec shutter speed is used to record the results.

13

Appeal 2013-007392
Reexamination Control 95/001,578
Patent 6,785,400 B1

*Deljouravesh*

FF28.  Deljouravesh describes an optical patternator for quantitative and on-line spray diagnostics.  Deljouravesh, Title and Abstract.

FF29.  According to Deljouravesh, laser light sheet imaging has been used in a wide variety of flow visualization application to obtain qualitative information regarding the overall structure of the flows considered.  This method uses cylindrical optics to produce a planar region of illumination from a laser beam.  Deljouravesh § 2.2.4, Laser light sheet imaging.

FF30.  In Deljouravesh, a laser beam is converted into a plane of light by a cylindrical lens.  The plane of light is then projected to illuminate a cross section of the spray, as depicted in Fig. 3.2.  Deljouravesh, Fig. 3.2; *see also* Deljouravesh, Chapter 2.2.



Figure 3.2 Schematic of Cartesian geometry optical patternator by Wang *et al.* [17]

**Fig. 3.2 of Deljouravesh Depicting a Cylindrical Lens
Converting a Laser Beam into a Plane of Light**

FF30.  As shown in Fig. 4.2, the cylindrical lens is adjacent to the top of the laser.  Deljouravesh, Fig. 4.2.

14

**AD 074**

Appeal 2013-007392
Reexamination Control 95/001,578
Patent 6,785,400 B1

FF31. Deljouravesh describes that "the optical patternator consists of two sub-systems, one for the acquisition and recording of the forward light power and one for the capture and digitization of video images through a CCD camera." Deljouravesh, Chapter 4.1.

FF32. Deljouravesh additionally contemplates analyzing metered dosage inhalers. "The importance of particle size measurement (offered by some optical methods) in two phase-flows can not [sic] be overstressed. In some medical applications sprays are used for drug delivery via the patient's respiratory tract through the use of metered dosage inhalers." Deljouravesh, Chapter 2.2.

CLAIM CONSTRUCTION

An Illuminator for Providing an Illumination of the Spray Plume
<u>along at Least One Geometric Plane that Intersects the Spray Plume</u>

Patent Owner argues that "an illuminator for providing an illumination of the spray plume along at least one geometric plane that intersects the spray plume" should be construed as "a light source that projects a thin sheet of light that intersects the spray plume along a geometric plane." PO App. Br. 13. Additionally, according to the Patent Owner, "along at least one geometric plane" means along one geometric plane at a time. *Id.* We disagree.

The Patent Owner first relies on the "context of the claim" to construe "at least one" as one at a time. PO App. Br. 12-14. The only "context" identified though is the later recited singular form of "an interaction." *Id.* In particular, the Patent Owners asserts "[u]se of the singular (i.e., 'an interaction') defines the limitation to the specific interaction along the one

15

**AD 075**

Appeal 2013-007392
Reexamination Control 95/001,578
Patent 6,785,400 B1

geometric plane selected for the particular test the user wishes to perform." *Id.* at 13. This is not persuasive.

It is well established that "a" (or "an") in a comprising claim means one *or more. See Baldwin. Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1342 (Fed. Cir. 2008). Merely reciting a single interaction here does not preclude the claim from also covering additional interactions. Moreover, the singular form of "an interaction" is consistent with the express language of the claim – at least one, i.e. one *or* more than one. In other words, claim 3 covers illuminating along one geometric plane (resulting in one interaction) as well as illuminating along multiple geometric planes (resulting in multiple interactions).

The Patent Owner's reliance on claim 5 is likewise unavailing. Claim 5 recites:

> 5. An apparatus according to claim 3, wherein a first time-sequential set of images corresponds to an axial cross-sectional density characteristic along a first geometric plane substantially normal to a flow direction centerline, and a second time-sequential set of images corresponds to a longitudinal density characteristic along a second geometric plane substantially parallel to and intersecting the flow direction centerline.

The Patent Owner maintains that because the Specification, in one embodiment, describes that illumination of these first and second geometric planes are achieved through rotation of the illuminator, claim 3 must be limited to projecting light along only one geometric plane at a time. PO App. Br. 14-17. Specifically, the Patent Owner asserts that "the apparatus provides a user with the ability to generate only one time-sequential set of images at a time using an illuminator that projects one thin sheet of light at a

Appeal 2013-007392
Reexamination Control 95/001,578
Patent 6,785,400 B1

time, and provides at least two options for the type of image data generated
by virtue of the position in which the illuminator and imaging device are
placed...." PO App. Br. 15-16.

　　While the Patent Owner correctly points out that the Specification
only depicts illuminating along one plane at a time, the Specification also
expressly identifies that at least two geometric planes may be illuminated
simultaneously. *See* FF 7; *see also* Oral Hearing Transcript at 7-8.
According to the Specification then, the illumination of one or more
geometric planes that interact with the spray plume may occur one at a time
or may occur simultaneously.

　　Moreover, claim 5 is not inconsistent with the Examiner's
interpretation of claim 3. Patent Owner here essentially argues that because
claim 5 requires a first and second time-sequential set of images, the sets of
images must be taken at separate times. Even if claim 5 arguably requires
two sequential sets of images to be taken one at a time, it still falls within the
scope of claim 3. Claim 3 requires at least one, i.e. one or more, sequential
set of images or a spray plume where the illumination was along at least one,
i.e. one or more, geometric plane. This language expressly permits the claim
to include more than one sequential set of images where illumination is
along more than one geometric plane, regardless of timing. Therefore, we
are not persuaded that "along at least one geometric plane" means one
geometric plane at a time.

　　Next, the Patent Owner contends that the claimed illumination should
be limited to a thin sheet. PO App. Br. 18-20. The Patent Owner here
points to the Farina Declaration, which provides that a skilled artisan would

17

**AD 077**

Appeal 2013-007392
Reexamination Control 95/001,578
Patent 6,785,400 B1

understand the claimed illumination to be a thin sheet of light. *Id.* at 20
(citing ¶¶30-35). The Farina Declaration relies on various passages of the
Specification, provided definitions, and knowledge of a person of ordinary
skill in the art for this conclusion. *See* Farina Decl. ¶35. We, however, are
not persuaded that the claimed invention is so limited.

The express language of claim 3 merely recites an illumination, not a
"thin sheet of light." Neither is the plain and ordinary meaning of
illumination, as Dr. Farina acknowledges, limited to a thin sheet of light.
*See* Farina Decl. ¶31. While the sole described embodiment projects thin
sheets of light, the Specification elsewhere recites language consistent with
the claim. FF4. Claims generally are not limited to any particular
embodiment disclosed in the specification, even where only a single
embodiment is disclosed. *Innova/Pure Water, Inc. v. Safari Water Filtration
Sys.*, Inc., 381 F.3d 1111, 1117 (Fed.Cir.2004). The Summary of the
Invention also discloses providing an illumination of the spray plume along
at least one geometric plane that intersects the spray plume, without limiting
the illumination to a thin sheet of light. FF4; *see also* Spec. 3:6-9.

Moreover, the Specification describes that the illumination device is
preferably a laser sheet generator and that light from the illumination device
is capable of being shaped into a thin sheet for accurate illumination. FF8.
While it may be preferable to use a thin sheet of light for better accuracy, the
discussion at least implies that other forms of illumination, such as
illuminating along multiple geometric planes at one time, are contemplated
and could be employed. *See also* FF25 (identifying that prior art Aleshin
explains that a laser light source is preferred but any light source that

18

**AD 078**

Appeal 2013-007392
Reexamination Control 95/001,578
Patent 6,785,400 B1

illuminates the selected cross section of the stream and highlights the interior portion may be used).

The Patent Owner, at the oral hearing, stated that the cited goals of the patent, such as obtaining plume geometry and spray pattern measurements, could not be achieved without illuminating along a thin sheet of light. In other words, illuminating along multiple geometric planes (as done by some of the prior art) could not achieve the stated goals of the patent. The Patent Owner expressly refers to the Farina declaration. *See* Tr. 24-25 (citing in particular ¶32). The Farina Declaration, however, merely indicates that the Specification describes use of a thin sheet and that unstructured light sources cannot project a thin sheet of light. The stated goals of the patent, and whether a thin sheet of light is required to achieve them, are not persuasively addressed.

Finally, the Patent Owner argues that the illumination device must be a structured light source because only a structured light source can project a thin sheet of light. This argument, however, lacks merit. As discussed above, we are not persuaded that the claimed illumination must directly project a thin sheet and, therefore, we also agree with the Examiner that the claimed invention is not limited to a structured light source. We further note that the '400 Patent fails to discuss (or even mention) structured or unstructured light or any distinction between them.

Based on the record before us, we disagree with the Patent Owner that "an illuminator for providing an illumination of the spray plume along at least one geometric plane that intersects the spray plume" should be construed as "a light source that projects a thin sheet of light that intersects

**AD 079**

Appeal 2013-007392
Reexamination Control 95/001,578
Patent 6,785,400 B1

the spray plume along a geometric plane." And further disagree that "at least one" means "one at a time."

Spray Plume

The Patent Owner additionally argues that a spray plume should be limited to "a spray of limited duration. PO App. Br. (citing Farina Decl. ¶¶40-42). We disagree.

The Farina Declaration, relying on two passages of the Specification, states that a skilled artisan would "understand the term 'spay plume' in the context of the '400 patent to describe extremely transient, short-cycle spray plume where the spray plume duration is only approximately one second – i.e. of limited duration." Farina Decl. ¶41. But this interpretation is at odds with other teachings of the Specification. For example, the Specification discloses that the invention may include a spray pump actuator that is capable of controlling the *duration* of the aerosol spray plume. *See* Spec. 2:58-61 and 4:55-58. Thus, the Specification supports varying spray plume duration, and should not be limited only to an extremely transient, short-cycle spray.

Therefore, we disagree with the Patent Owner's proposed construction of a spray plume.

ANALYSIS

THE ANTICIPATION REJECTIONS OF CLAIMS 3-8 AND 13
BASED ON GOMEZ, MISZUK, DIETRICH, DODGE, DOLOVICH, AND SHIN

**AD 080**

Appeal 2013-007392
Reexamination Control 95/001,578
Patent 6,785,400 B1

*Claim 3*

Based on the record before us, we find that the Examiner did not err in rejecting claim 3 as anticipated by each of Gomez, Miszuk, Dietrich, Dodge, Dolovich, and Shin. *See* RAN 12.

Each of the cited prior art rejections disclose an illuminator for providing an illumination of the spray plume along one geometric plane or along multiple geometric planes. *See e.g.,* FF12, FF17, FF21, FF24, FF26, and FF30. For example, Miszuk teaches using a high intensity light source to illuminate a spray plume. The high intensity light source provides this illumination of the entire spray plume, thus providing illumination along numerous geometric planes that intersect the spray plume. FF12. Similarly, Dodge, Shin, and Dietrich all disclose illuminating the entire spray plume with light sources, such as a photo light (Dodge), stroboscopic illuminator, (Dietrich), and collimated 650W candescent light source (Shin). *See* FF17, FF21, and FF27. Because we are not persuaded that the claimed illumination must be limited to a thin sheet of light or illuminating only one geometric plane at a time, we agree with the Examiner that each cited prior art reference teaches the claimed illuminator limitation.

We likewise agree with the Examiner that Gomez and Dolovich disclose an illuminator for illuminating along one geometric plane. Specifically, Gomez discloses using a laser generating means to project a laser beam through a measurement plane that then propagates along an axis. FF16. Gomez thus teaches illuminating along at least one geometric plane, i.e. the plane the laser travels along that intersects the spray plume. FF16. Dolovich similarly teaches using a laser to illuminate a spray plume to

Appeal 2013-007392
Reexamination Control 95/001,578
Patent 6,785,400 B1

analyze a *slice* of the spray plume. FF17. We thus agree with the Examiner that these prior art references then teach an illuminator for providing an illumination of a spray plume along at least one geometric plane that intersects a spray plume.

Therefore, we disagree with the Patent Owner that the Examiner erred in rejecting claim 3 as anticipated by under 35 U.S.C. §102 by the cited prior art and accordingly affirm the rejections of claim 3.

*Claims 4, 6-8 and 13*

We likewise agree with the Examiner regarding the rejections of dependent claims 4-8 and 13 based on the cited prior art. The Patent Owner here relies on the arguments presented for claim 3. *See* PO App. Br. 21-27. As discussed above, those arguments are unavailing. Therefore, we are also not persuaded that the Examiner erred in rejecting dependent claims 4, 6-8 and 13 as anticipated by the cited prior art. Accordingly, we affirm the rejections as to these claims.

*Claim 5*

Based on the record before us, we agree with the Patent Owner that the Examiner erred in rejecting claim 5 as anticipated by Miszuk.

The Examiner relies on Miszuk's teaching of the need for "two simultaneous orthogonal views… to describe the character and direction of the flume pattern adequately." RAN 16. Claim 5 though expressly recites obtaining a first and second set of sequential images along the geometric planes substantially normal and parallel to the flow direction centerline.

22

Appeal 2013-007392
Reexamination Control 95/001,578
Patent 6,785,400 B1

Merely disclosing the importance of obtaining simultaneous orthogonal views falls short of disclosing the claimed limitations.

Therefore, we disagree that Miszuk anticipates claim 5 and reverse this rejection with respect to claim 5.

## THE OBVIOUSNESS REJECTION OF CLAIMS 5 AND 13

Based on the record before us, we disagree with the Patent Owner that the Examiner erred in rejecting claims 5 and 13 based on the cited combination of Deljouravesh and Dodge.

First, Patent Owner relies on its proposed constructions for the claimed illuminator limitation and spray plume. PO App. Br. 29. As discussed above, we disagree with these constructions and therefore are not persuaded that Deljouravesh and Dodge combined fail to teach the claimed limitations.

Further, the Patent Owner argues that a skilled artisan would not combine Deljouravesh with Dodge because Dodge teaches away from the combination. *Id.* According to the Patent Owner, Dodge teaches away from using planar light because it discloses using diffuse light. *Id.* The Examiner, however, merely relies on Dodge's teaching of taking images at varying angles to satisfy the limitation obtaining a first and second set of sequential images along the spray axis and perpendicular to the spray axis. RAN 25-27.

A reference teaches away from a combination when a person of ordinary skill, upon reading the reference, would be discouraged from the combination. *In re Mouttet*, 686 F.3d 1322, 1333-1334 (Fed. Cir.

**AD 083**

Appeal 2013-007392
Reexamination Control 95/001,578
Patent 6,785,400 B1

2012)(citations omitted). The mere disclosure of an alternative design, such as Dodge's use of diffuse light compared to Deljouravesh's planar light, is insufficient to teach away. *See Id.* The Patent Owner reliance solely on Dodge's use of diffuse light without any disclosure of Dodge that disparages use of planar light is not persuasive. Therefore, we disagree with the Patent Owner that Dodge teaches away from the cited combination.

The Patent Owner additionally makes blanket assertions that the resulting images of the cited combination of Deljouravesh and Dodge would not be visible. PO App. Br. 30. These blanket assertions though, without supporting argument or evidence, are unavailing. The Patent Owner refers to the Farina Declaration, but the cited portions present no persuasive additional points. *See* Farina Decl. ¶¶100-102 and 124-126 (mimicking the Patent Owner's arguments in the Patent Owner's appeal brief).

Therefore, based at least on the reasons identified by the Examiner, we agree that the cited combination of Deljouravesh and Dodge renders claims 5 and 13 obvious. Accordingly, we affirm the obviousness rejection.

## THE OBVIOUSNESS REJECTIONS OF CLAIMS 9

Based on the record before us, we disagree with the Patent Owner that the Examiner erred in rejecting claim 9 based on the cited combinations of Deljouravesh and Shin, Dodge and Shin, and Aleshin and Shin.

In response to each obviousness rejection of claim 9, the Patent Owner, relying on its proposed claim constructions, asserts that none of the cited art teaches the clamed illuminator. *See* PO App. Br. 30-33. Namely, the Patent Owner argues that none of the cited references alone or in

Appeal 2013-007392
Reexamination Control 95/001,578
Patent 6,785,400 B1

combination can project a thin sheet of light that intersects the spray plume

along at least one geometric plane. *Id.* As discussed above, we disagree

with the Patent Owner's proposed construction limiting the illumination to a

thin sheet and therefore find these arguments unpersuasive.

Additionally, with respect to the rejection based on Aleshin and Shin,

the Patent Owner contends that "POSITA would not combine references

disclosing and teaching characterization of a steady flow stream of material -

- such as is disclosed and taught by the '333 patent." PO App. Br. 33.

Notably absent though is any persuasive support as to why a skilled artisan

would not combine the references.

Instead, the Patent Owner distinguishes the steady flow stream of the

cited art from the "'spray plume' with a duration of one second." *See Id.* As

discussed above, we disagree with the Patent Owner's narrow interpretation

of the claimed spray plume. Moreover, we are not persuaded that a skilled

artisan would not combine the cited art because of the mere use of a steady

flow stream.

Therefore, we affirm the rejections of claim 9 as obvious in view of

Deljouravesh and Shin, Dodge and Shin, and Aleshin and Shin.


THE OBVIOUSNESS REJECTIONS OF CLAIMS 10, 11 AND 12

The Patent Owner, here, again relying on its proposed claim

constructions, asserts that Dolovich and Settles fail to disclose the

illuminator of claim 3 and therefore also cannot teach the limitations of

claims 10-12. *See* PO App. Br. 33-35. Namely, the Patent Owner argues

that neither Dolovich nor Settles project a thin sheet of light that intersects

Appeal 2013-007392
Reexamination Control 95/001,578
Patent 6,785,400 B1

the spray plume along at least one geometric plane. *Id.* As discussed above, we disagree with the Patent Owner's proposed construction limiting the illumination to a thin sheet and likewise find the Patent Owner's arguments here unavailing.

Accordingly, we affirm the obviousness rejection of claims 10 and 11 based on Dolovich and the obviousness rejections of claim 12 based on the combination of Settles and Dolovich.

THE INDEFINITENESS REJECTION OF CLAIMS 14 AND 15

With respect to claim 14, the Examiner fails to explain why it is rejected as indefinite. *See* RAN 33-34. As the Patent Owner explains, the Specification describes the limitations of claim 14 and we agree that claim 14 is not indefinite. *See* PO App. Br. 35-36.

The Examiner rejected claim 15 under 35 U.S.C. §112, second paragraph as indefinite for failing to particularly point out and distinctly claim the subject matter which applicant regards as the invention. More specifically, the Examiner explains that projecting a thin sheet of light is indefinite "because it can be construed to mean either (i) the illuminator delivers (i.e., projects) only one sheet of light at the spray plume or (ii) is simply capable of delivering a thin sheet of light (e.g., a light bulb projects a multitude of thin sheets of light)." RAN 34. We disagree.

As the Patent Owner points out, the Specification expressly describes and depicts a laser projecting only one thin sheet of light at the spray plume. PO App. Br. 36-37. We agree with the Patent Owner then that the Specification clearly defines the limitations and claim 15 is definite.

26

**AD 086**

Appeal 2013-007392
Reexamination Control 95/001,578
Patent 6,785,400 B1

Accordingly, we reverse the rejection of claims 14 and 15 under 35 U.S.C. § 112.

THE ANTICIPATION/OBVIOUSNESS REJECTIONS OF CLAIMS 14 AND 15 BASED ON DELJOURAVESH, ALESHIN, AND SETTLES[3]

With respect to claim 14, the Patent Owner here presents the same arguments as those presented for claim 3. Namely, the Patent Owner relies on its proposed construction to distinguish the cited prior art. As discussed above, we disagree with the Patent Owner's proposed construction and therefore also disagree with the dependent distinctions over the cited prior art here.

With respect to claim 15, the Patent Owner distinguishes Deljouravesh, Aleshin, and Settles because the light sources, i.e. lasers, do not alone directly project the thin sheet of light but instead rely on adjacent lenses to convert the laser beam into a thin sheet of light. PO App. Br. 40-42 and 46-47; *see also* Farina Decl. ¶39. This argument, however, is misplaced. Each prior art laser source with its accompanying lens, together, satisfies the claimed laser limitation. Claim 15 does not recite a laser sheet generator. As can be seen, for example, in Fig. 4.2 of Deljouravesh, these lenses or optical devices are merely placed at the tip of the laser. FF30. Therefore, we agree with the Examiner that a skilled artisan would understand that a laser and accompanying lens of the cited prior art that project a thin sheet of light would satisfy the claimed limitation.

---

[3] Because we affirm the rejections of claims 14 and 15 as anticipated/obvious by each of Deljouravesh, Aleshin, and Settles, we do not address the additional rejections of claims 14 and 15.

AD 087

Appeal 2013-007392
Reexamination Control 95/001,578
Patent 6,785,400 B1

Accordingly, we affirm the anticipation/obviousness rejections of claims 14 and 15.

## DECISION

The Examiner's decision to reject claims 14 and 15 under 35 U.S.C. §112, second paragraph as indefinite is reversed. Likewise, the Examiner's decision to reject claim 5 as anticipated in view of Miszuk is reversed.

The Examiner's remaining decisions to reject claims 3-7 and 9-15 as anticipated and/or obvious are affirmed.

Requests for extensions of time in this *inter partes* reexamination proceeding are governed by 37 C.F.R. § 1.956. *See* 37 C.F.R. § 41.79.

## AFFIRMED

ak

PATENT OWNER:
Greenberg Traurig
Met Life Building
200 Park Avenue
New York, NY 10166

THIRD-PARTY REQUESTER:

Kenealy Vaidya, LLP
515 East Braddock Road
Suite B
Alexandria, VA 22314

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE PATENT TRIAL AND APPEAL BOARD
_____

INNOVASYSTEMS, INC.
Third Party Requester and Respondent

v.

PROVERIS SCIENTIFIC CORPORATION
Patent Owner and Appellant
_____

Appeal 2013-007392
Reexamination Control 95/001,578
Patent 6,785,400 B1
Technology Center 3900
_____

Before KEVIN F. TURNER, STEPHEN C. SIU, and
JENNIFER L. McKEOWN, *Administrative Patent Judges*.

McKEOWN, *Administrative Patent Judge*.


DECISION ON REHEARING

In the Decision on Appeal dated January 31, 2014 ("Decision"), we affirmed rejections of claims 3–15.  Patent Owner requests rehearing of this decision under 37 C.F.R. § 41.79.  Request for Rehearing ("Request") dated February 28, 2014.[1]

_____

[1] Requestor responds to the Request.  *See* Respondent's Response to Request for Rehearing ("TPR Rehear. Resp.") dated March 28, 2014.

Appeal 2013-007392
Reexamination Control 95/001,578
Patent 6,785,400 B1

Patent Owner contends the Board misapprehended or overlooked the preamble of claim 3, particularly in view of the Federal Circuit decision, *Proveris Scientific Corp. v. Innovasystems, Inc.*, 739 F.3d 1367 (Fed. Cir. 2014). As such, Patent Owner requests reconsideration of our construction of the claimed "an illuminator for providing an illumination of the spray plume along at least one geometric plane that intersects the spray plume" in view of the preamble of claim 3. Request 1. Although the Decision did not discuss the preamble expressly, it was considered and we find Patent Owner's arguments unpersuasive as further explained below.

Patent Owner asserts that the failure to consider the preamble of claim 3 resulted in an inconsistent construction for the claimed illuminator. Request 1. Namely, according to Patent Owner, construing that the illumination along *at least one* geometric plane means illumination along one or more geometric plane is inconsistent with the preamble's phrase along *a* geometric plane, i.e. only one geometric plane. *See* Request 5 ("the preamble phrase '*each* of the images being representative of a density characteristic of the spray plume (1) along *a* geometric plane that intersects the spray plume' refers to only one 'geometric plane.'").

We disagree. Patent Owner here essentially presents the already rejected argument that "a" should be construed as only one. *See* Decision 15–16 (rejecting the Patent Owner's argument that the recited *an* interaction is limited to only one interaction); *see also* TPR Rehear. Resp. 5–6. While the Patent Owner additionally notes that "a geometric plane" in the preamble precedes the open-ended, transitional phrase comprising, we are not

Appeal 2013-007392
Reexamination Control 95/001,578
Patent 6,785,400 B1

persuaded, in this instance, that "a geometric plane" should be limited to only one geometric plane.

Namely, we find Patent Owner's reliance on *Norian Corp. v. Stryker Corp.*, 432 F.3d 1356 (2005) is misplaced. *See* Request 5–7. As Requestor points one, the Federal Circuit, in particular considers use of the transitional phrase "consisting of" preceding the use of the article "a". *Norian*, 432 F.3d at 1359; *see also* TPR Rehear. Req. 6. The Federal Circuit also notes that both the Specification and prosecution history support the narrow interpretation. *See e.g.*, *Norian*, 432 F.3d at 1359 ("each of the solutions described in the specification uses only a single solute, and the specification makes no reference to using a mixture of multiple solutes in a single solution" and noting that "Norian amended the critical claim language by replacing the words 'a sodium phosphate solution' with the words 'a solution consisting of water and a sodium phosphate.'"). In contrast here, the Specification supports *simultaneously* illuminating two geometric planes and acquiring image data for those illuminated portions. *See* Decision, FF7; *see also* '400 Patent, col. 4, ll. 39-45.

Patent Owner further attempts to support its contention by emphasizing that there is

> [a]n exception to the general rule that "a" or "an" means more than one only arises where the language of the claims themselves, the specification, or the prosecution history necessitate a departure from the rule ....

Request 5 (quoting and underlining, in part, *Baldwin. Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1342-1343 (Fed. Cir. 2008)). Notably though, Patent Owner fails to persuasively explain how *the specification or*

3

**AD 091**

Appeal 2013-007392
Reexamination Control 95/001,578
Patent 6,785,400 B1

*prosecution history* here warrants application of this exception. *See* Request 5–7.

Patent Owner also appears to urge that the language "each image" supports limiting a geometric plane to only one geometric plane. Request 5. This argument lacks merit. As the Requestor points out, each image refers to each image of the recited at least one sequential set of images. TPR Rehear. Resp. 6–7. Nothing in the claim language precludes that each particular image must be limited to only one geometric plane. Moreover, the body of the claim suggests otherwise. Namely, reciting "at least one geometric plane" expressly suggests illumination, and image data of the interaction, with one *or more* geometric planes.

We find Patent Owner's remaining arguments unavailing. For example, we disagree that the preamble limits claim 3 to a specific embodiment. As discussed in the Decision, the Specification may only depict in the Figures illuminating one geometric plane at a time, but the Specification describes *simultaneously* or sequentially illuminating the spray axis and traverse to the spray axis.[2] This is consistent with the claim language of illuminating at least one, i.e. one or more geometric planes.

Finally, Patent Owner asserts that the following statement is inconsistent and should be reconsidered:

_____

[2] Patent Owner takes issue with the characterization that the Specification identifies simultaneously illuminating "*at least* two geometric planes." *See* Request 4. According to the Patent Owner, the Specification describes, illuminating, at most, two geometric planes. Request 4. We recognize that the Specification describes simultaneously illuminating two geometric planes, but note that nothing in the Specification suggests the simultaneous illumination is limited to only two geometric planes.

4

**AD 092**

Appeal 2013-007392
Reexamination Control 95/001,578
Patent 6,785,400 B1

> Claim 3 requires at least one, i.e. one or more, sequential set of
> images of a spray plume where the illumination was along at
> least one, i.e. one or more, geometric plane. This language
> expressly permits the claim to include more than one sequential
> set of images where illumination is along more than one
> geometric plane, <u>regardless of timing</u>. Therefore, we are not
> persuaded that "along at least one geometric plane" means one
> geometric plane at a time.

Request 8.[3] For the reasons discussed above and in the Decision, we are not persuaded that we erred in rejecting Patent Owner's construction that "along at least one geometric plane" means one geometric plane at a time.

The subject Request has been granted to the extent that the Decision has been reconsidered, but is denied with respect to making any changes therein.

No time period for taking any subsequent action in connection with this appeal may be extended under 37 C.F.R. § 1.136(a)(1)(iv).

Pursuant to 37 C.F.R. § 41.79(d), this decision is final for the purpose of judicial review.  A party seeking judicial review must timely serve notice on the Director of the United States Patent and Trademark Office.  *See* 37 C.F.R. §§ 90.1 and 1.983.

<u>DENIED</u>

---

[3] We note that this statement was in response to Patent Owner's argument that claim 5, which recites a first and second time-sequential set of images corresponding to a first and second geometric plane, respectively, warrants limiting the "at least one geometric plane" recited in claim 3 to illuminating one geometric plane at a time.  Specifically, the Decision was pointing out that claim 3, being broader than claim 5, does not include the first or second time-sequential limitations.

Appeal 2013-007392
Reexamination Control 95/001,578
Patent 6,785,400 B1

PATENT OWNER:

GREENBERG TRAURIG
MET LIFE BUILDING
200 PARK AVENUE
NEW YORK, NY 10166

THIRD-PARTY REQUESTER:

KENEALY VAIDYA LLP
515 EAST BRADDOCK RD.
ALEXANDRIA, VA 22314

## **CERTIFICATE OF SERVICE**

I, Barry J. Schindler, hereby certify that on May 15, 2015, this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and that paper copies will be sent to the parties indicated as non-registered participants. This was originally filed on May 11, 2105.

/s/ Barry J. Schindler
BARRY J. SCHINDLER
LENNIE A. BERSH
200 Park Avenue
Florham Park, NJ 07932
Tel. No.: (973) 360-7900
Fax No.: (973) 295-1251
schindlerb@gtlaw.com

Attorneys for Patent Owner–Appellant
Proveris Scientific Corporation

## **CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS**

1.      This brief complies with the type-volume limitation of Federal Rule of

Appellate Procedure 28.1(e)(2)(B).

The brief contains 13,729 words, excluding the parts of the brief exempted

by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Federal Rule of

Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of

Appellate Procedure 32(a)(6).

The brief has been prepared in a proportionally spaced typeface using

Microsoft Office Word 2003 in 14 Times New Roman.

 /s/ Barry J. Schindler
BARRY J. SCHINDLER
LENNIE A. BERSH
200 Park Avenue
Florham Park, NJ 07932
Tel. No.: (973) 360-7900
Fax No.: (973) 295-1251
schindlerb@gtlaw.com

Attorneys for Patent Owner–Appellant
Dated:  May 11, 2015          Proveris Scientific Corporation